**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee for the Benefit of the Certificateholders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2019-MFP, Commercial Mortgage Pass-Through Certificates, Series 2019-MFP, by and through Situs Holdings, LLC, as Special Servicer under the Trust and Servicing Agreement, dated as of July 18, 2019,<br><br>*Plaintiff,*<br><br>v.<br><br>JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, MEYER CHETRIT, SHADOW CREEK OWNER, LLC, and 3100 DANIEL MCCALL DRIVE, LLC,<br><br>*Defendants.* | Case No. _____<br><br>**COMPLAINT** |

Plaintiff Wells Fargo Bank, National Association (the "<u>Trustee</u>" or "<u>Wells Fargo</u>"), as trustee for the benefit of the certificateholders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2019-MFP, Commercial Mortgage Pass-Through Certificates, Series 2019-MFP (the "<u>Trust</u>"), acting by and through Situs Holdings, LLC (the "<u>Special Servicer</u>"), as special servicer under the Trust and Servicing Agreement, dated as of July 18, 2019 (the "<u>TSA</u>"), hereby files this action for breach of contract against JPMorgan Chase Bank, National Association ("<u>JPM</u>"), Meyer Chetrit, and Shadow Creek Owner, LLC ("<u>Shadow Creek Owner</u>"), for reformation against Shadow Creek Owner, and for fraudulent transfer against 3100 Daniel McCall Drive, LLC ("<u>3100 Daniel McCall Drive</u>"), and in support alleges:

**Introduction**[1]

1.    This case arises from JPM's decision to originate a $481 million Mortgage Loan to the Chetrit Group in June 2019 based on financial information that both JPM and the Chetrits knew to be false and dramatically inflated.  JPM immediately offloaded any risk it had on the Mortgage Loan to the Trust, taking home millions of dollars of fees in the process.  The value of the Properties backing the Mortgage Loan then collapsed—leaving the Trust with tens of millions of dollars in losses.  This lawsuit invokes the Trustee's contractual and equitable remedies to hold JPM and the Chetrits accountable for their misconduct and to recover the Trust's losses.

2.    In early 2019, the Chetrit Group approached JPM seeking financing for its acquisition of a portfolio of 43 multifamily properties from upstart real-estate investor ROCO Real Estate, LLC.  During their due diligence on the Properties, the Chetrit Group and JPM discovered that the trailing-twelve-month financial statements (or T12s) that ROCO provided to the Chetrits (and that the Chetrits, in turn, provided to JPM) were fraudulent.  In total, the T12s massively overstated the Properties' historical net operating income (or NOI) by approximately 25%.  NOI is a key metric used by commercial real-estate lenders and investors both to assess the value of the property backing a loan and to determine whether the borrower will be able to afford its monthly debt-service payments.

3.    Rather than demand corrected T12s that accurately stated the NOI of the Properties, JPM proceeded with the Mortgage Loan as if the financial data it was provided were accurate.  JPM continued to use the dramatically overstated NOI from the false T12s to market the Mortgage Loan to Trust investors and provided the same dramatically overstated NOI to the appraisal firm

---

[1]    Capitalized terms used in this Introduction are defined *supra* in the preamble or *infra* in the Factual Background.

that valued the Properties at $573.5 million.  JPM never disclosed that the financial data that it provided materially misrepresented the NOI generated by the Properties.

4.    JPM did not itself have to bear the outsized risk associated with the inflated NOI figures because it never intended to hold the Mortgage Loan after origination.  Instead, it immediately transferred the risk of the Mortgage Loan to the Trust and its investors, who were left in the dark about the fraudulent NOI that anchored, among other things, the anticipated cash flow and appraisals of the Properties that JPM showed them before they invested.  JPM, for its part, collected millions in fees for originating the Mortgage Loan and selling the Certificates that the Trust issued.

5.    In plowing ahead with the Mortgage Loan without correcting the false T12s, both JPM and the Chetrits breached their contractual representations and warranties under the transaction documents.  In the Loan Agreement, the Chetrits represented and warranted that all financial statements and financial data delivered to JPM was complete and accurate and agreed that any material inaccuracy would constitute an Event of Default under the Loan Agreement.  For its part, JPM represented and warranted in the Mortgage Loan Purchase Agreement (or MLPA) through which it transferred the Mortgage Loan to the Trust, that it did not have actual knowledge of any Events of Default under the Loan Agreement.  Both parties' representations and warranties were made false by the NOI fraud they had uncovered months before originating the Mortgage Loan.

6.    JPM agreed under the MLPA that it would repurchase any portion of the Mortgage Loan impacted by a Material Breach of its representations and warranties.  The fraudulent NOI in the false T12s impacted every one of the 43 Properties backing the Mortgage Loan.  JPM is therefore required to repurchase the Mortgage Loan in its entirety or pay damages for having failed

to do so.  JPM is separately and independently responsible for repurchasing a portion of the Mortgage Loan tied to the Shadow Creek apartment complex in Lufkin, Texas, because it delivered a defective Deed of Trust for that property that failed to convey a valid security interest to the Trustee.  And the Borrower entity for that property, Shadow Creek Owner, is obligated to execute a corrected instrument fixing the defective Deed of Trust and is subject to reformation of the original Deed of Trust to correct a scrivener's error and to set out the terms of the parties' actual agreement.  Finally, the Trustee is entitled to avoidance of the opportunistic fraudulent transfer of Shadow Creek Owner's legal interest in a portion of the Shadow Creek property to non-Borrower affiliate 3100 Daniel McCall Drive that the Chetrits orchestrated with the deliberate intent to evade Shadow Creek Owner's payment obligations to the Trustee.

7.    For his part, Meyer Chetrit agreed to guaranty repayment of the Mortgage Loan in the amount of any recourse liability arising from material misrepresentations in the financial statements and financial information delivered to JPM.  He is therefore liable for the significant losses arising from the Chetrits' delivery of T12s that substantially overstated NOI earned from the Properties and for delivering materially inaccurate rent rolls for Shadow Creek.

8.    The Borrower on the Mortgage Loan defaulted in 2022 and continues to owe over $285 million.  The remaining Properties that serve as collateral for the Mortgage Loan are worth far less than that outstanding amount.  The Trustee's repurchase remedy against JPM and recourse to Meyer Chetrit, as Guarantor, are therefore the only avenue for the Trustee to recover the full amount owed under the Mortgage Loan and avoid the substantial losses arising from JPM's and the Chetrits' misconduct.  Accordingly, the Trustee seeks an order of specific performance requiring JPM to repurchase the Mortgage Loan in its entirety or, in the alternative, money damages in the amount of the Repurchase Price.  To the extent not made whole by the repurchase

remedy, the Trustee seeks money damages from Meyer Chetrit under the Guaranty Agreement. And the Trustee seeks various remedies related to Borrower's failure to properly convey a security interest in Shadow Creek Apartments and the subsequent fraudulent transfer of that property interest to a non-Borrower affiliate.

### The Parties

9.     Wells Fargo Bank, National Association is a national banking association organized and existing under the laws of the United States with its head office in Sioux Falls, South Dakota.  Wells Fargo is the trustee of the J.P. Morgan Chase Commercial Mortgage Securities Trust 2019-MFP, Commercial Mortgage Pass-Through Certificates, Series 2019-MFP. In initiating this lawsuit, Wells Fargo acts by and through the Special Servicer, Situs Holdings, LLC, in accordance with the Trust and Servicing Agreement, dated as of July 18, 2019.

10.     Defendant JPMorgan Chase Bank, National Association is a national banking association organized and existing under the laws of the United States with its head office in Columbus, Ohio.  JPM is the Seller of the Mortgage Loan under the MLPA at issue in this action.

11.     Defendant Meyer Chetrit is a natural person domiciled in New York.  Meyer Chetrit is the guarantor under a Guaranty Agreement in which he guaranteed payment of certain recourse obligations of Borrower under the Loan Agreement.

12.     Defendant Shadow Creek Owner, LLC is a Delaware limited liability company with its principal place of business in New York.  None of Shadow Creek Owner's direct or indirect members are citizens of South Dakota.  Shadow Creek Owner is one of the special-purpose entities that comprises Borrower, and it owns the Property known as the Shadow Creek Apartments in Lufkin, Texas.

13.     Defendant 3100 Daniel McCall Drive, LLC is a Delaware limited liability company with its principal place of business in New York.  None of 3100 Daniel McCall Drive's direct or

indirect members are citizens of South Dakota.  3100 Daniel McCall Drive was created on or about April 9, 2024, by the Chetrits specifically for the purpose of taking ownership of a portion of Property known as the Shadow Creek Apartments outside the reach of the Trustee's security interest.

### Jurisdiction, Venue, And Governing Law

14.    This Court has original jurisdiction over this action under 28 U.S.C. § 1332, because it is a civil action between citizens of different states and the matter in controversy exceeds $75,000.00 exclusive of interest and costs.

15.    Trustee, as a national banking association with its head office in South Dakota, is a South Dakota citizen.

16.    None of the four Defendants in this case is a citizen of South Dakota.  JPM, as a national banking association with its head office in Ohio, is an Ohio citizen.  Meyer Chetrit, as a natural person domiciled in New York, is a New York citizen.   Shadow Creek Owner and 3100 Daniel McCall Drive are Delaware limited liability companies with their principal place of business in New York, and are indirectly owned (through a series of limited liability companies) by Jonathan Chetrit, Meyer Chetrit, Jacob Chetrit, Joseph Chetrit, Daniel Chetrit, Simon Chetrit, and Michael Chetrit, all of whom are, on information and belief, citizens of New York or California.

17.    Venue is proper in the Southern District of New York because, as described more fully below, Defendants undertook substantial activities relating to the MLPA in New York, including negotiating and signing the MLPA in New York.  JPM also expressly submitted to the jurisdiction of this Court in the MLPA.  Ex. 1 (MLPA) § 13 ("Each of the parties hereto irrevocably: (i) submits to the exclusive jurisdiction of the courts of the State of New York and the federal courts of the United States of America for the Southern District of New York for the

purpose of any action or proceeding relating to this agreement; (ii) waives, to the fullest extent permitted by law, the defense of an inconvenient forum in any action or proceeding in any such court; (iii) agrees that a final judgment in any action or proceeding in any such court shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment or in any other manner provided by law …." (capitalization altered)).

18.     Meyer Chetrit likewise expressly submitted to the jurisdiction of this Court in the Guaranty Agreement.  Ex. 2 § 5.3 (Guaranty Agreement) ("Any legal suit, action or proceeding against Lender or Guarantor arising out of or relating to this guaranty may at Lender's option be instituted in any federal or state court in the City of New York, County of New York, pursuant to Section 5-1402 of the New York General Obligations Law, and Guarantor waives any objections which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and each of Lender and Guarantor hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding." (capitalization altered)).

19.     Shadow Creek Owner also expressly submitted to the jurisdiction of this Court in the Loan Agreement.  Ex. 3 (Loan Agreement) § 10.3(b) ("Any legal suit, action or proceeding against lender or borrower arising out of or relating to this Agreement or the other Loan Documents may at Lender's option be instituted in any federal or state court in the City of New York, County of New York, pursuant to Section 5-1402 of the New York General Obligations Law and Borrower waives any objections which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and Borrower hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding." (capitalization altered)).

20.     New York law governs this action.  Ex. 1 (MLPA) § 12 ("This agreement and any claim, controversy or dispute arising under or related to this agreement, the relationship of the

parties to this agreement, and/or the interpretation and enforcement of the rights and duties of the parties to this agreement shall be governed by and construed in accordance with the internal laws and decisions of the State of New York, without regard to the choice of law rules thereof.  The parties hereto intend that the provisions of Section 5-1401 of the New York General Obligations Law shall apply to this agreement." (capitalization altered)); Ex. 2 § 5.3 (Guaranty Agreement) ("This guaranty shall be governed by and construed in accordance with the laws of the State of New York and the applicable laws of the United States of America."); Ex. 3 (Loan Agreement) § 10.3(a) ("To the fullest extent permitted by law, Borrower hereby unconditionally and irrevocably waives any claim to assert that the law of any other jurisdiction governs this Agreement, the Note and the other Loan Documents, and this Agreement, the Note and the other Loan Documents shall be governed by and construed in accordance with the laws of the State of New York pursuant to Section 5-1401 of the New York General Obligations Law." (capitalization altered)).

## **Factual Background**

### I.      **The Mortgage Loan**

21.     This case involves a $481 million mortgage loan (the "Mortgage Loan") secured by a portfolio of 43 multifamily properties (including four student-housing properties) (the "Properties").  JPM originated the Mortgage Loan and then sold it to an affiliate, J.P. Morgan Chase Commercial Mortgage Securities Corp. ("JPMCC").  JPMCC then deposited the Mortgage Loan in a commercial mortgage-backed securities ("CMBS") trust called J.P. Morgan Chase Commercial Mortgage Securities Trust 2019-MFP (defined earlier as the "Trust"), where it is held today.

22.     The borrowers on the Mortgage Loan are 43 special-purpose entities (collectively defined in the Loan Agreement as the "Borrower") affiliated with the Chetrit Group, a prominent

real-estate investment company owned by brothers Joseph and Meyer Chetrit, along with other Chetrit family members.

23.    The Chetrits obtained the Mortgage Loan to finance their purchase of the Properties from ROCO Real Estate, LLC ("ROCO"), an upstart real-estate investment company based in Bloomfield Hills, Michigan, that had acquired the Properties between 2013 and 2018.  During the time period relevant to the Complaint, ROCO was owned by two sets of brothers, Tyler and Evan Ross and Michael and David Colman.

24.    The Mortgage Loan and its transfer to the Trust are governed by various agreements, including the Loan Agreement, the Guaranty Agreement, the MLPA, and the TSA. These agreements are described in greater detail in the paragraphs that follow.  The Trust is in physical possession of the wet-ink Note with allonge dated July 18, 2019, firmly affixed thereto by staple and evidencing the Trust's ownership of the Loan and acquisition of the Note.  A true and correct copy is attached as Exhibit 4.

25.    The Loan Agreement.  On or about June 19, 2019, the Borrower executed a promissory note (the "Note") in favor of JPM for $481 million.  That same day, JPM and Borrower entered into a loan agreement (the "Loan Agreement"), which sets forth Borrower's obligations while repaying the Mortgage Loan.  The Mortgage Loan is secured by mortgages on the 43 multifamily properties backing the Mortgage Loan, which are located in ten different states.  *See* Ex. 3 (Loan Agreement).

26.    The Guaranty Agreement.  As further security for the Mortgage Loan, JPM negotiated a guaranty agreement, executed as of June 19, 2019 (the "Guaranty Agreement") with Meyer Chetrit.   Under the Guaranty Agreement, Meyer Chetrit, as Guarantor, agreed to

unconditionally and irrevocably guaranty certain recourse obligations of the Borrower tied to "bad boy" acts identified in the Loan Agreement.  *See* Ex. 2 (Guaranty Agreement).

27.    <u>MLPA</u>.  Less than a month after originating the Mortgage Loan, JPM sold it to affiliate JPMCC under the MLPA, dated as of July 18, 2019.  The MLPA sets forth various rights and obligations of JPM, as Seller, and JPMCC, as Buyer of the Mortgage Loan.  MLPA Exhibit A includes certain representations and warranties made by JPM as part of the transfer, which are discussed in greater detail below.  *See* Ex. 1 (MLPA).

28.    <u>TSA</u>.  JPMCC, in turn, deposited the Mortgage Loan into a CMBS trust governed by a trust and servicing agreement, dated as of July 18, 2019 (the "<u>TSA</u>") in exchange for the commercial mortgage pass-through certificates (the "<u>Certificates</u>") issued by the CMBS trust, which were then sold to investors (the "<u>Certificateholders</u>").  Ex. 5 (TSA) § 2.1(a).  Under the TSA, JPMCC assigned to Wells Fargo, in its capacity as Trustee, all of JPMCC's "right title and interest whether now owned or hereafter acquired" in the Mortgage Loan and JPMCC's "rights and remedies … under the [MLPA]."  *Id.*

29.    Pursuant to the TSA, Situs, in its capacity as Special Servicer, is granted full power and authority to service and administer the Mortgage Loan following a Special Servicing Loan Event, which occurred when Borrower failed to repay the Mortgage Loan when due on July 9, 2022 (the "<u>Maturity Date</u>").

30.    The Trustee asserts claims under the Loan Agreement, MLPA, and Guaranty Agreement.  Relevant terms of the Loan Agreement, MLPA, and Guaranty Agreement are discussed in greater detail below.

**A.    Borrower's Representations And Warranties Under The Loan Agreement**

31.    In connection with the Mortgage Loan, and to induce JPM to make the loan, Borrower made certain representations and warranties in the Loan Agreement related to the

condition and financial health of the Properties and the accuracy of certain materials provided to

JPM.  At issue here, Borrower made two representations and warranties concerning the accuracy

of the financial information that Borrower provided to JPM, as set forth below.

32.    *First*, under Loan Agreement Section 4.1.11, Borrower represents and warrants

that:

> **Financial Information.**    All financial data, including, without
> limitation, the statements of cash flow and income and operating
> expense, that have been delivered to Lender by Borrower in
> connection with the Loan (a) are true, complete and correct in all
> material respects, (b) accurately represent the financial condition of
> Borrower and each Individual Property, as applicable, as of the date
> of such reports, and (c) to the extent prepared or audited by an
> independent certified public accounting firm, have been prepared in
> accordance with GAAP throughout the periods covered, except as
> disclosed therein.…

Ex. 3 (Loan Agreement) § 4.1.11 (The "Financial Information Representation").

33.    *Second*, under Loan Agreement Section 4.1.33, Borrower represents and warrants

that:

> **No Change in Facts or Circumstances; Disclosure.**    All
> information submitted by and on behalf of Borrower to Lender and
> in all financial statements, rent rolls (including the rent roll attached
> hereto as Schedule V), reports, certificates and other documents
> submitted in connection with the Loan or in satisfaction of the terms
> thereof and all statements of fact made by Borrower in this
> Agreement or in any other Loan Document, are true, complete and
> correct in all material respects.  There has been no material adverse
> change in any condition, fact, circumstance or event that would
> make any such information inaccurate, incomplete or otherwise
> misleading in any material respect or that otherwise materially and
> adversely affects or would reasonably be expected to materially and
> adversely affect the use, operation or value of any Individual
> Property or the business operations or the financial condition of
> Borrower.  Borrower has not failed to disclose any material fact that
> would be reasonably be expected to cause any Provided Information
> or representation or warranty made herein to be materially
> misleading.

*Id.* § 4.1.33 (the "Disclosure Representation").

34.     The Borrower's representations and warranties "survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower." *Id.* § 4.2.

35.     Borrower further agreed that "[a]ll representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf." *Id.*

36.     It is an Event of Default under the Loan Agreement "if any representation or warranty made by Borrower herein … shall have been false or misleading in any material respect as of the date the representation or warranty was made." *Id.* § 8.1(a)(v).

**B.     Meyer Chetrit's Recourse Guaranty**

37.     As further inducement to JPM to provide the Mortgage Loan, Meyer Chetrit agreed to personally guaranty certain Borrower obligations under the Guaranty Agreement.  The Guaranty Agreement states:

> Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.  Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

Ex. 2 (Guaranty Agreement) § 1.1.

38.     The Guaranty Agreement defines "Guaranteed Obligations" as the Recourse Liabilities described in Loan Agreement Section 9.3.  *Id.* § 1.2 ("As used herein, the term 'Guaranteed Obligations' means all obligations and liabilities of Borrower pursuant to Section 9.3 of the Loan Agreement." (emphasis omitted)).

39.    Loan Agreement Section 9.3(b)(i) provides that "Borrower shall be fully and personally liable and subject to legal action, for any loss, cost, out of pocket expense, damage … , claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with … material misrepresentation by any Individual Borrower, Principal or Guarantor in the Loan Documents or any document required to be delivered by Borrower, Principal or Guarantor pursuant to the Loan Documents." Ex. 3 (Loan Agreement) § 9.3(b)(i).[2]  Through this provision, Borrower and Meyer Chetrit, as Guarantor, assumed recourse liability for any false representations under the Loan Agreement. *See generally id.* § 4.1.

40.    Meyer Chetrit also assumed full recourse liability in the event of any transfer of any legal or beneficial interests in any Property that is not permitted by the Loan Agreement. Under Loan Agreement Section 9.3(c)(ii)(B)(3), "the Debt shall be fully recourse to Borrower in the event … any Individual Borrower fails to obtain Lender's prior written consent to any Transfer to the extent such consent is required by this Agreement."  *Id.* § 9.3(c)(ii)(B)(3).  Under Loan Agreement Section 5.2.10(b)(i),

> Without the prior written consent of Lender, and except to the extent otherwise set forth in this Section 5.2.10 (including, without limitation, Section 5.2.10(d) hereof), Borrower shall not, and shall not permit any Restricted Party do any of the following (collectively, a "**Transfer**"): (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) any Individual Property or any part thereof or any legal or beneficial interest therein … other than … (B) Permitted Transfers.

---

[2]    Absent one of these recourse triggers, the Trustee's only source of recovery for payment deficiencies is the Properties that serve as the Mortgage Loan's collateral.

*Id.* § 5.2.10(b)(i).

41.    Under the Guaranty Agreement, Meyer Chetrit agreed that Lender may seek to recover from him for the recourse liabilities described in Loan Agreement Section 9.3(b) and (c) without first exhausting its remedies against the Borrower or the Properties.  Specifically, Guaranty Agreement Section 1.6 provides:

> It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other Person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations.  Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

Ex. 2 (Guaranty Agreement) § 1.6.

42.    Meyer Chetrit also agreed to be personally liable for all costs and expenses, including attorney's fees, incurred by Lender in enforcing and/or preserving its rights under the Guaranty Agreement.  *Id.* § 1.8.  This covenant survives the payment and performance of the Guaranteed Obligations.  *Id.*

### C.    JPM's Repurchase Obligation Under The MLPA

43.    In connection with its securitization of the Mortgage Loan, and to induce the Trust to acquire the Mortgage Loan, JPM made the representations and warranties in MLPA Exhibit A. These representations and warranties improve the marketability of the Certificates issued by the Trust by guaranteeing repayment of the Certificates (through repurchase of the Mortgage Loan) if the Mortgage Loan fails to fulfill certain baseline markers of creditworthiness.

44.    Of particular relevance here, JPM represented and warranted that, to the best of its knowledge after due inquiry, there was no Event of Default existing under any of the Mortgage Loan Documents, including the Loan Agreement.    Specifically, MLPA Exhibit A, Representation 4 provides that:

> [t]o the best of the Seller's Knowledge (as defined below) after due inquiry, (a) there is no monetary or material non-monetary Event of Default (as defined in the Loan Agreement) existing under any of the Mortgage Loan Documents, (b) there is no event which, with the passage of time or with notice and the expiration of any applicable grace or cure period, would constitute a material Event of Default under any of the Mortgage Loan Documents and (c) the Seller has not waived any Event of Default.  "Seller's Knowledge" means the actual knowledge of any of the individuals at the Seller who were actively involved in the origination, administration or servicing of the Mortgage Loan.

Ex. 1 (MLPA) Ex. A, Rep. 4 (the "No Event Of Default Representation" or "Representation 4"). The Mortgage Loan Documents include the Loan Agreement.  Ex. 5 (TSA) § 1.1, at 40 ("Mortgage Loan Documents" definition); *see* Ex. 1 (MLPA) § 1 (defining "Mortgage Loan Documents" as "defined in the Trust and Servicing Agreement").

45.    Through this representation and warranty, JPM assured the Trust and prospective Certificateholders that it had performed the detailed due diligence expected of highly sophisticated originators like JPM, and that it had not uncovered (*i.e.*, obtained "actual knowledge of") any materially false representations or warranties made by Borrower that would cause an Event of Default under the Loan Agreement.  The Trust and its Certificateholders, who do not have access to the same due diligence materials as JPM does in its role as originator, have no choice but to rely on the integrity of JPM's due-diligence process, and the No Event of Default Representation in the MLPA is intended to provide the Trust and its Certificateholders with additional comfort that this reliance was not misplaced.

46.     Under MLPA Section 8(a), "if there is a breach of any representation or warranty made by the Seller relating to the Mortgage Loan as set forth in Exhibit A hereto," and such "breach materially and adversely affects the value of the Mortgage Loan or the interest of the Purchaser (or the holders of the Certificates) therein … (a … '<u>Material Breach</u>,' … )," then "the party discovering such … Material Breach shall promptly notify the Seller." Ex. 1 (MLPA) § 8(a).

47.     "Within 90 days" of receipt of such notice, "the Seller shall either (x) repurchase the Mortgage Loan … at an amount equal to the Repurchase Price (as defined in the [TSA]), (y) promptly cure such … Material Breach … in all material respects or (z) if such … Material Breach is not related to the Mortgage Loan not being a Qualified Mortgage, indemnify the Trust for the losses directly related to such Material Breach … , subject, in the case of any partial repurchase or indemnity in lieu of a repurchase, to receipt of a Rating Agency Confirmation from each Rating Agency with respect to such action." Ex. 1 (MLPA) § 8(a); *accord* Ex. 5 (TSA) § 2.9(a).

48.     The same notice and remedy provisions apply if JPM delivers a required Mortgage Loan document to Trust that is materially defective. Specifically, under MLPA Section 8(a), "[i]f any document required to be delivered to the Purchaser or its designee pursuant to <u>Section 3</u> … is defective (… a '<u>Defect</u>')," and such "Defect … materially and adversely affects the value of the Mortgage Loan or the interest of the Purchaser (or the holders of the Certificates) therein … (a '<u>Material Document Defect</u>' … )," then "the party discovering such Material Document Defect … shall promptly notify the Seller." Ex. 1 (MLPA) § 8(a).

49.     And, "[w]ithin 90 days" of receipt of such notice, "the Seller shall either (x) repurchase the Mortgage Loan … at an amount equal to the Repurchase Price (as defined in the [TSA]), (y) promptly cure such Material Document Defect … , in all material respects or (z) if

such Material Document Defect … is not related to the Mortgage Loan not being a Qualified

Mortgage, indemnify the Trust for the losses directly related to such … Material Document Defect,

subject, in the case of any partial repurchase or indemnity in lieu of a repurchase, to receipt of a

Rating Agency Confirmation from each Rating Agency with respect to such action."   Ex. 1

(MLPA) § 8(a).

50.    The TSA defines the "Repurchase Price" as:

[T]he sum of:

(i) the unpaid principal balance of the Mortgage Loan … ,

(ii) accrued and unpaid interest on the Mortgage Loan at the weighted average of the Component Rates (without giving effect to the Default Rate) to and including the last day of the related Mortgage Loan Interest Accrual Period in which the repurchase is to occur … ,

(iii) unreimbursed Property Protection Advances and … ,

(iv) an amount equal to all interest on outstanding Monthly Payment Advances … ,

(v) any unpaid Trust Fund Expenses … and

(vi) any other expenses reasonably incurred or expected to be incurred by the Servicer, the Special Servicer, the Certificate Administrator, the Operating Advisor or the Trustee arising out of the enforcement of the repurchase obligation.

No Liquidation Fee shall be payable by the Mortgage Loan Seller in connection with a repurchase of the Mortgage Loan (or any allocable portion of the Mortgage Loan) due to a Material Breach or a Material Document Defect pursuant to the Mortgage Loan Purchase Agreement (so long as such repurchase occurs prior to the expiration of the Initial Resolution Period or Extended Resolution Period (if applicable)).

Ex. 5 (TSA) § 1.1 ("Repurchase Price" definition) (line breaks added).

51.    MLPA Section 8(a)'s repurchase remedy is the "sole remedy" for Material

Breaches and Material Document Defects.  Ex. 1 (MLPA) § 7(e).

## II.    Borrower And JPM Misrepresent The Properties' Financial Performance

52.    In assessing the acquisition of the ROCO portfolio, the Chetrits hired multiple professional advisers, including Iron Hound Management Company ("Iron Hound") and Post Road Management ("Post Road").  Iron Hound and Post Road assisted the Chetrits in performing due diligence on the Properties.

53.    Iron Hound contacted JPM on the Chetrits' behalf about providing a loan to finance the Chetrits' purchase of the ROCO portfolio and interfaced with JPM during JPM's own due-diligence process for making the Mortgage Loan.  The transaction was a high profile deal for JPM—so much so that JPM's Head of Real Estate Loan Origination for the United States, Joseph Geoghan, quarterbacked the transaction from start to finish.

54.    ROCO provided the Chetrits and their advisers with, among other materials, trailing-twelve-months operating statements (or "T12s") for the Properties that purported to track the financial performance of the Properties.  The T12s included various categories of income earned and expenses incurred on the Properties over the trailing twelve months and purported to reflect each of the Properties' respective net operating income (or "NOI") for that period.  ROCO also provided the Chetrits and their advisers with the raw data from ROCO's internal accounting system, which accurately reflected the Properties' operating income and expenses.  Iron Hound, acting on the Chetrits' behalf, provided the T12s and backup materials from ROCO's internal accounting system to JPM so that it could perform due diligence on the requested financing.  JPM also requested, and the Chetrits provided, bank statements from ROCO that could be used to verify the accuracy of the T12s.

55.    In February 2019, five months before JPM made the Mortgage Loan, the Chetrits discovered that ROCO's T12s were deliberately and fraudulently altered to falsely increase reported NOI for the Properties.  To overstate NOI, ROCO depressed expenses and inflated

income.  For example, ROCO depressed expenses by deleting or reducing actual expenses incurred on the Properties, like cable-television costs, sewer costs, contractor costs (cleaning, painting and drywall, etc.), employee wages, travel, offices supplies, management fees, computer costs, marketing, and trash collection.  ROCO inflated income by increasing the amounts for certain itemized funding streams like late charges, bad debt rent write-offs, and miscellaneous income, and by omitting rent concessions and adjustments.

56.    The Chetrits confirmed the inaccuracy of the false T12s by comparing them with the raw data that ROCO provided from its internal accounting system, which JPM also had in its possession.

57.    Upon discovering that the T12s contained false and inaccurate information, the Chetrits demanded an in-person meeting in New York and confronted ROCO.  At that meeting, which occurred in February 2019, the Chetrits informed ROCO that they had identified *at least* $3.5 million in purported income listed on the T12s that did not exist.  The Chetrits ultimately identified an additional $2.6 million in underreported repairs and maintenance costs, and another $900,000 in other erroneous entries.  Combined with the fake income, the Chetrits determined that ROCO's T12s overstated NOI by approximately $7 million.  ROCO admitted that it was overreporting net operating income and, as a result, ROCO agreed to reduce the purchase price for the Properties by over $65 million.

58.    After their February 2019 meeting with ROCO, the Chetrits informed JPM that the T12s contained false and inaccurate information, including that $3.5 million in income reflected on the T12s "did not exist" and was not "actually being collected" and that the T12s underreported operating expenses.  Thus, JPM had actual knowledge over five months before originating the Mortgage Loan that T12s provided by Borrower contained materially false information.

59.    The overstatement of NOI in the T12s was sufficiently severe that the Chetrits and their advisers determined that they could no longer rely on ROCO's financial reporting in assessing the appropriate purchase price for the ROCO portfolio.  Behind closed doors, JPM expressed similar sentiments.  In April 2019, for example, an analyst at JPM responsible for due diligence on the ROCO Properties described financial reporting provided by the Borrower in text messages to a colleague as "made up" and "ridic[ulous]."

60.    Tyler Ross, the Co-CEO of ROCO, has since admitted that the T12 NOI figures were overstated by 25%.  While the T12s showed $40.6 million in NOI on the Properties, ROCO's internal, undoctored T12s showed just $30.3 million in NOI on the Properties.  The $10.3 million in overstated NOI impacted every single one of the 43 Properties backing the Mortgage Loan.  Mr. Ross pleaded guilty to bank fraud for submitting similarly inflated NOI figures to Fannie Mae in relation to a previous financing for the Properties and has been sentenced to prison.

61.    Upon learning that the T12s contained false information, JPM had an obligation to engage in due inquiry to determine the scope of the fraudulent reporting.  JPM had all of the information that it needed to do so at its fingertips.  It had ROCO's underlying bank statements and the raw data from ROCO's internal accounting system that could be used to validate the accuracy of information contained in the T12s provided by Borrower.  And JPM knew that it faced a serious issue.  JPM's Head of Real Estate Loan Origination for the United States, Mr. Geoghan, has admitted that a discovery of this type of fraud should have stopped the deal in its tracks until JPM was able to find out why the financials were inaccurate.

62.    Instead, JPM plowed ahead as if nothing unusual had happened.  JPM did not perform additional due diligence to determine the scope of false information in the T12s provided by Borrower.  Worse yet, JPM did not even insist that the Chetrits supply accurate T12s correcting

the $7 million in NOI that they had determined to be false, or that the Chetrits demand and supply accurate T12s from ROCO. JPM continued to use the false T12s throughout the process of originating and selling the Mortgage Loan to the Trust and marketing the transaction to the public, without even bothering to correct known errors in the numbers.

63.    In marketing the Trust certificates to investors, JPM presented ROCO's false T12s as accurately reflecting the historical performance of the Properties without adjustment or correction. JPM provided the false T12s to its appraiser, Newmark Knight Frank ("Newmark"), in March 2019, and Newmark used those T12s to determine the as-is appraised value of $573.5 million for the Properties. JPM then provided those appraisals to the Trust and made them available to prospective Certificateholders, using them to justify a reported loan-to-value ratio of 83.9%. JPM presented this loan-to-value ratio to the Trust and prominently featured it in its offering memorandum without disclosing that it was derived from false NOI assumptions.

64.    JPM separately reported an "Underwritten Net Operating Income" to the Trust and in its marketing materials that reduced the T12 NOI by approximately the $3.5 million. But JPM did not explain that this "adjustment" was simply deleting a portion of the NOI that JPM had determined did not actually exist. Instead, JPM crafted an "Underwritten Net Operating Income" definition that carefully avoided disclosing the most salient point: that the Borrower's *actual* T12s were fraudulently overstated.[3]    And the "Underwritten Net Operating Income" inexplicably

---

[3]    Specifically, Underwritten Net Operating Income is defined as:

(a) the sum of (i) annualized Gross Income from Operations based on in-place base rents in connection with leases with tenants in occupancy at the Property and paying rent as adjusted by the Mortgage Lender assuming an amount for vacancy/collections loss equal to the greater of (x) the actual vacancy and (y) 5% plus (ii) amounts received by the Borrowers from the ownership and operation of the Property to the extent such amounts are recurring in nature and properly included as Gross Income from Operations during such period, annualized, less (b) budgeted operating expenses based on the annual budget last delivered and

reduced NOI by only about *half* of the $7 million overstatement of NOI that the Chetrits and JPM unequivocally knew existed before closing.

65.    JPM never disclosed to the Trust or prospective Certificateholders that ROCO's "historical" NOIs were fraudulently inflated by 25%, despite having actual knowledge of the majority (if not all) of that inflation.  Ultimately, JPM provided a $481 million mortgage loan for the Chetrit's acquisition of the ROCO portfolio, covering nearly 92% of the $522 million purchase price that the Chetrits paid for the Properties.

66.    JPM was willing to issue such a risky loan because it never intended to hold it.  As was its plan from the start, JPM transferred the Mortgage Loan to the Trust within a month of origination and sold the Certificates issued by the Trust to third-party investors who, unlike JPM, were unaware that Borrower had delivered dramatically overstated financials.  Those left holding the bag had relied on Borrower financial information that JPM presented to them as accurate while knowing otherwise.  JPM, meanwhile, walked away with millions of dollars in fees for originating the loan and selling the Trust Certificates.

67.    By delivering the false T12s to JPM, Borrower violated the Financial Information Representation and the Disclosure Representation in the Loan Agreement.    Ex. 3 (Loan Agreement) §§ 4.1.11, 4.1.33.  Those misrepresentations constituted an Event of Default under the Loan Agreement.  *Id.* § 8.1(a)(v).  And they give rise to Borrower recourse liability under Loan Agreement Section 9.3(b)(1) that Meyer Chetrit guaranteed under the Guaranty Agreement.

---

approved by the Mortgage Lender, as applicable, annualized, and adjusted by the Mortgage Lender to assume (i) an amount for management fees equal to 3% of Gross Income from Operations and (ii) Replacement Reserve Fund contributions equal to $330.00 per Unit per year, less (c) trailing 12 month concessions.

68.     Because JPM had knowledge of Borrower's misrepresentations, JPM breached its representation and warranty that "[t]o the best of [JPM's] Knowledge … after due inquiry, (a) there is no … material non-monetary Event of Default … existing under the Mortgage Loan Documents. Ex. 1 (MLPA), Schedule A, Rep. 4.   To the extent there was any portion of Borrower's inflated NOI that JPM did not actually discover before closing, that was only because JPM failed to undertake the "due inquiry" it represented that it had performed.  *Id.*  This Material Breach under the MLPA forms one basis for Trustee's demand, discussed in Part V below, that JPM repurchase the Mortgage Loan.

### III.    JPM Delivers A Defective Deed Of Trust For The Shadow Creek Property

69.     In addition to the Material Breach described above, JPM delivered defective documentation of its security interest in one of the largest Properties backing the Mortgage Loan— the Shadow Creek Apartments in Lufkin, Texas ("Shadow Creek")—rendering the Trust unable to effectively exercise its foreclosure remedy to recover against the Property.

70.     Shadow Creek comprises two apartment buildings located at 2807 Daniel McCall Drive ("Shadow Creek Tract 1") and 3100 Daniel McCall Drive ("Shadow Creek Tract 2"), respectively, which collectively contain 221 apartment units.   It was one of the ten largest Properties at origination, with an "As-Is Appraised Value" of $21.5 million and an allocated Mortgage Loan amount of $18.03 million.

71.     Both JPM and Borrower intended to include Shadow Creek Tract 2 in collateral backing the Mortgage Loan.  This intent is reflected in numerous places in the Loan Documents and marketing materials for the Trust.  For example, the rent roll attached as Schedule V of the original Loan Agreement indicates that the Mortgage Loan is supported by rents from both Shadow Creek Tract 1 and Shadow Creek Tract 2.  The Preliminary Offering Circular used to market the Certificates describes Shadow Creek as a 221-unit apartment complex, incorporating

the apartments from Shadow Creek Tract 1 and Shadow Creek Tract 2.  And the reported historical NOI and projected NOI for Shadow Creek provided by the Chetrits and used to underwrite the Mortgage Loan incorporate income and operating expenses from both Shadow Creek Tract 1 and Shadow Creek Tract 2.  The appraisal conducted on Shadow Creek and provided to prospective Certificateholders determined value based on projected income generated by Shadow Creek Tract 1 and Shadow Creek Tract 2, considered together.

72.    Borrower conveyed a security interest in Shadow Creek to JPM through a Deed of Trust, in accordance with Texas law.  The Deed of Trust conveyed title of Shadow Creek Tract 1 to Ronald Addison, in his capacity as Trustee under the Deed of Trust (the "Shadow Creek Trustee"), but in what can only be explained as an egregious scrivener's error, failed to convey title of Shadow Creek Tract 2.  Specifically, the Deed of Trust included, as Exhibit A, a "Legal Description" of the real property conveyed that included a description of Shadow Creek Tract 1 but not Shadow Creek Tract 2.

73.    Notwithstanding this error, the Borrower and the Trustee continued to treat Shadow Creek Tract 2 as part of the collateral for the Mortgage Loan, and Borrower stipulated to inclusion of the Shadow Creek Tract 2 in the Receivership Estate established in a separate action pending before this Court (the "Receivership Action").[4]  Borrower, however, has refused to execute and record a corrected Deed of Trust that would properly convey the intended security interest to the Trustee and pave the way for non-judicial foreclosure.

74.    The absence of an effective Deed of Trust conveying a security interest in Shadow Creek Tract 2 has caused extraordinary prejudice to the Trust.  In particular, the Trustee

---

[4]    The Receivership Action is captioned, *Wells Fargo Bank, Nat'l Ass'n v. Barrington Park Owner, LLC*, Case No. 23-cv-09972 (DEH) (S.D.N.Y.).

is not able to conduct a non-judicial foreclosure in respect of Shadow Creek Tract 2 due to the defective documentation. Moreover, Shadow Creek Tract 1 is not marketable when split from Shadow Creek Tract 2. As such, the defective Deed of Trust for Shadow Creek has prevented the Trustee from exercising its default remedies in respect of the Shadow Creek property and will continue to do so indefinitely.

75.    The failure to convey a security interest in Shadow Creek Tract 2 in the Shadow Creek Deed of Trust is a Material Document Defect under the MLPA and forms a separate basis for the Trustee's demand, discussed below, that JPM repurchase the Shadow Creek portion of the Mortgage Loan.

76.    In the "Further Assurances" section of the Loan Agreement, the Borrower agreed that:

> Borrower shall, at Borrower's sole cost and expense: … execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require.

Ex. 3 (Loan Agreement) § 5.1.9(b).

77.    In addition, the Borrower agreed that:

> Borrower shall, at Borrower's sole cost and expense: … do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

*Id.* § 5.1.9(c).

78.    Under Texas Property Code § 5.029, "the parties to the original transaction … may execute a correction instrument to make a material correction to the recorded original instrument

of conveyance, including a correction to: … add: … land to a conveyance that correctly conveys other land." Tex. Prop. Code § 5.029(a)(1)(C).

79.    Accordingly, Borrower is obligated under the Loan Agreement to execute a correction instrument to add Shadow Creek Tract 2 to conveyance in the Deed of Trust for Shadow Creek.

80.    As noted above, Borrower has refused to do so.

## IV.    The Chetrits Learn Of The Defect And Cause Shadow Creek Owner To Fraudulently Transfer Its Interest In Shadow Creek Tract 2

81.    When the Chetrits learned about the defective Shadow Creek Deed of Trust, they did not try to correct the error.  Instead, they attempted to capitalize on it.

82.    Like the defective Deed of Trust from Shadow Creek Owner to JPM, the special warranty deed that conveyed title of Shadow Creek from the previous owner, an affiliate of ROCO known as ROCO-Shadow Creek, LLC ("ROCO-Shadow Creek"), to Shadow Creek Owner contained the same scrivener's error: it conveyed Shadow Creek Tract 1 but not Shadow Creek Tract 2.

83.    Thus, when the transaction closed on June 19, 2019, Shadow Creek Owner did not have formal title to Shadow Creek Tract 2 because of the defective special warranty deed.  But Shadow Creek Owner had a legal and beneficial interest in Shadow Creek Tract 2 because ROCO-Shadow Creek had agreed to convey Shadow Creek to Shadow Creek Owner but failed to do so, and because the special warranty deed that conveyed Shadow Creek Tract 1 contained a scrivener's error that was subject to reformation.

84.    As a result, ROCO-Shadow Creek held bare title to Shadow Creek Tract 2 in constructive trust for Shadow Creek Owner, and Shadow Creek Owner held a legal interest in Shadow Creek Tract 2 through, among other things, its entitlement to receive formal title to

Shadow Creek Tract 2 under its purchase-and-sale agreement with ROCO-Shadow Creek and a cause of action for reformation of the special warranty deed.

85.     Once the Chetrits and Shadow Creek Owner learned that the special warranty deed conveying title from ROCO-Shadow Creek was defective, they opportunistically seized on the defect to attempt to convey Shadow Creek Tract 2 to a non-Borrower affiliate known as 3100 Daniel McCall Drive, LLC (defined earlier as "3100 Daniel McCall Drive")—an entity they created on or about April 9, 2024, specifically for the purpose of taking ownership of Shadow Creek Tract 2 outside the reach of the Trustee's security interest. 3100 Daniel McCall Drive, as a non-Borrower entity, is not subject to the Loan Agreement and is not included in the Guaranty Agreement.

86.     On or around May 2024, Shadow Creek Owner, acting by and through the Chetrits, asserted its legal interest in Shadow Creek Tract 2 in communications with ROCO-Shadow Creek. Rather than insist that ROCO-Shadow Creek transfer Shadow Creek Tract 2 to Shadow Creek Owner, Shadow Creek Owner instead transferred its right to receive title to Shadow Creek Tract 2 to its non-Borrower affiliate, 3100 Daniel McCall Drive in exchange for no value. In doing so, Shadow Creek Owner bargained, transferred, and disposed of its legal interest in Shadow Creek Tract 2. And, as a result, ROCO-Shadow Creek conveyed legal title to Shadow Creek Tract 2 to 3100 Daniel McCall Drive.

87.     Shadow Creek Owner never sought Trustee's consent for Shadow Creek Owner's transfer of its legal interest in Shadow Creek to 3100 Daniel McCall Drive, and the Trustee never provided consent.

88.    As a result, Shadow Creek Owner's transfer of its legal interest in Shadow Creek was a prohibited Transfer under the Loan Agreement.    Specifically, Loan Agreement Section 5.2.10(b)(i) provides:

> Without the prior written consent of Lender, and except to the extent otherwise set forth in this Section 5.2.10 (including, without limitation, Section 5.2.10(d) hereof), Borrower shall not, and shall not permit any Restricted Party do any of the following (collectively, a "**Transfer**"): (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) any Individual Property or any part thereof or any legal or beneficial interest therein … other than … (B) Permitted Transfers."

Ex. 3 (Loan Agreement) § 5.2.10(b)(i).  "Permitted Transfers" are those that result from the death or legal incapacity of any natural person holding direct or indirect ownership interests in the Borrower.  *Id.* § 1.1 ("Permitted Transfer" definition).

89.    Loan Agreement Section 5.2.10(d) permits Transfers of direct and indirect ownership interests in the Borrower without Lender's consent if that transfer meets certain specified requirements.  *Id.* § 5.2.10(d).  The Transfer of Shadow Creek Owner's legal interest in Shadow Creek Tract 2 involved a Transfer of a legal interest in on of the Properties, not in any Borrower, and therefore does not fit within the parameters of Section 5.2.10(d).

90.    Loan Agreement Section 5.2.10(e) permits a one-time transfer of the fee interest in the Properties and assumption of the Loan by the transferee if certain conditions are met.  *Id.* § 5.2.10(e).  The Transfer of Shadow Creek Owner's legal interest in Shadow Creek Tract 2 did not involve a one-time transfer of the fee interest in the Properties or assumption of the Loan by the transferee, and in any event did not satisfy the enumerated conditions in Section 5.2.10(e) for such a Transfer.

91.    As such, the Transfer of Shadow Creek's legal interest in Shadow Creek Tract 2 constituted a Transfer that was neither a Permitted Transfer nor a transfer permitted under any

other provision of Section 5.2.10 of the Loan Agreement.  It was therefore a Transfer that was not permitted by the Loan Agreement.

92.    When Shadow Creek Owner made this prohibited Transfer, it was insolvent because the only asset it retained was Shadow Creek Tract 1, which is worth far less than the portion of the Mortgage Loan balance allocated to Shadow Creek Owner.

**V.    JPM Refuses To Fulfill Its Repurchase Obligations**

93.    On April 19, 2024, the Trustee delivered written notice (the "April 19 Repurchase Notice") to JPM, as Seller under the MLPA, of a Material Document Defect in respect of the Deed of Trust for Shadow Creek.  The April 19 Repurchase Notice stated that the Deed of Trust was defective because it failed to provide a security interest in Shadow Creek Tract 2 to the Trustee. The April 19 Repurchase Notice demanded that JPM "repurchase the affected Mortgage Loan at the applicable Repurchase Price."

94.    On June 5, 2024, JPM responded by refusing to repurchase the Shadow Creek portion of the Mortgage Loan.

95.    On November 26, 2024, Lender delivered an additional notice (the "November 26 Repurchase Notice") to JPM, as Seller under the MLPA, of a Material Breach of the No Event of Default Representation in Exhibit A to the MLPA.  The Trustee stated that JPM had actual knowledge of multiple false representations and warranties by Borrower related to the accuracy of financial statements delivered to the original lender, which caused an Event of Default under the Loan Agreement at the time of loan origination.

96.    On February 24, 2025, JPM responded refusing to repurchase the Mortgage Loan.

## Causes Of Action

**Count 1: Breach Of Contract**
**Against Defendant JPMorgan Chase Bank, National Association**
*Seeking Specific Performance And, Alternatively, Money Damages*
Repurchase Of The Mortgage Loan

97.     The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

98.     The Loan Agreement, MLPA, and TSA are valid and enforceable contracts under New York law.

99.     Under the MLPA, JPM transferred all of its right, title, and interest in the Mortgage Loan and the Mortgage Loan Documents, including the Loan Agreement, to its affiliate, JPMCC.

100.     Under the TSA, JPMCC, as Depositor, deposited the Mortgage Loan into the Trust and conveyed to the Trustee all of the its right, title, and interest in the Mortgage Loan and its rights and remedies under the MLPA.  *See* Ex. 5 (TSA) § 2.1.

101.     Accordingly, the Trustee, acting by and through the Special Servicer, has the right to enforce all rights and remedies under the Loan Agreement and the MLPA.

102.     Loan Agreement Section 8.1(a)(v) provides that it is an Event of Default under the Loan Agreement "if any representation or warranty made by Borrower herein … shall have been false or misleading in any material respect as of the date the representation or warranty was made." Ex. 3 (Loan Agreement) § 8.1(a)(v).

103.     In Loan Agreement Section 4.1.11, the Borrower represented and warranted that:

> [a]ll financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender by Borrower in connection with the Loan (a) are true, complete and correct in all material respects, (b) accurately represent the financial condition of Borrower and each Individual Property, as applicable, as of the date of such reports, and (c) to the

extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with GAAP throughout the periods covered, except as disclosed therein.…

*Id.* § 4.1.11 (defined earlier as the "<u>Financial Information Representation</u>").

104.    In Loan Agreement Section 4.1.33, Borrower represented and warranted that:

[a]ll information submitted by and on behalf of Borrower to Lender and in all financial statements, rent rolls (including the rent roll attached hereto as Schedule V), reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are true, complete and correct in all material respects.  There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or would reasonably be expected to materially and adversely affect the use, operation or value of any Individual Property or the business operations or the financial condition of Borrower.  Borrower has not failed to disclose any material fact that would be reasonably be expected to cause any Provided Information or representation or warranty made herein to be materially misleading.

*Id.* § 4.1.33 (defined earlier as the "<u>Disclosure Representation</u>").

105.    The Financial Information Representation and the Disclosure Representation were false when made because the Chetrits delivered materially inaccurate and incorrect T12s to JPM that overstated historical NOI that the Properties generated by over $10 million.

106.    These misrepresentations caused an Event of Default under Loan Agreement Section 8.1(a)(v) on the date that JPM originated the Mortgage Loan.

107.    In MLPA Exhibit A, JPM represented and warranted that:

[t]o the best of the Seller's Knowledge (as defined below) after due inquiry, (a) there is no monetary or material non-monetary Event of Default (as defined in the Loan Agreement) existing under any of the Mortgage Loan Documents, (b) there is no event which, with the passage of time or with notice and the expiration of any applicable grace or cure period, would constitute a material Event of Default under any of the Mortgage Loan Documents and (c) the Seller has

31

> not waived any Event of Default.  "Seller's Knowledge" means the
> actual knowledge of any of the individuals at the Seller who were
> actively involved in the origination, administration or servicing of
> the Mortgage Loan.

Ex. 1 (MLPA) Ex. A, Rep. 4 (defined earlier as the "No Event Of Default Representation" or

"Representation 4").

108.    The No Event Of Default Representation was materially false when made because

(a) the Chetrits delivered the false T12s to JPM; (b) the delivery of the false T12s violated the

Financial Information Representation and the Disclosure Representation in the Loan Agreement;

(c) those misrepresentations constituted an Event of Default under Loan Agreement

Section 8.1(a)(v); and (d) JPM had knowledge of the Borrower's misrepresentations or would have

become aware of them if JPM had performed the due inquiry that it represented it had performed.

109.    Under MLPA Section 8(a), "if there is a breach of any representation or warranty

made by the Seller relating to the Mortgage Loan as set forth in Exhibit A hereto," and such

"breach materially and adversely affects the value of the Mortgage Loan or the interest of the

Purchaser (or the holders of the Certificates) therein … (a … 'Material Breach,' … )," then "the

party discovering such … Material Breach shall promptly notify the Seller." Ex. 1 (MLPA) § 8(a).

110.    "Within 90 days" of receipt of such notice, "the Seller shall either (x) repurchase

the Mortgage Loan … at an amount equal to the Repurchase Price (as defined in the [TSA]),

(y) promptly cure such … Material Breach, as the case may be, in all material respects or (z) if

such … Material Breach is not related to the Mortgage Loan not being a Qualified Mortgage,

indemnify the Trust for the losses directly related to such Material Breach … , subject, in the case

of any partial repurchase or indemnity in lieu of a repurchase, to receipt of a Rating Agency

Confirmation from each Rating Agency with respect to such action." Ex. 1 (MLPA) § 8(a).

111.    JPM received notice of its Material Breach of the MLPA on November 26, 2024, in the November 26 Repurchase Notice.

112.    The ninety-day period for JPM to repurchase the Mortgage Loan elapsed on February 24, 2025.

113.    JPM has refused to repurchase the Mortgage Loan as required by MLPA Section 8(a).

114.    The MLPA provides that JPM's obligation to repurchase the Mortgage Loan is the "sole remedy" available for JPM's breaches of the representations and warranties in the MLPA.

115.    Based on this sole-remedy provision, in accordance with governing New York law, the Trustee is entitled to specific performance of JPM's contractual obligation to repurchase the Mortgage Loan for the Repurchase Price plus prejudgment interest as of the date of JPM's breaches, which occurred when they were made on July 18, 2019.

116.    In the alternative, the Trustee is entitled to money damages in the amount of the Repurchase Price and prejudgment interest as of the date of JPM's breaches, which occurred when they were made on July 18, 2019.

117.    For Properties that have been foreclosed upon and sold, the Trustee seeks the difference, if any, between the actual amounts received in that sale and the Repurchase Price for the Property that was sold, or such other amount that may be determined by the Court.

**Count 2: Breach Of Contract**
**Against Defendant JPMorgan Chase Bank, National Association**
*Seeking Specific Performance And, Alternatively, Money Damages*
Repurchase Of The Portion Of The Mortgage Loan Comprising Shadow Creek

118.    The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

119.    The Loan Agreement, MLPA, and TSA are valid and enforceable contracts under New York law.

120.    Under the MLPA, JPM transferred all of its right, title, and interest in the Mortgage Loan and the Mortgage Loan Documents, including the Loan Agreement, to its affiliate, JPMCC.

121.    Under the TSA, JPMCC, as Depositor, deposited the Mortgage Loan into the Trust and conveyed to the Trustee all of the its right, title, and interest in the Mortgage Loan and its rights and remedies under the MLPA.  *See* Ex. 5 (TSA) § 2.1.

122.    Accordingly, the Trustee, acting by and through the Special Servicer, has the right to enforce all rights and remedies under the Loan Agreement and the MLPA.

123.    Under MLPA Section 8(a), "[i]f any document required to be delivered to the Purchaser or its designee pursuant to Section 3 … is defective (… a 'Defect')," and such "Defect …materially and adversely affects the value of the Mortgage Loan or the interest of the Purchaser (or the holders of the Certificates) therein … (a 'Material Document Defect' …)," then "the party discovering such Material Document Defect … shall promptly notify the Seller."  Ex. 1 (MLPA) § 8(a).

124.    And, "[w]ithin 90 days" of receipt of such notice, "the Seller shall either (x) repurchase the Mortgage Loan … at an amount equal to the Repurchase Price (as defined in the [TSA]), (y) promptly cure such Material Document Defect … in all material respects or (z) if such Material Document Defect … is not related to the Mortgage Loan not being a Qualified Mortgage, indemnify the Trust for the losses directly related to such Material Breach … , subject, in the case of any partial repurchase or indemnity in lieu of a repurchase, to receipt of a Rating

Agency Confirmation from each Rating Agency with respect to such action."  Ex. 1 (MLPA) § 8(a).

125.    Borrower conveyed a security interest in Shadow Creek to JPM through a Deed of Trust, in accordance with Texas law.

126.    The Deed of Trust was defective because it conveyed title only to Shadow Creek Tract 1, and not Shadow Creek Tract 2.

127.    The Deed of Trust for Shadow Creek was a Material Document Defect under the MLPA.

128.    JPM received notice of Material Document Defect on April 19, 2024, in the April 19 Repurchase Notice.

129.    On June 5, 2024, JPM responded by refusing to repurchase the Shadow Creek portion of the Mortgage Loan.

130.    The ninety-day period for JPM to repurchase the Mortgage Loan elapsed on July 18, 2024.

131.    JPM has failed to repurchase the Shadow Creek portion of the Mortgage Loan as required by MLPA Section 8(a).

132.    The MLPA provides that JPM's obligation to repurchase the Shadow Creek portion of the Mortgage Loan is the "sole remedy" available for JPM's breaches of the representations and warranties in the MLPA.

133.    Based on this sole-remedy provision, in accordance with governing New York law, the Trust is entitled to specific performance of JPM's contractual obligation to repurchase the Shadow Creek portion of the Mortgage Loan in the amount of the Repurchase Price plus

prejudgment interest as of the date of JPM's breaches, which occurred when they were made on July 18, 2019.

134.    In the alternative, the Trust is entitled to money damages for the Shadow Creek portion of the Mortgage Loan in the amount of the Repurchase Price plus prejudgment interest as of the date of JPM's breaches, which occurred when they were made on July 18, 2019.

**Count 3: Breach Of Contract**
**Against Defendant Shadow Creek Owner, LLC**
*Seeking Specific Performance And, Alternatively, Money Damages*
Execution Of A Correction Instrument Under Loan Agreement Section 5.1.9

135.    The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

136.    The Loan Agreement, MLPA, and TSA are valid and enforceable contracts under New York law.

137.    Under the MLPA, JPM transferred all of its right, title, and interest in the Mortgage Loan and the Mortgage Loan Documents, including the Loan Agreement, to its affiliate, JPMCC.

138.    Under the TSA, JPMCC, as Depositor, deposited the Mortgage Loan into the Trust and conveyed to the Trustee all of the its right, title, and interest in the Mortgage Loan and its rights and remedies under the MLPA.  *See* Ex. 5 (TSA) § 2.1.

139.    Accordingly, the Trustee, acting by and through the Special Servicer, has the right to enforce all rights and remedies under the Loan Agreement and the MLPA.

140.    Borrower and JPM intended to include Shadow Creek Tract 2 in the collateral backing the Mortgage Loan.

141.    The intent of Borrower and JPM to include Shadow Creek Tract 2 in the collateral backing the Mortgage Loan is reflected in numerous places in the Loan Documents and marketing materials to Certificateholders.

142.    For example, the rent roll attached as Schedule V of the original Loan Agreement indicates that the Mortgage Loan is supported by rents from both Shadow Creek Tract 1 and Shadow Creek Tract 2.    The Preliminary Offering Circular used to market the Certificates describes Shadow Creek as a 221-unit apartment complex, incorporating the apartments from Shadow Creek Tract 1 and Shadow Creek Tract 2.    The purported historical NOI and projected NOI are both predicated on the inclusion of Shadow Creek Tract 1 and Shadow Creek Tract 2 as collateral for the Mortgage Loan.    And the appraisal conducted on Shadow Creek and reported to prospective Certificateholders determined value based on projected income generated by Shadow Creek Tract 1 and Shadow Creek Tract 2, considered together.

143.    Borrower conveyed a security interest in Shadow Creek to JPM through a Deed of Trust, in accordance with Texas law.

144.    The Deed of Trust was defective because it conveyed title only to Shadow Creek Tract 1, and not Shadow Creek Tract 2, to the Shadow Creek Trustee, and therefore failed to properly document the Trustee's security interest in Shadow Creek Tract 2.

145.    Notwithstanding this error, the Borrower and the Trustee have always treated Shadow Creek Tract 2 as part of the collateral for the Mortgage Loan, and Borrower stipulated to inclusion of the Shadow Creek Tract 2 in the Receivership Estate established in the Receivership Action.

146.    Borrower, however, has refused to execute and record a corrected Deed of Trust that would properly convey Lender's security interest and pave the way for non-judicial foreclosure.

147.    Under the Loan Agreement, Borrower agreed that:

> Borrower shall, at Borrower's sole cost and expense: … execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require.

Ex. 3 (Loan Agreement) § 5.1.9(b).

148.    Additionally, Borrower agreed that:

> Borrower shall, at Borrower's sole cost and expense: … do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

*Id.* § 5.1.9(c).

149.    Under Texas Property Code § 5.029, "the parties to the original transaction … may execute a correction instrument to make a material correction to the recorded original instrument of conveyance, including a correction to: … add: … land to a conveyance that correctly conveys other land." Tex. Prop. Code § 5.029(a)(1)(C).

150.    Accordingly, Borrower is obligated under the Loan Agreement to execute a correction instrument to add Shadow Creek Tract 2 to the Deed of Trust for Shadow Creek, and correct any other instrument of transfer or deed necessary to give effect the intended transfer of security interest in Shadow Creek Tract 2 to the Trustee.

151.    Based on Loan Agreement Section 5.1.9, the Trust is entitled to specific performance of Borrower's contractual obligation to execute and deliver a correction instrument

in compliance with Texas Property Code Section 5.029(a)(1)(C) that conveys Shadow Creek Tract 2 alongside Shadow Creek Tract 1, as such correction instrument evidences, preserves, or protects the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents and more effectively carries out the intents and purposes of the Loan Agreement and the other Mortgage Loan Documents.

152.    Specific performance is an appropriate remedy here because money damages may be difficult quantify with reasonable certainty and suitable substitute performance may be difficult to procure.  Under Loan Agreement Section 9.3, the Borrower acknowledged that an action for specific performance may be appropriate to enable the Lender to enforce and realize upon its interest under the Note.

153.    Additionally, the Trust is entitled to money damages in an amount to be determined by the Court for Shadow Creek's depreciation in value during the time period in which Borrower failed to execute the correction instrument.

154.    In the alternative, the Trust is entitled to money damages in an amount to be determined by the Court for (a) the Borrower's failure to execute the correction instrument and (b) Shadow Creek's depreciation in value during the time period in which Borrower failed to execute the correction instrument.

**Count 4: Reformation**
**Against Defendant Shadow Creek Owner, LLC**
*Seeking Reformation Of The Deed Of Trust*

155.    The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

156.    The Loan Agreement, MLPA, and TSA are valid and enforceable contracts under New York law.

157.   Under the MLPA, JPM transferred all of its right, title, and interest in the Mortgage Loan and the Mortgage Loan Documents, including the Loan Agreement, to its affiliate, JPMCC.

158.   Under the TSA, JPMCC, as Depositor, deposited the Mortgage Loan into the Trust, and the Trustee, acting by and through the Special Servicer, is entitled to enforce all of Depositor's rights and remedies under the MLPA.  *See* Ex. 5 (TSA) § 2.1.

159.   Accordingly, the Trustee, acting by and through the Special Servicer, has the right to enforce all rights and remedies in connection with the Mortgage and other Mortgage Loan Documents securing the Note.

160.   Borrower and JPM intended to include Shadow Creek Tract 2 in the collateral backing the Mortgage Loan.

161.   The intent of Borrower and JPM to include Shadow Creek Tract 2 in the collateral backing the Mortgage Loan is reflected in numerous places in the Loan Documents and marketing materials to Certificateholders.

162.   For example, the rent roll attached as Schedule V of the original Loan Agreement indicates that the Mortgage Loan is supported by rents from both Shadow Creek Tract 1 and Shadow Creek Tract 2.   The Preliminary Offering Circular used to market the Certificates describes Shadow Creek as a 221-unit apartment complex, incorporating the apartments from Shadow Creek Tract 1 and Shadow Creek Tract 2.   The purported historical NOI and projected NOI are both predicated on the inclusion of Shadow Creek Tract 1 and Shadow Creek Tract 2 as collateral for the Mortgage Loan.   And the appraisal conducted on Shadow Creek and reported to prospective Certificateholders determined value based on projected income generated by Shadow Creek Tract 1 and Shadow Creek Tract 2, considered together.

163.    Borrower conveyed a security interest in Shadow Creek to JPM through a Deed of Trust, in accordance with Texas law.

164.    The Deed of Trust contained a scrivener's error because it conveyed title only to Shadow Creek Tract 1, and not Shadow Creek Tract 2.

165.    Notwithstanding this scrivener's error, the Borrower and the Lender have always treated Shadow Creek Tract 2 as part of the collateral for the Mortgage Loan, and Borrower stipulated to inclusion of the Shadow Creek Tract 2 in the Receivership Estate established in the Receivership Action.

166.    Reformation is appropriate to remedy the Borrower's and JPM's mutual mistake in executing the Deed of Trust containing the scrivener's error and to set forth their actual agreement in a reformed Deed of Trust, which was to convey a security interest in both Shadow Creek Tract 1 and Shadow Creek Tract 2 to JPM through the Deed of Trust.

**Count 5: Breach Of Contract**
**Against Defendant Meyer Chetrit**
*Seeking Money Damages*
Breach Of Guaranty Section 1.1
In Connection With Material Misrepresentations Of The T12s

167.    The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

168.    The Guaranty Agreement, MLPA, and TSA are valid and enforceable contracts under New York law.

169.    Under the MLPA, JPM transferred all of its right, title, and interest in the Mortgage Loan and the Mortgage Loan Documents, including the Guaranty Agreement, to its affiliate, JPMCC.

170.    Under the TSA, JPMCC, as Depositor, transferred, assigned, and conveyed the Guaranty Agreement to the Trust, and the Trustee, acting by and through the Special Servicer, is

entitled to enforce all of Depositor rights and remedies under the Guaranty Agreement.  *See* Ex. 5

(TSA) § 2.1.

171.    Under the Guaranty Agreement, Defendant Meyer Chetrit agreed:

> Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise.  Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

Ex. 2 (Guaranty Agreement) § 1.1.

172.    The Guaranty Agreement defines "Guaranteed Obligations" as the Recourse

Liabilities described in Loan Agreement Section 9.3.  *Id.* § 1.2 ("As used herein, the term

'Guaranteed Obligations' means all obligations and liabilities of Borrower pursuant to Section 9.3

of the Loan Agreement." (emphasis omitted)).

173.    Under the Guaranty Agreement, Meyer Chetrit agreed that Lender may pursue

recovery from him without first seeking to exhaust its remedies against the Borrower.  *Id.* § 1.6.

174.    Meyer Chetrit also agreed he was liable for all costs and expenses, including

attorney's fees, incurred by Lender in enforcing and/or preserving its rights under the Guaranty

Agreement.  *Id.* § 1.8.  This covenant survives the payment and performance of the Guaranteed

Obligations.  *Id.*

175.    Under the Guaranty Agreement, Meyer Chetrit is personally liable for all of

Borrower's Recourse Liabilities under Loan Agreement Section 9.3.

176.    Under Loan Agreement Section 9.3(b)(i),

> Borrower shall be fully and personally liable and subject to legal action, for any loss, cost, out of pocket expense, damage … , claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with … material misrepresentation

> by any Individual Borrower, Principal or Guarantor in the Loan
> Documents or any document required to be delivered by Borrower,
> Principal or Guarantor pursuant to the Loan Documents.

Ex. 3 (Loan Agreement) § 9.3(b)(i).

177.    In Loan Agreement Section 4.1.11, the Borrower represented and warranted that:

> [a]ll financial data, including, without limitation, the statements of
> cash flow and income and operating expense, that have been
> delivered to Lender by Borrower in connection with the Loan (a) are
> true, complete and correct in all material respects, (b) accurately
> represent the financial condition of Borrower and each Individual
> Property, as applicable, as of the date of such reports, and (c) to the
> extent prepared or audited by an independent certified public
> accounting firm, have been prepared in accordance with GAAP
> throughout the periods covered, except as disclosed therein.…

*Id.* § 4.1.11 (defined earlier as the "Financial Information Representation").

178.    In Loan Agreement Section 4.1.33, Borrower represented and warranted that:

> [a]ll information submitted by and on behalf of Borrower to Lender
> and in all financial statements, rent rolls (including the rent roll
> attached hereto as Schedule V), reports, certificates and other
> documents submitted in connection with the Loan or in satisfaction
> of the terms thereof and all statements of fact made by Borrower in
> this Agreement or in any other Loan Document, are true, complete
> and correct in all material respects.  There has been no material
> adverse change in any condition, fact, circumstance or event that
> would make any such information inaccurate, incomplete or
> otherwise misleading in any material respect or that otherwise
> materially and adversely affects or would reasonably be expected to
> materially and adversely affect the use, operation or value of any
> Individual Property or the business operations or the financial
> condition of Borrower.  Borrower has not failed to disclose any
> material fact that would be reasonably be expected to cause any
> Provided Information or representation or warranty made herein to
> be materially misleading.

*Id.* § 4.1.33 (defined earlier as the "Disclosure Representation").

179.    The Financial Information Representation and the Disclosure Representation were

false when made because the Chetrits delivered materially inaccurate and incorrect T12s to JPM

that overstated historical NOI that the Properties generated by over $10 million.

180.    These material misrepresentations rendered the Borrower and Meyer Chetrit, as the Guarantor, fully and personally liable and subject to legal action, for any loss, cost, out of pocket expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of and in connection with the material misrepresentations.

181.    Accordingly, the Trust is entitled to money damages, including attorney's fees and court costs, from Meyer Chetrit in an amount to be determined by the Court for the material misrepresentations in respect of the financial data (including the T12s) plus prejudgment interest.

**Count 6: Breach Of Contract**
**Against Defendant Meyer Chetrit**
*Seeking Money Damages*
Breach Of Guaranty Section 1.1
In Connection With Material Misrepresentations In
The Rent Roll Attached As Loan Agreement Schedule V

182.    The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

183.    The Guaranty Agreement, MLPA, and TSA are valid and enforceable contracts under New York law.

184.    Under the MLPA, JPM transferred all of its right, title, and interest in the Mortgage Loan and the Mortgage Loan Documents, including the Guaranty Agreement, to its affiliate, JPMCC.

185.    Under the TSA, JPMCC, as Depositor, transferred, assigned, and conveyed the Guaranty Agreement to the Trust, and the Trustee, acting by and through the Special Servicer, is entitled to enforce all of Depositor's rights and remedies under the Guaranty Agreement. *See* Ex. 5 (TSA) § 2.1.

186.    Under the Guaranty Agreement, Defendant Meyer Chetrit agreed:

> Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

Ex. 2 (Guaranty Agreement) § 1.1.

187. The Guaranty Agreement defines "Guaranteed Obligations" as the Recourse Liabilities described in Loan Agreement Section 9.3. *Id.* § 1.2 ("As used herein, the term 'Guaranteed Obligations' means all obligations and liabilities of Borrower pursuant to Section 9.3 of the Loan Agreement." (emphasis omitted)).

188. Under the Guaranty Agreement, Meyer Chetrit agreed that Lender may pursue recovery from him without first seeking to exhaust its remedies against the Borrower. *Id.* § 1.6.

189. Meyer Chetrit also agreed he was liable for all costs and expenses, including attorney's fees, incurred by Lender in enforcing and/or preserving its rights under the Guaranty Agreement. *Id.* § 1.8. This covenant survives the payment and performance of the Guaranteed Obligations. *Id.*

190. Under the Guaranty Agreement, Meyer Chetrit is personally liable for all of Borrower's Recourse Liabilities under Loan Agreement Section 9.3.

191. Under Loan Agreement Section 9.3(b)(i),

> Borrower shall be fully and personally liable and subject to legal action, for any loss, cost, out of pocket expense, damage …, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with … material misrepresentation by any Individual Borrower, Principal or Guarantor in the Loan Documents or any document required to be delivered by Borrower, Principal or Guarantor pursuant to the Loan Documents.

Ex. 3 (Loan Agreement) § 9.3(b)(i).

192.     In Loan Agreement Section 4.1.33, Borrower represented and warranted that "[a]ll information submitted by and on behalf of Borrower to Lender and in all … rent rolls (including the rent roll attached hereto as Schedule V) … are true, complete and correct in all material respects." *Id.* § 4.1.33.

193.     This representation was false when made because the Borrower knew that the rent rolls, including the rent roll attached as Loan Agreement Schedule V, indicated that the Mortgage Loan is supported by rents from both Shadow Creek Tract 1 and Shadow Creek Tract 2.

194.     Thus, to the extent that Borrower now contends that Shadow Creek Tract 2 was not a part of the collateral supporting the Mortgage Loan, the rent rolls (including the rent roll attached to the Loan Agreement as Schedule V) were not true, complete, and correct in all material respects, and the Borrower's representation otherwise was a material misrepresentation rendering the Borrower and Meyer Chetrit, as the Guarantor, fully and personally liable and subject to legal action, for any loss, cost, out of pocket expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of and in connection with the material misrepresentation.

195.     Accordingly, the Trust is entitled to money damages, including attorney's fees and court costs, from Meyer Chetrit in an amount to be determined by the Court for the material misrepresentation in respect of the rent rolls as they pertain to Shadow Creek plus prejudgment interest.

**Count 7: Actual Fraudulent Transfer**
**Against Defendant 3100 Daniel McCall Drive**
*Seeking Avoidance and, Alternatively, Money Damages*
<u>Under NY DCL § 273(a)(1)</u>

196.     The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

197.    The Trustee is a creditor of Defendant Shadow Creek Owner, who is a Borrower under the Loan Agreement.

198.    As of June 19, 2019, Shadow Creek Owner had a legal and beneficial interest in Shadow Creek Tract 2 because ROCO-Shadow Creek had agreed to convey Shadow Creek to Shadow Creek Owner but failed to do so.

199.    As a result, ROCO-Shadow Creek held bare title to Shadow Creek Tract 2 in constructive trust for Shadow Creek Owner, and Shadow Creek Owner held a legal interest in Shadow Creek Tract 2 through, among other things, its entitlement to receive formal title to Shadow Creek Tract 2 under its purchase-and-sale agreement with ROCO-Shadow Creek and a cause of action for reformation of the special warranty deed.

200.    Shadow Creek Owner instead transferred its right to receive title to Shadow Creek Tract 2 to its non-Borrower affiliate, 3100 Daniel McCall Drive—a transaction for which it received no consideration.

201.    Shadow Creek Owner was insolvent at the time of the transfer.

202.    Shadow Creek Owner made the transfer to 3100 Daniel McCall Drive with actual intent to hinder, delay, or defraud the Trustee.  Such intent can be inferred from, among other things, the fact that the transfer was made by and for the benefit of insiders of Shadow Creek Owner, the transfer was made without consideration to Shadow Creek Owner, the transfer was made in violation of Shadow Creek Owner's affirmative obligations, including under Loan Agreement Section 5.2.10(b)(i), not to make such a transfer, the Transfer was made without any notice to the Trustee and at a time when Shadow Creek Owner knew that the Trustee was asserting a security interest in Shadow Creek Tract 2 that the transfer would frustrate, and Shadow Creek Owner was insolvent at the time of the transfer.

203.    As a result of the transfer, the Trustee's ability to recover through enforcement mechanisms against Shadow Creek Owner and the Shadow Creek property have been entirely frustrated.

204.    The transfer is therefore voidable as an actual fraudulent transfer under the New York Debtor and Creditor Law.

205.    3100 Daniel McCall Drive is the direct transferee of Shadow Creek Owner's fraudulent transfer.

206.    Accordingly, the Trust is entitled to recover Shadow Creek Tract 2 from 3100 Daniel McCall Drive.

207.    In the alternative, the Trust is entitled to recover monetary damages in an amount to be determined by the Court for the value of Shadow Creek Tract 2 plus prejudgment interest from Defendant 3100 Daniel McCall Drive for the actual fraudulent transfer of Shadow Creek Tract 2.

**Count 8: Constructive Fraudulent Transfer
Against Defendant 3100 Daniel McCall Drive**
*Seeking Avoidance and, Alternatively, Money Damages*
Under NY DCL §§ 273(a)(2), 274(a)

208.    The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

209.    The Trustee is a creditor of Defendant Shadow Creek Owner, who is a Borrower under the Loan Agreement.

210.    As of June 19, 2019, Shadow Creek Owner had a legal and beneficial interest in Shadow Creek Tract 2 because ROCO-Shadow Creek had agreed to convey Shadow Creek to Shadow Creek Owner but failed to do so.

211.    As a result, ROCO-Shadow Creek held bare title to Shadow Creek Tract 2 in constructive trust for Shadow Creek Owner, and Shadow Creek Owner held a legal interest in Shadow Creek Tract 2 through, among other things, its entitlement to receive formal title to Shadow Creek Tract 2 under its purchase-and-sale agreement with ROCO-Shadow Creek and a cause of action for reformation of the special warranty deed.

212.    Shadow Creek Owner instead transferred its right to receive title to Shadow Creek Tract 2 to its non-Borrower affiliate, 3100 Daniel McCall Drive—a transaction for which it received no consideration.

213.    Shadow Creek Owner was insolvent at the time of the Transfer or became insolvent as a result of the Transfer because its remaining asset—Shadow Creek Tract 1, which is worth far less than the portion of the Mortgage Loan balance allocated to Shadow Creek Owner.

214.    Shadow Creek Owner was engaged in a business or a transaction for which its remaining asset—Shadow Creek Tract 1, which is worth far less than the portion of the Mortgage Loan balance allocated to Shadow Creek Owner—was unreasonably small in relation to the business or transaction.

215.    As a result of the transfer, the Trustee's ability to recover through enforcement mechanisms against Shadow Creek Owner and the Shadow Creek property have been entirely frustrated.

216.    The transfer is therefore voidable as a constructive fraudulent transfer under the New York Debtor and Creditor Law.

217.    Accordingly, the Trust is entitled to recover Shadow Creek Tract 2 from 3100 Daniel McCall Drive.

218.    In the alternative, the Trust is entitled to recover monetary damages in an amount to be determined by the Court for the value of Shadow Creek Tract 2 plus prejudgment interest from Defendant 3100 Daniel McCall Drive for the constructive fraudulent transfer of Shadow Creek Tract 2.

**Count 9: Breach Of Contract**
**Against Defendant Meyer Chetrit**
*Seeking Money Damages*
Breach Of Guaranty Section 1.1
In Connection With Impermissible Transfer Of Shadow Creek Tract 2

219.    The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

220.    The Guaranty Agreement, MLPA, and TSA are valid and enforceable contracts under New York law.

221.    Under the MLPA, JPM transferred all of its right, title, and interest in the Mortgage Loan and the Mortgage Loan Documents, including the Guaranty Agreement, to its affiliate, JPMCC.

222.    Under the TSA, JPMCC, as Depositor, transferred, assigned, and conveyed the Guaranty Agreement to the Trust, and the Trustee, acting by and through the Special Servicer, is entitled to enforce all of Depositor's rights and remedies under the Guaranty Agreement. *See* Ex. 5 (TSA) § 2.1.

223.    Under the Guaranty Agreement, Defendant Meyer Chetrit agreed:

> Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

Ex. 2 (Guaranty Agreement) § 1.1.

224.    The Guaranty Agreement defines "Guaranteed Obligations" as the Recourse Liabilities described in Loan Agreement Section 9.3.  *Id.* § 1.2 ("As used herein, the term 'Guaranteed Obligations' means all obligations and liabilities of Borrower pursuant to Section 9.3 of the Loan Agreement." (emphasis omitted)).

225.    Under the Guaranty Agreement, Meyer Chetrit agreed that Lender may pursue recovery from him without first seeking to exhaust its remedies against the Borrower.  *Id.* § 1.6.

226.    Meyer Chetrit also agreed he was liable for all costs and expenses, including attorney's fees, incurred by Lender in enforcing and/or preserving its rights under the Guaranty Agreement.  *Id.* § 1.8.  This covenant survives the payment and performance of the Guaranteed Obligations.  *Id.*

227.    Under the Guaranty Agreement, Meyer Chetrit is personally liable for all of Borrower's Recourse Liabilities under Loan Agreement Section 9.3.

228.    Under Loan Agreement Section 9.3(c)(ii)(B)(3), "the Debt shall be fully recourse to Borrower in the event … any Individual Borrower fails to obtain Lender's prior written consent to any Transfer to the extent such consent is required by this Agreement." Ex. 3 (Loan Agreement) § 9.3(c)(ii)(B)(3).

229.    Under Loan Agreement Section 5.2.10(b)(i),

> "Without the prior written consent of Lender, and except to the extent otherwise set forth in this Section 5.2.10 (including, without limitation, Section 5.2.10(d) hereof), Borrower shall not, and shall not permit any Restricted Party do any of the following (collectively, a "**Transfer**"): (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) any Individual Property or any part thereof or any legal or beneficial interest therein … other than … (B) Permitted Transfers.

Ex. 3 (Loan Agreement) § 5.2.10(b)(i).

230.    As of June 19, 2019, Shadow Creek Owner had a legal and beneficial interest in Shadow Creek Tract 2 because ROCO-Shadow Creek had agreed to convey Shadow Creek to Shadow Creek Owner but failed to do so.

231.    As a result, ROCO-Shadow Creek held bare title to Shadow Creek Tract 2 in constructive trust for Shadow Creek Owner, and Shadow Creek Owner held a legal interest in Shadow Creek Tract 2 through, among other things, its entitlement to receive formal title to Shadow Creek Tract 2 under its purchase-and-sale agreement with ROCO-Shadow Creek and a cause of action for reformation of the special warranty deed.

232.    On or about May 2024, Shadow Creek Owner, acting by and through Meyer Chetrit, asserted its legal interest in Shadow Creek Tract 2 in communications with ROCO-Shadow Creek.    During those communications, Shadow Creek Owner bargained, transferred, and disposed of its legal interest in Shadow Creek Tract 2 in exchange for ROCO-Shadow Creek's conveyance of legal title to Shadow Creek Tract 2 to 3100 Daniel McCall Drive, a non-Borrower affiliate of the Chetrits that is not bound by the Loan Agreement and not included in the Guaranty Agreement.

233.    The transfer of Shadow Creek Owner's legal interest in Shadow Creek Tract 2 was a Transfer, as defined in the Loan Agreement.

234.    The transfer of Shadow Creek Owner's legal interest in Shadow Creek Tract 2 was not a Permitted Transfer, nor was it a Transfer that was allowed without prior consent of the Trustee pursuant to Sections 5.2.10(d) or 5.2.10(e) of the Loan Agreement.

235.    Shadow Creek Owner did not request and did not receive the Trustee's consent, written or otherwise, for this Transfer.

236.    The Transfer was therefore an impermissible Transfer that was prohibited by the Loan Agreement.

237.    Because Shadow Creek Owner failed to obtain the Trustee' prior written consent to the Transfer, as required by the Loan Agreement, under Loan Agreement Section 9.3(c)(ii)(B)(3), the Debt is "fully recourse to Borrower," and through the Guaranty Agreement, to Meyer Chetrit.

238.    Accordingly, the Trust is entitled to money damages from Meyer Chetrit for the full amount of the Debt under the Guaranty Agreement, along with attorney's fees, court costs, and other costs of collection plus prejudgment interest.

## Prayer For Relief

WHEREFORE, the Trust respectfully requests that the Court enter judgment in favor of the Trust and against JPM:

A.    Ordering JPM to specifically perform its obligation to repurchase the Mortgage Loan at the Repurchase Price, *less* the actual amounts that the Trust received from the prior sale of any Properties;

B.    Alternatively, awarding damages in favor of the Trust and against JPM in the amount of the Repurchase Price, *less* the actual amounts that the Trust received from the prior sale of any Properties;

C.    Ordering JPM to specifically perform its obligation to repurchase the Shadow Creek portion of the Mortgage Loan at the Repurchase Price;

D.    Alternatively, awarding damages in favor of the Trust and against JPM for the Shadow Creek portion of the Mortgage Loan in the amount of the Repurchase Price;

E.      Ordering Shadow Creek Owner to specifically perform its obligation to execute a correction instrument adding Shadow Creek Tract 2 to the Deed of Trust for the Shadow Creek Property;

F.      Awarding damages in favor of the Trust and against Shadow Creek Owner in an amount to be determined by the Court equal to Shadow Creek's depreciation in value during the time period in which Shadow Creek Owner failed to execute the correction instrument adding Shadow Creek Tract 2 to the Deed of Trust for the Shadow Creek Property;

G.      Alternatively, awarding damages in favor of the Trust and against Shadow Creek Owner in an amount to be determined by the Court for the Shadow Creek Owner's failure to execute a correction instrument adding Shadow Creek Tract 2 to the Deed of Trust for the Shadow Creek Property;

H.      Reforming the Deed of Trust to correct the scrivener's error and Shadow Creek Owner's and JPM's mutual mistake in order to convey a valid and enforceable security interest in Shadow Creek Tract 2 to the Trustee;

I.      Awarding damages in favor of the Trust and against Meyer Chetrit in an amount to be determined by the Court for his breach of Guaranty Section 1.1 as a result of the material misrepresentations related to the Borrower's financial data (including the T12s);

J.      Awarding damages in favor of the Trust and against Meyer Chetrit in an amount to be determined by the Court for his breach of Guaranty Section 1.1 as a result of the material misrepresentations related to the rent rolls (including the rent roll attached to as Loan Agreement Schedule V);

K.      Awarding damages in favor of the Trust and against Meyer Chetrit for the full amount of the Debt for his breach of Guaranty Section 1.1 as a result of the Transfer of Shadow Creek Owner's legal interest in Shadow Creek Tract 2 to 3100 Daniel McCall Drive;

L.      Avoiding the transfer of Shadow Creek Owner's legal interest in Shadow Creek Tract 2 to 3100 Daniel McCall Drive and awarding full legal title of Shadow Creek Tract 2 to Shadow Creek Owner, subject to the Trustee's security interest therein;

M.      Awarding money damages in favor of the Trust and against 3100 Daniel McCall Drive for the value of the legal interest in and title to Shadow Creek Tract 2 that Shadow Creek Owner fraudulently transferred to 3100 Daniel McCall Drive;

N.      Awarding pre-judgment interest, as of the date of the breaches and other misconduct asserted herein;

O.      Awarding attorney's fees, costs, and expenses, as required under the relevant contracts and permitted under applicable law; and

P.      Awarding such other and further relief, in law and equity, as this Court deems just and proper.

Dated: March 10, 2025
      New York, New York

QUINN EMANUEL URQUHART
  & SULLIVAN, LLP

By:

Blair A. Adams
Evan Hess
Mary Trainor

295 Fifth Avenue
New York, NY 10016-7103
(212) 849-7000
blairadams@quinnemanuel.com
evanhess@quinnemanuel.com
marytrainor@quinnemanuel.com

*Attorneys for Plaintiff*