**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

WELLS FARGO BANK, NATIONAL
ASSOCIATION, as Trustee for the Benefit
of the Certificateholders of J.P. Morgan
Chase Commercial Mortgage Securities
Trust 2019-MFP, Commercial Mortgage
Pass-Through Certificates, Series 2019-
MFP, by and through Situs Holdings, LLC,
as Special Servicer under the Trust and
Servicing Agreement, dated as of July 18,
2019,

   *Plaintiff*,

    v.

JPMORGAN CHASE BANK,
NATIONAL ASSOCIATION, MEYER
CHETRIT, SHADOW CREEK OWNER,
LLC, and 3100 DANIEL MCCALL
DRIVE, LLC,

   *Defendants*.

Case No. 1:25-cv-01943 (DEH) [rel. 1:23-cv-09972 (DEH)]

---

### ANSWER OF DEFENDANTS MEYER CHETRIT, SHADOW CREEK OWNER, LLC, AND 3100 DANIEL MCCALL DRIVE, LLC

   Defendants Meyer Chetrit, Shadow Creek Owner, LLC, and 3100 Daniel McCall Drive, LLC (collectively, the "Chetrit Defendants"), by and through their undersigned counsel, hereby answer the Complaint of Plaintiff Wells Fargo Bank, National Association (ECF No. 1) in the above-captioned case.

   The Chetrit Defendants deny each and every allegation in the Complaint, whether express or implied, that is not expressly admitted below. The Chetrit Defendants deny all allegations in the headings of the Complaint, whether express or implied, except as specifically

admitted below, and citation of such headings herein is solely for ease of reference. Any factual allegation below is admitted only as to the specific admitted facts and not as to any purported conclusions, characterizations, implications, or speculations that arguably follow from the admitted facts. The Chetrit Defendants deny that Plaintiff is entitled to the relief requested in the Complaint, or to any other relief. The Chetrit Defendants reserve the right to amend and/or supplement this answer and defenses ("Answer"), which is based on information known to them at this time.

**AS TO PLAINTIFF'S COMPLAINT**

**Introduction**[1]

1.      This case arises from JPM's decision to originate a $481 million Mortgage Loan to the Chetrit Group in June 2019 based on financial information that both JPM and the Chetrits knew to be false and dramatically inflated. JPM immediately offloaded any risk it had on the Mortgage Loan to the Trust, taking home millions of dollars of fees in the process. The value of the Properties backing the Mortgage Loan then collapsed—leaving the Trust with tens of millions of dollars in losses. This lawsuit invokes the Trustee's contractual and equitable remedies to hold JPM and the Chetrits accountable for their misconduct and to recover the Trust's losses.

**Answer:** Paragraph 1 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, admit that JPMorgan Chase Bank, National Association ("JPM") originated a loan in the amount of $481 million to various borrower entities affiliated with the Chetrit Group in June 2019. Deny that the Chetrits knew

---

[1] Capitalized terms used in this Introduction are defined *supra* in the preamble or *infra* in the Factual Background.

financial information to be false and dramatically inflated, and that the Trust suffered tens of millions of dollars in losses.  Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1.

2.    In early 2019, the Chetrit Group approached JPM seeking financing for its acquisition of a portfolio of 43 multifamily properties from upstart real-estate investor ROCO Real Estate, LLC. During their due diligence on the Properties, the Chetrit Group and JPM discovered that the trailing-twelve-month financial statements (or T12s) that ROCO provided to the Chetrits (and that the Chetrits, in turn, provided to JPM) were fraudulent. In total, the T12s massively overstated the Properties' historical net operating income (or NOI) by approximately 25%. NOI is a key metric used by commercial real-estate lenders and investors both to assess the value of the property backing a loan and to determine whether the borrower will be able to afford its monthly debt-service payments.

**Answer:** Admit that NOI is a key metric used in the commercial real estate industry. Otherwise deny the allegations in Paragraph 2.

3.    Rather than demand corrected T12s that accurately stated the NOI of the Properties, JPM proceeded with the Mortgage Loan as if the financial data it was provided were accurate. JPM continued to use the dramatically overstated NOI from the false T12s to market the Mortgage Loan to Trust investors and provided the same dramatically overstated NOI to the appraisal firm that valued the Properties at $573.5 million.  JPM never disclosed that the financial data that it provided materially misrepresented the NOI generated by the Properties.

**Answer:** Paragraph 3 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 3.

4.     JPM did not itself have to bear the outsized risk associated with the inflated NOI figures because it never intended to hold the Mortgage Loan after origination.  Instead, it immediately transferred the risk of the Mortgage Loan to the Trust and its investors, who were left in the dark about the fraudulent NOI that anchored, among other things, the anticipated cash flow and appraisals of the Properties that JPM showed them before they invested.  JPM, for its part, collected millions in fees for originating the Mortgage Loan and selling the Certificates that the Trust issued.

**Answer:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4.

5.     In plowing ahead with the Mortgage Loan without correcting the false T12s, both JPM and the Chetrits breached their contractual representations and warranties under the transaction documents. In the Loan Agreement, the Chetrits represented and warranted that all financial statements and financial data delivered to JPM was complete and accurate and agreed that any material inaccuracy would constitute an Event of Default under the Loan Agreement. For its part, JPM represented and warranted in the Mortgage Loan Purchase Agreement (or MLPA) through which it transferred the Mortgage Loan to the Trust, that it did not have actual knowledge of any Events of Default under the Loan Agreement. Both parties' representations and warranties were made false by the NOI fraud they had uncovered months before originating the Mortgage Loan.

**Answer:** Paragraph 5 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny the allegations in Paragraph 5.

6.      JPM agreed under the MLPA that it would repurchase any portion of the Mortgage Loan impacted by a Material Breach of its representations and warranties. The fraudulent NOI in the false T12s impacted every one of the 43 Properties backing the Mortgage Loan. JPM is therefore required to repurchase the Mortgage Loan in its entirety or pay damages for having failed to do so. JPM is separately and independently responsible for repurchasing a portion of the Mortgage Loan tied to the Shadow Creek apartment complex in Lufkin, Texas, because it delivered a defective Deed of Trust for that property that failed to convey a valid security interest to the Trustee. And the Borrower entity for that property, Shadow Creek Owner, is obligated to execute a corrected instrument fixing the defective Deed of Trust and is subject to reformation of the original Deed of Trust to correct a scrivener's error and to set out the terms of the parties' actual agreement. Finally, the Trustee is entitled to avoidance of the opportunistic fraudulent transfer of Shadow Creek Owner's legal interest in a portion of the Shadow Creek property to non-Borrower affiliate 3100 Daniel McCall Drive that the Chetrits orchestrated with the deliberate intent to evade Shadow Creek Owner's payment obligations to the Trustee.

**Answer:** Paragraph 6 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents.  Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations concerning JPM's obligations under the MLPA, and deny all other allegations in Paragraph 6.

7.      For his part, Meyer Chetrit agreed to guaranty repayment of the Mortgage Loan in the amount of any recourse liability arising from material misrepresentations in the financial statements and financial information delivered to JPM. He is therefore liable for the significant

losses arising from the Chetrits' delivery of T12s that substantially overstated NOI earned from the Properties and for delivering materially inaccurate rent rolls for Shadow Creek.

**Answer:** Paragraph 7 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer to the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise admit that Meyer Chetrit is the Guarantor under the Guaranty Agreement, and deny all other allegations in Paragraph 7.

8.    The Borrower on the Mortgage Loan defaulted in 2022 and continues to owe over $285 million. The remaining Properties that serve as collateral for the Mortgage Loan are worth far less than that outstanding amount. The Trustee's repurchase remedy against JPM and recourse to Meyer Chetrit, as Guarantor, are therefore the only avenue for the Trustee to recover the full amount owed under the Mortgage Loan and avoid the substantial losses arising from JPM's and the Chetrits' misconduct. Accordingly, the Trustee seeks an order of specific performance requiring JPM to repurchase the Mortgage Loan in its entirety or, in the alternative, money damages in the amount of the Repurchase Price. To the extent not made whole by the repurchase remedy, the Trustee seeks money damages from Meyer Chetrit under the Guaranty Agreement. And the Trustee seeks various remedies related to Borrower's failure to properly convey a security interest in Shadow Creek Apartments and the subsequent fraudulent transfer of that property interest to a non-Borrower affiliate.

**Answer:** Paragraph 8 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, admit that a payment default on the Mortgage Loan (defined herein) occurred in 2022, and otherwise deny all allegations in Paragraph 8.

**The Parties**

9.      Wells Fargo Bank, National Association is a national banking association organized and existing under the laws of the United States with its head office in Sioux Falls, South Dakota. Wells Fargo is the trustee of the J.P. Morgan Chase Commercial Mortgage Securities Trust 2019-MFP, Commercial Mortgage Pass-Through Certificates, Series 2019-MFP. In initiating this lawsuit, Wells Fargo acts by and through the Special Servicer, Situs Holdings, LLC, in accordance with the Trust and Servicing Agreement, dated as of July 18, 2019.

        **Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  To the extent a response is required, admit that Wells Fargo is the trustee of the Certificates (defined herein), and otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9.

10.     Defendant JPMorgan Chase Bank, National Association is a national banking association organized and existing under the laws of the United States with its head office in Columbus, Ohio. JPM is the Seller of the Mortgage Loan under the MLPA at issue in this action.

        **Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  To the extent a response is required, admit that JPM is the Seller of the Mortgage Loan under the MLPA, and otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 10.

11.     Defendant Meyer Chetrit is a natural person domiciled in New York. Meyer Chetrit is the guarantor under a Guaranty Agreement in which he guaranteed payment of certain recourse obligations of Borrower under the Loan Agreement.

        **Answer:** Respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents.  To the extent a response is required, admit that

Meyer Chetrit is a natural person domiciled in New York and is the Guarantor under the Guaranty Agreement. Otherwise deny the allegations in Paragraph 11.

12. Defendant Shadow Creek Owner, LLC is a Delaware limited liability company with its principal place of business in New York. None of Shadow Creek Owner's direct or indirect members are citizens of South Dakota. Shadow Creek Owner is one of the special-purpose entities that comprises Borrower, and it owns the Property known as the Shadow Creek Apartments in Lufkin, Texas.

**Answer:** Deny that Shadow Creek Owner owns the Property known as the Shadow Creek Apartments in Lufkin, Texas, and specifically aver that Shadow Creek Owner, LLC owns that portion of the property referred to herein as the Shadow Creek Apartments located at 2807 Daniel McCall Drive, Lufkin, Texas (later defined as Shadow Creek Tract 1). Otherwise admit the allegations in Paragraph 12.

13. Defendant 3100 Daniel McCall Drive, LLC is a Delaware limited liability company with its principal place of business in New York. None of 3100 Daniel McCall Drive's direct or indirect members are citizens of South Dakota. 3100 Daniel McCall Drive was created on or about April 9, 2024, by the Chetrits specifically for the purpose of taking ownership of a portion of Property known as the Shadow Creek Apartments outside the reach of the Trustee's security interest.

**Answer:** Deny that 3100 Daniel McCall Drive, LLC was created specifically for the purpose of taking ownership of a portion of the Shadow Creek Apartments (later defined as Shadow Creek Tract 2) outside the reach of the Trustee's security interest. Otherwise admit the allegations in Paragraph 13.

## Jurisdiction, Venue, And Governing Law

14.    This Court has original jurisdiction over this action under 28 U.S.C. § 1332, because it is a civil action between citizens of different states and the matter in controversy exceeds $75,000.00 exclusive of interest and costs.

**Answer:** Paragraph 14 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, admit the allegations in Paragraph 14.

15.    Trustee, as a national banking association with its head office in South Dakota, is a South Dakota citizen.

**Answer:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15.

16.    None of the four Defendants in this case is a citizen of South Dakota. JPM, as a national banking association with its head office in Ohio, is an Ohio citizen. Meyer Chetrit, as a natural person domiciled in New York, is a New York citizen. Shadow Creek Owner and 3100 Daniel McCall Drive are Delaware limited liability companies with their principal place of business in New York, and are indirectly owned (through a series of limited liability companies) by Jonathan Chetrit, Meyer Chetrit, Jacob Chetrit, Joseph Chetrit, Daniel Chetrit, Simon Chetrit, and Michael Chetrit, all of whom are, on information and belief, citizens of New York or California.

**Answer:** Admit that none of the Chetrit Defendants is a citizen of South Dakota and that all of the Chetrit Defendants are citizens of New York.  Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16.

17.    Venue is proper in the Southern District of New York because, as described more fully below, Defendants undertook substantial activities relating to the MLPA in New York,

including negotiating and signing the MLPA in New York. JPM also expressly submitted to the jurisdiction of this Court in the MLPA. Ex. 1 (MLPA) § 13 ("Each of the parties hereto irrevocably: (i) submits to the exclusive jurisdiction of the courts of the State of New York and the federal courts of the United States of America for the Southern District of New York for the purpose of any action or proceeding relating to this agreement; (ii) waives, to the fullest extent permitted by law, the defense of an inconvenient forum in any action or proceeding in any such court; (iii) agrees that a final judgment in any action or proceeding in any such court shall be conclusive and may be enforced in any other jurisdiction by suit on the judgment or in any other manner provided by law …." (capitalization altered)).

**Answer:** Paragraph 17 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer to the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17.

18.    Meyer Chetrit likewise expressly submitted to the jurisdiction of this Court in the Guaranty Agreement. Ex. 2 § 5.3 (Guaranty Agreement) ("Any legal suit, action or proceeding against Lender or Guarantor arising out of or relating to this guaranty may at Lender's option be instituted in any federal or state court in the City of New York, County of New York, pursuant to Section 5-1402 of the New York General Obligations Law, and Guarantor waives any objections which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and each of Lender and Guarantor hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding." (capitalization altered)).

**Answer:** Paragraph 18 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer to the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit the allegations in Paragraph 18.

19. Shadow Creek Owner also expressly submitted to the jurisdiction of this Court in the Loan Agreement. Ex. 3 (Loan Agreement) § 10.3(b) ("Any legal suit, action or proceeding against lender or borrower arising out of or relating to this Agreement or the other Loan Documents may at Lender's option be instituted in any federal or state court in the City of New York, County of New York, pursuant to Section 5-1402 of the New York General Obligations Law and Borrower waives any objections which it may now or hereafter have based on venue and/or forum non conveniens of any such suit, action or proceeding, and Borrower hereby irrevocably submits to the jurisdiction of any such court in any suit, action or proceeding." (capitalization altered)).

**Answer:** Paragraph 19 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer to the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit the allegations in Paragraph 19.

20. New York law governs this action. Ex. 1 (MLPA) § 12 ("This agreement and any claim, controversy or dispute arising under or related to this agreement, the relationship of the parties to this agreement, and/or the interpretation and enforcement of the rights and duties of the parties to this agreement shall be governed by and construed in accordance with the internal laws and decisions of the State of New York, without regard to the choice of law rules thereof. The parties hereto intend that the provisions of Section 5-1401 of the New York General Obligations Law shall apply to this agreement." (capitalization altered)); Ex. 2 § 5.3 (Guaranty Agreement)

("This guaranty shall be governed by and construed in accordance with the laws of the State of New York and the applicable laws of the United States of America."); Ex. 3 (Loan Agreement) § 10.3(a) ("To the fullest extent permitted by law, Borrower hereby unconditionally and irrevocably waives any claim to assert that the law of any other jurisdiction governs this Agreement, the Note and the other Loan Documents, and this Agreement, the Note and the other Loan Documents shall be governed by and construed in accordance with the laws of the State of New York pursuant to Section 5-1401 of the New York General Obligations Law." (capitalization altered)).

**Answer:** Paragraph 20 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer to the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise admit that the Loan Agreement and the Guaranty Agreement contain New York choice-of-law provisions, and deny knowledge or information sufficient to form a belief as to the truth of all other allegations in Paragraph 20.

### Factual Background

I.      **The Mortgage Loan**

21.    This case involves a $481 million mortgage loan (the "Mortgage Loan") secured by a portfolio of 43 multifamily properties (including four student-housing properties) (the "Properties"). JPM originated the Mortgage Loan and then sold it to an affiliate, J.P. Morgan Chase Commercial Mortgage Securities Corp. ("JPMCC"). JPMCC then deposited the Mortgage Loan in a commercial mortgage-backed securities ("CMBS") trust called J.P. Morgan Chase Commercial Mortgage Securities Trust 2019-MFP (defined earlier as the "Trust"), where it is held today.

**Answer:** Admit that JPM originated a loan in the amount of $481 million secured by a portfolio of 43 properties.  Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21.

22.    The borrowers on the Mortgage Loan are 43 special-purpose entities (collectively defined in the Loan Agreement as the "Borrower") affiliated with the Chetrit Group, a prominent real-estate investment company owned by brothers Joseph and Meyer Chetrit, along with other Chetrit family members.

**Answer:** Admit the allegations in Paragraph 22.

23.    The Chetrits obtained the Mortgage Loan to finance their purchase of the Properties from ROCO Real Estate, LLC ("ROCO"), an upstart real-estate investment company based in Bloomfield Hills, Michigan, that had acquired the Properties between 2013 and 2018. During the time period relevant to the Complaint, ROCO was owned by two sets of brothers, Tyler and Evan Ross and Michael and David Colman.

**Answer:** Admit that the Chetrit Group obtained the Mortgage Loan in connection with its acquisition of the Properties from ROCO.  Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23.

24.    The Mortgage Loan and its transfer to the Trust are governed by various agreements, including the Loan Agreement, the Guaranty Agreement, the MLPA, and the TSA. These agreements are described in greater detail in the paragraphs that follow. The Trust is in physical possession of the wet-ink Note with allonge dated July 18, 2019, firmly affixed thereto by staple and evidencing the Trust's ownership of the Loan and acquisition of the Note. A true and correct copy is attached as Exhibit 4.

**Answer:** Paragraph 24 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24.

25. <u>The Loan Agreement</u>. On or about June 19, 2019, the Borrower executed a promissory note (the "<u>Note</u>") in favor of JPM for $481 million. That same day, JPM and Borrower entered into a loan agreement (the "<u>Loan Agreement</u>"), which sets forth Borrower's obligations while repaying the Mortgage Loan. The Mortgage Loan is secured by mortgages on the 43 multifamily properties backing the Mortgage Loan, which are located in ten different states. *See* Ex. 3 (Loan Agreement).

**Answer:** Respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. To the extent a response is required, admit the allegations in Paragraph 25.

26. <u>The Guaranty Agreement</u>. As further security for the Mortgage Loan, JPM negotiated a guaranty agreement, executed as of June 19, 2019 (the "<u>Guaranty Agreement</u>") with Meyer Chetrit. Under the Guaranty Agreement, Meyer Chetrit, as Guarantor, agreed to unconditionally and irrevocably guaranty certain recourse obligations of the Borrower tied to "bad boy" acts identified in the Loan Agreement. *See* Ex. 2 (Guaranty Agreement).

**Answer:** Respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. To the extent a response is required, admit that Meyer Chetrit is the Guarantor under the Guaranty Agreement, and otherwise deny the allegations in Paragraph 26.

27. <u>MLPA</u>. Less than a month after originating the Mortgage Loan, JPM sold it to affiliate JPMCC under the MLPA, dated as of July 18, 2019. The MLPA sets forth various rights and obligations of JPM, as Seller, and JPMCC, as Buyer of the Mortgage Loan. MLPA Exhibit A includes certain representations and warranties made by JPM as part of the transfer, which are discussed in greater detail below. *See* Ex. 1 (MLPA).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27.

28. <u>TSA</u>. JPMCC, in turn, deposited the Mortgage Loan into a CMBS trust governed by a trust and servicing agreement, dated as of July 18, 2019 (the "<u>TSA</u>") in exchange for the commercial mortgage pass-through certificates (the "<u>Certificates</u>") issued by the CMBS trust, which were then sold to investors (the "<u>Certificateholders</u>"). Ex. 5 (TSA) § 2.1(a). Under the TSA, JPMCC assigned to Wells Fargo, in its capacity as Trustee, all of JPMCC's "right title and interest whether now owned or hereafter acquired" in the Mortgage Loan and JPMCC's "rights and remedies … under the [MLPA]." *Id.*

**Answer:** Paragraph 28 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28.

29. Pursuant to the TSA, Situs, in its capacity as Special Servicer, is granted full power and authority to service and administer the Mortgage Loan following a Special Servicing Loan

Event, which occurred when Borrower failed to repay the Mortgage Loan when due on July 9, 2022 (the "Maturity Date").

**Answer:** Paragraph 29 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29.

30. The Trustee asserts claims under the Loan Agreement, MLPA, and Guaranty Agreement. Relevant terms of the Loan Agreement, MLPA, and Guaranty Agreement are discussed in greater detail below.

**Answer:** Paragraph 30 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30.

A. **Borrower's Representations And Warranties Under the Loan Agreement**

31. In connection with the Mortgage Loan, and to induce JPM to make the loan, Borrower made certain representations and warranties in the Loan Agreement related to the condition and financial health of the Properties and the accuracy of certain materials provided to JPM. At issue here, Borrower made two representations and warranties concerning the accuracy of the financial information that Borrower provided to JPM, as set forth below.

**Answer:** Paragraph 31 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise

admit that Borrower made certain representations and warranties in the Loan Agreement, as set forth therein, and deny all other allegations in Paragraph 31.

32.    *First*, under Loan Agreement Section 4.1.11, Borrower represents and warrants that:

> **Financial Information.** All financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender by Borrower in connection with the Loan (a) are true, complete and correct in all material respects, (b) accurately represent the financial condition of Borrower and each Individual Property, as applicable, as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with GAAP throughout the periods covered, except as disclosed therein.…

Ex. 3 (Loan Agreement) § 4.1.11 (The "<u>Financial Information Representation</u>").

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  To the extent a response is required, admit that Plaintiff has accurately quoted the cited document in Paragraph 32, and otherwise deny any allegation that is inconsistent with the writing.

33.    *Second*, under Loan Agreement Section 4.1.33, Borrower represents and warrants that:

> **No Change in Facts or Circumstances; Disclosure.** All information submitted by and on behalf of Borrower to Lender and in all financial statements, rent rolls (including the rent roll attached hereto as Schedule V), reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are true, complete and correct in all material respects. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or would reasonably be expected to materially and adversely affect the use, operation or value of any Individual Property or the business operations or the financial condition of

Borrower. Borrower has not failed to disclose any material fact that would be reasonably be expected to cause any Provided Information or representation or warranty made herein to be materially misleading.

*Id.* § 4.1.33 (the "Disclosure Representation").

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, admit that Plaintiff has accurately quoted the cited document in Paragraph 33, and otherwise deny any allegation that is inconsistent with the writing.

34.    The Borrower's representations and warranties "survive for so long as any amount remains owing to Lender under this Agreement or any of the other Loan Documents by Borrower." *Id.* § 4.2.

**Answer:** Paragraph 34 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that Plaintiff has accurately quoted the cited document in Paragraph 34, and deny any allegation that is inconsistent with the writing.

35.    Borrower further agreed that "[a]ll representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf." *Id.*

**Answer:** Paragraph 35 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise

admit that Plaintiff has accurately quoted the cited document in Paragraph 35, and deny any allegation that is inconsistent with the writing.

36.    It is an Event of Default under the Loan Agreement "if any representation or warranty made by Borrower herein … shall have been false or misleading in any material respect as of the date the representation or warranty was made." *Id.* § 8.1(a)(v).

**Answer:** Paragraph 36 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise admit that Plaintiff has accurately quoted the cited document in Paragraph 36, and deny any allegation that is inconsistent with the writing.

**B.    Meyer Chetrit's Recourse Guaranty**

37.    As further inducement to JPM to provide the Mortgage Loan, Meyer Chetrit agreed to personally guaranty certain Borrower obligations under the Guaranty Agreement. The Guaranty Agreement states:

> Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

Ex. 2 (Guaranty Agreement) § 1.1.

**Answer:** Paragraph 37 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise admit that Plaintiff has accurately quoted the cited document, and deny all other allegations in Paragraph 37.

38.   The Guaranty Agreement defines "Guaranteed Obligations" as the Recourse Liabilities described in Loan Agreement Section 9.3. *Id.* § 1.2 ("As used herein, the term 'Guaranteed Obligations' means all obligations and liabilities of Borrower pursuant to Section 9.3 of the Loan Agreement." (emphasis omitted)).

**Answer:** Paragraph 38 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise admit that "Guaranteed Obligations" is defined in the Guaranty Agreement by reference to Section 9.3 of the Loan Agreement, and deny all other allegations in Paragraph 38.

39.   Loan Agreement Section 9.3(b)(i) provides that "Borrower shall be fully and personally liable and subject to legal action, for any loss, cost, out of pocket expense, damage … , claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with … material misrepresentation by any Individual Borrower, Principal or Guarantor in the Loan Documents or any document required to be delivered by Borrower, Principal or Guarantor pursuant to the Loan Documents." Ex. 3 (Loan Agreement) § 9.3(b)(i).[2] Through this provision, Borrower and Meyer Chetrit, as Guarantor, assumed recourse liability for any false representations under the Loan Agreement. *See generally id.* § 4.1.

**Answer:** Paragraph 39 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise

---

[2] Absent one of these recourse triggers, the Trustee's only source of recovery for payment deficiencies is the Properties that serve as the Mortgage Loan's collateral.

admit that Plaintiff has accurately quoted the cited document, and deny all other allegations in Paragraph 39, including footnote 2.

40.    Meyer Chetrit also assumed full recourse liability in the event of any transfer of any legal or beneficial interests in any Property that is not permitted by the Loan Agreement. Under Loan Agreement Section 9.3(c)(ii)(B)(3), "the Debt shall be fully recourse to Borrower in the event … any Individual Borrower fails to obtain Lender's prior written consent to any Transfer to the extent such consent is required by this Agreement." *Id.* § 9.3(c)(ii)(B)(3).  Under Loan Agreement Section 5.2.10(b)(i),

> Without the prior written consent of Lender, and except to the extent otherwise set forth in this Section 5.2.10 (including, without limitation, Section 5.2.10(d) hereof), Borrower shall not, and shall not permit any Restricted Party do any of the following (collectively, a "**Transfer**"): (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) any Individual Property or any part thereof or any legal or beneficial interest therein … other than … (B) Permitted Transfers.

*Id.* § 5.2.10(b)(i).

**Answer:** Paragraph 40 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise admit that Plaintiff has accurately quoted the cited document, and deny all other allegations in Paragraph 40.

41.     Under the Guaranty Agreement, Meyer Chetrit agreed that Lender may seek to recover from him for the recourse liabilities described in Loan Agreement Section 9.3(b) and (c) without first exhausting its remedies against the Borrower or the Properties. Specifically, Guaranty Agreement Section 1.6 provides:

> It shall not be necessary for Lender (and Guarantor hereby waives any rights which Guarantor may have to require Lender), in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower or others liable on the Loan or the Guaranteed Obligations or any other Person, (ii) enforce Lender's rights against any collateral which shall ever have been given to secure the Loan, (iii) enforce Lender's rights against any other guarantors of the Guaranteed Obligations, (iv) join Borrower or any others liable on the Guaranteed Obligations in any action seeking to enforce this Guaranty, (v) exhaust any remedies available to Lender against any collateral which shall ever have been given to secure the Loan, or (vi) resort to any other means of obtaining payment of the Guaranteed Obligations. Lender shall not be required to mitigate damages or take any other action to reduce, collect or enforce the Guaranteed Obligations.

Ex. 2 (Guaranty Agreement) § 1.6.

**Answer:** Paragraph 41 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise admit that Plaintiff has accurately quoted the cited document, and deny all other allegations in Paragraph 41.

42.     Meyer Chetrit also agreed to be personally liable for all costs and expenses, including attorney's fees, incurred by Lender in enforcing and/or preserving its rights under the Guaranty Agreement. *Id.* § 1.8. This covenant survives the payment and performance of the Guaranteed Obligations. *Id.*

**Answer:** Paragraph 42 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to

22

the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny the allegations in Paragraph 42.

      **C.    JPM's Repurchase Obligation Under The MLPA**

      43.    In connection with its securitization of the Mortgage Loan, and to induce the Trust to acquire the Mortgage Loan, JPM made the representations and warranties in MLPA Exhibit A. These representations and warranties improve the marketability of the Certificates issued by the Trust by guaranteeing repayment of the Certificates (through repurchase of the Mortgage Loan) if the Mortgage Loan fails to fulfill certain baseline markers of creditworthiness.

      **Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43.

      44.    Of particular relevance here, JPM represented and warranted that, to the best of its knowledge after due inquiry, there was no Event of Default existing under any of the Mortgage Loan Documents, including the Loan Agreement. Specifically, MLPA Exhibit A, Representation 4 provides that:

> [t]o the best of the Seller's Knowledge (as defined below) after due inquiry, (a) there is no monetary or material non-monetary Event of Default (as defined in the Loan Agreement) existing under any of the Mortgage Loan Documents, (b) there is no event which, with the passage of time or with notice and the expiration of any applicable grace or cure period, would constitute a material Event of Default under any of the Mortgage Loan Documents and (c) the Seller has not waived any Event of Default. "Seller's Knowledge" means the actual knowledge of any of the individuals at the Seller who were actively involved in the origination, administration or servicing of the Mortgage Loan.

Ex. 1 (MLPA) Ex. A, Rep. 4 (the "No Event Of Default Representation" or "Representation 4").

The Mortgage Loan Documents include the Loan Agreement. Ex. 5 (TSA) § 1.1, at 40 ("Mortgage

Loan Documents" definition); *see* Ex. 1 (MLPA) § 1 (defining "Mortgage Loan Documents" as "defined in the Trust and Servicing Agreement").

**Answer:** Respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44.

45. Through this representation and warranty, JPM assured the Trust and prospective Certificateholders that it had performed the detailed due diligence expected of highly sophisticated originators like JPM, and that it had not uncovered (*i.e.*, obtained "actual knowledge of") any materially false representations or warranties made by Borrower that would cause an Event of Default under the Loan Agreement. The Trust and its Certificateholders, who do not have access to the same due diligence materials as JPM does in its role as originator, have no choice but to rely on the integrity of JPM's due-diligence process, and the No Event of Default Representation in the MLPA is intended to provide the Trust and its Certificateholders with additional comfort that this reliance was not misplaced.

**Answer:** Paragraph 45 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45.

46. Under MLPA Section 8(a), "if there is a breach of any representation or warranty made by the Seller relating to the Mortgage Loan as set forth in Exhibit A hereto," and such "breach materially and adversely affects the value of the Mortgage Loan or the interest of the

Purchaser (or the holders of the Certificates) therein … (a … '<u>Material Breach</u>,' … )," then "the party discovering such … Material Breach shall promptly notify the Seller." Ex. 1 (MLPA) § 8(a).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46.

47. "Within 90 days" of receipt of such notice, "the Seller shall either (x) repurchase the Mortgage Loan … at an amount equal to the Repurchase Price (as defined in the [TSA]), (y) promptly cure such … Material Breach … in all material respects or (z) if such … Material Breach is not related to the Mortgage Loan not being a Qualified Mortgage, indemnify the Trust for the losses directly related to such Material Breach … , subject, in the case of any partial repurchase or indemnity in lieu of a repurchase, to receipt of a Rating Agency Confirmation from each Rating Agency with respect to such action." Ex. 1 (MLPA) § 8(a); *accord* Ex. 5 (TSA) § 2.9(a).

**Answer:** Respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47.

48. The same notice and remedy provisions apply if JPM delivers a required Mortgage Loan document to Trust that is materially defective. Specifically, under MLPA Section 8(a), "[i]f any document required to be delivered to the Purchaser or its designee pursuant to <u>Section 3</u> … is defective (… a '<u>Defect</u>')," and such "Defect … materially and adversely affects the value of the Mortgage Loan or the interest of the Purchaser (or the holders of the Certificates) therein … (a '<u>Material Document Defect</u>' … )," then "the party discovering such Material Document Defect … shall promptly notify the Seller." Ex. 1 (MLPA) § 8(a).

**Answer:** Paragraph 48 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48.

49. And, "[w]ithin 90 days" of receipt of such notice, "the Seller shall either (x) repurchase the Mortgage Loan … at an amount equal to the Repurchase Price (as defined in the [TSA]), (y) promptly cure such Material Document Defect … , in all material respects or (z) if such Material Document Defect … is not related to the Mortgage Loan not being a Qualified Mortgage, indemnify the Trust for the losses directly related to such … Material Document Defect, subject, in the case of any partial repurchase or indemnity in lieu of a repurchase, to receipt of a Rating Agency Confirmation from each Rating Agency with respect to such action." Ex. 1 (MLPA) § 8(a).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49.

50. The TSA defines the "Repurchase Price" as:

[T]he sum of:

(i) the unpaid principal balance of the Mortgage Loan … ,

(ii) accrued and unpaid interest on the Mortgage Loan at the weighted average of the Component Rates (without giving effect to the Default Rate) to and including the last day of the related Mortgage Loan Interest Accrual Period in which the repurchase is to occur … ,

(iii) unreimbursed Property Protection Advances and … ,

(iv) an amount equal to all interest on outstanding Monthly Payment Advances … ,

(v) any unpaid Trust Fund Expenses … and

(vi) any other expenses reasonably incurred or expected to be incurred by the Servicer, the Special Servicer, the Certificate Administrator, the Operating Advisor or the Trustee arising out of the enforcement of the repurchase obligation.

No Liquidation Fee shall be payable by the Mortgage Loan Seller in connection with a repurchase of the Mortgage Loan (or any allocable portion of the Mortgage Loan) due to a Material Breach or a Material Document Defect pursuant to the Mortgage Loan Purchase Agreement (so long as such repurchase occurs prior to the expiration of the Initial Resolution Period or Extended Resolution Period (if applicable)).

Ex. 5 (TSA) § 1.1 ("Repurchase Price" definition) (line breaks added).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50.

51. MLPA Section 8(a)'s repurchase remedy is the "sole remedy" for Material Breaches and Material Document Defects. Ex. 1 (MLPA) § 7(e).

**Answer:** Paragraph 51 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51.

## II.    Borrower And JPM Misrepresent The Properties' Financial Performance

52. In assessing the acquisition of the ROCO portfolio, the Chetrits hired multiple professional advisers, including Iron Hound Management Company ("Iron Hound") and Post Road

Management ("Post Road"). Iron Hound and Post Road assisted the Chetrits in performing due diligence on the Properties.

**Answer:** Admit the allegations in Paragraph 52.

53.    Iron Hound contacted JPM on the Chetrits' behalf about providing a loan to finance the Chetrits' purchase of the ROCO portfolio and interfaced with JPM during JPM's own due-diligence process for making the Mortgage Loan. The transaction was a high profile deal for JPM—so much so that JPM's Head of Real Estate Loan Origination for the United States, Joseph Geoghan, quarterbacked the transaction from start to finish.

**Answer:** Admit that Iron Hound contacted JPM on the Chetrits' behalf in connection with providing the Mortgage Loan and interfaced with JPM during the due diligence process. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53.

54.    ROCO provided the Chetrits and their advisers with, among other materials, trailing-twelve-months operating statements (or "T12s") for the Properties that purported to track the financial performance of the Properties. The T12s included various categories of income earned and expenses incurred on the Properties over the trailing twelve months and purported to reflect each of the Properties' respective net operating income (or "NOI") for that period. ROCO also provided the Chetrits and their advisers with the raw data from ROCO's internal accounting system, which accurately reflected the Properties' operating income and expenses. Iron Hound, acting on the Chetrits' behalf, provided the T12s and backup materials from ROCO's internal accounting system to JPM so that it could perform due diligence on the requested financing. JPM also requested, and the Chetrits provided, bank statements from ROCO that could be used to verify the accuracy of the T12s.

**Answer:** Respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. To the extent a response is required, admit that ROCO provided the Chetrits' advisers with T12s for the Properties and access to other data. Deny that the data from ROCO's internal accounting system accurately reflected the Properties' operating income and expenses. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54.

55.    In February 2019, five months before JPM made the Mortgage Loan, the Chetrits discovered that ROCO's T12s were deliberately and fraudulently altered to falsely increase reported NOI for the Properties. To overstate NOI, ROCO depressed expenses and inflated income. For example, ROCO depressed expenses by deleting or reducing actual expenses incurred on the Properties, like cable-television costs, sewer costs, contractor costs (cleaning, painting and drywall, etc.), employee wages, travel, offices supplies, management fees, computer costs, marketing, and trash collection. ROCO inflated income by increasing the amounts for certain itemized funding streams like late charges, bad debt rent write-offs, and miscellaneous income, and by omitting rent concessions and adjustments.

**Answer:** Deny that, in February 2019, the Chetrits discovered that ROCO's T12s were deliberately and fraudulently altered. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55.

56.    The Chetrits confirmed the inaccuracy of the false T12s by comparing them with the raw data that ROCO provided from its internal accounting system, which JPM also had in its possession.

**Answer:** Deny the allegations in Paragraph 56.

57.    Upon discovering that the T12s contained false and inaccurate information, the Chetrits demanded an in-person meeting in New York and confronted ROCO. At that meeting, which occurred in February 2019, the Chetrits informed ROCO that they had identified *at least* $3.5 million in purported income listed on the T12s that did not exist. The Chetrits ultimately identified an additional $2.6 million in underreported repairs and maintenance costs, and another $900,000 in other erroneous entries. Combined with the fake income, the Chetrits determined that ROCO's T12s overstated NOI by approximately $7 million. ROCO admitted that it was overreporting net operating income and, as a result, ROCO agreed to reduce the purchase price for the Properties by over $65 million.

**Answer:** Admit that the Chetrit Group requested a meeting with ROCO in New York City in February 2019, at which the financial information that ROCO had provided was discussed; and that ROCO and the Chetrit Group agreed in February 2019 to a reduction in the purchase price of approximately $67.5 million.  Otherwise deny the allegations in Paragraph 57.

58.    After their February 2019 meeting with ROCO, the Chetrits informed JPM that the T12s contained false and inaccurate information, including that $3.5 million in income reflected on the T12s "did not exist" and was not "actually being collected" and that the T12s underreported operating expenses. Thus, JPM had actual knowledge over five months before originating the Mortgage Loan that T12s provided by Borrower contained materially false information.

**Answer:** Paragraph 58 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, admit that in February 2019, an adviser to the Chetrit Group stated in an email to JPM that it had identified "$3.5MM of other income that we did not believe was actually being collected and we 'right-sized' operating expenses by ~$375 per unit."  Otherwise deny the allegations in Paragraph 58.

59.    The overstatement of NOI in the T12s was sufficiently severe that the Chetrits and their advisers determined that they could no longer rely on ROCO's financial reporting in assessing the appropriate purchase price for the ROCO portfolio. Behind closed doors, JPM expressed similar sentiments. In April 2019, for example, an analyst at JPM responsible for due diligence on the ROCO Properties described financial reporting provided by the Borrower in text messages to a colleague as "made up" and "ridic[ulous]."

**Answer:** Deny that the Chetrit Group and its advisers determined they could no longer rely on ROCO's financial reporting in determining an acceptable purchase price.  Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59.

60.    Tyler Ross, the Co-CEO of ROCO, has since admitted that the T12 NOI figures were overstated by 25%. While the T12s showed $40.6 million in NOI on the Properties, ROCO's internal, undoctored T12s showed just $30.3 million in NOI on the Properties. The $10.3 million in overstated NOI impacted every single one of the 43 Properties backing the Mortgage Loan. Mr. Ross pleaded guilty to bank fraud for submitting similarly inflated NOI figures to Fannie Mae in relation to a previous financing for the Properties and has been sentenced to prison.

**Answer:** Admit that Tyler Ross pleaded guilty to one count of conspiracy to commit an offense against the United States under 18 U.S.C. §§ 371 and 1014 and was sentenced to a prison term in connection therewith.  Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60.

61.    Upon learning that the T12s contained false information, JPM had an obligation to engage in due inquiry to determine the scope of the fraudulent reporting. JPM had all of the information that it needed to do so at its fingertips. It had ROCO's underlying bank statements and

the raw data from ROCO's internal accounting system that could be used to validate the accuracy of information contained in the T12s provided by Borrower. And JPM knew that it faced a serious issue. JPM's Head of Real Estate Loan Origination for the United States, Mr. Geoghan, has admitted that a discovery of this type of fraud should have stopped the deal in its tracks until JPM was able to find out why the financials were inaccurate.

**Answer:** Paragraph 61 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61.

62. Instead, JPM plowed ahead as if nothing unusual had happened. JPM did not perform additional due diligence to determine the scope of false information in the T12s provided by Borrower. Worse yet, JPM did not even insist that the Chetrits supply accurate T12s correcting the $7 million in NOI that they had determined to be false, or that the Chetrits demand and supply accurate T12s from ROCO. JPM continued to use the false T12s throughout the process of originating and selling the Mortgage Loan to the Trust and marketing the transaction to the public, without even bothering to correct known errors in the numbers.

**Answer:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62.

63. In marketing the Trust certificates to investors, JPM presented ROCO's false T12s as accurately reflecting the historical performance of the Properties without adjustment or correction. JPM provided the false T12s to its appraiser, Newmark Knight Frank ("Newmark"), in March 2019, and Newmark used those T12s to determine the as-is appraised value of $573.5 million for the Properties. JPM then provided those appraisals to the Trust and made them available to prospective Certificateholders, using them to justify a reported loan-to-value ratio of 83.9%.

JPM presented this loan-to-value ratio to the Trust and prominently featured it in its offering memorandum without disclosing that it was derived from false NOI assumptions.

      **Answer:** Respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 63.

      64.   JPM separately reported an "Underwritten Net Operating Income" to the Trust and in its marketing materials that reduced the T12 NOI by approximately the $3.5 million. But JPM did not explain that this "adjustment" was simply deleting a portion of the NOI that JPM had determined did not actually exist. Instead, JPM crafted an "Underwritten Net Operating Income" definition that carefully avoided disclosing the most salient point: that the Borrower's *actual* T12s were fraudulently overstated.[3]   And the "Underwritten Net Operating Income" inexplicably reduced NOI by only about *half* of the $7 million overstatement of NOI that the Chetrits and JPM unequivocally knew existed before closing.

---

[3] Specifically, Underwritten Net Operating Income is defined as:

    (a) the sum of (i) annualized Gross Income from Operations based on in-place base rents in connection with leases with tenants in occupancy at the Property and paying rent as adjusted by the Mortgage Lender assuming an amount for vacancy/collections loss equal to the greater of (x) the actual vacancy and (y) 5% plus (ii) amounts received by the Borrowers from the ownership and operation of the Property to the extent such amounts are recurring in nature and properly included as Gross Income from Operations during such period, annualized, less budgeted operating expenses based on the annual budget last delivered and approved by the Mortgage Lender, as applicable, annualized, and adjusted by the Mortgage Lender to assume (i) an amount for management fees equal to 3% of Gross Income from Operations and (ii) Replacement Reserve Fund contributions equal to $330.00 per Unit per year, less (c) trailing 12 month concessions.

**Answer:** Paragraph 64 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny that the Borrower itself produced any T12s and any allegation concerning the Chetrits' knowledge, and deny knowledge or information sufficient to form a belief as to the truth of all other allegations in Paragraph 64 and footnote 3.

65.   JPM never disclosed to the Trust or prospective Certificateholders that ROCO's "historical" NOIs were fraudulently inflated by 25%, despite having actual knowledge of the majority (if not all) of that inflation. Ultimately, JPM provided a $481 million mortgage loan for the Chetrit's acquisition of the ROCO portfolio, covering nearly 92% of the $522 million purchase price that the Chetrits paid for the Properties.

**Answer:** Paragraph 65 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, admit that JPM originated a loan in the amount of $481 million to various borrower entities affiliated with the Chetrit Group. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 65.

66.   JPM was willing to issue such a risky loan because it never intended to hold it. As was its plan from the start, JPM transferred the Mortgage Loan to the Trust within a month of origination and sold the Certificates issued by the Trust to third-party investors who, unlike JPM, were unaware that Borrower had delivered dramatically overstated financials. Those left holding the bag had relied on Borrower financial information that JPM presented to them as accurate while knowing otherwise. JPM, meanwhile, walked away with millions of dollars in fees for originating the loan and selling the Trust Certificates.

**Answer:** Paragraph 66 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 66.

67.    By delivering the false T12s to JPM, Borrower violated the Financial Information Representation and the Disclosure Representation in the Loan Agreement. Ex. 3 (Loan Agreement) §§ 4.1.11, 4.1.33. Those misrepresentations constituted an Event of Default under the Loan Agreement. *Id.* § 8.1(a)(v). And they give rise to Borrower recourse liability under Loan Agreement Section 9.3(b)(1) that Meyer Chetrit guaranteed under the Guaranty Agreement.

**Answer:** Paragraph 67 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny the allegations in Paragraph 67.

68.    Because JPM had knowledge of Borrower's misrepresentations, JPM breached its representation and warranty that "[t]o the best of [JPM's] Knowledge … after due inquiry, (a) there is no … material non-monetary Event of Default … existing under the Mortgage Loan Documents. Ex. 1 (MLPA), Schedule A, Rep. 4. To the extent there was any portion of Borrower's inflated NOI that JPM did not actually discover before closing, that was only because JPM failed to undertake the "due inquiry" it represented that it had performed. *Id.* This Material Breach under the MLPA forms one basis for Trustee's demand, discussed in Part V below, that JPM repurchase the Mortgage Loan.

**Answer:** Paragraph 68 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise

deny that Borrower made any misrepresentations, and deny knowledge or information sufficient to form a belief as to the truth of all other allegations in Paragraph 68.

### III.    JPM Delivers A Defective Deed Of Trust For The Shadow Creek Property

69.    In addition to the Material Breach described above, JPM delivered defective documentation of its security interest in one of the largest Properties backing the Mortgage Loan—the Shadow Creek Apartments in Lufkin, Texas ("Shadow Creek")—rendering the Trust unable to effectively exercise its foreclosure remedy to recover against the Property.

**Answer:** Paragraph 69 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69.

70.    Shadow Creek comprises two apartment buildings located at 2807 Daniel McCall Drive ("Shadow Creek Tract 1") and 3100 Daniel McCall Drive ("Shadow Creek Tract 2"), respectively, which collectively contain 221 apartment units. It was one of the ten largest Properties at origination, with an "As-Is Appraised Value" of $21.5 million and an allocated Mortgage Loan amount of $18.03 million.

**Answer:** Admit that Shadow Creek (as defined herein) includes two tracts, one located at 2807 Daniel McCall Drive, Lufkin, Texas (Shadow Creek Tract 1), and the other located at 3100 Daniel McCall Drive, Lufkin, Texas (Shadow Creek Tract 2); that at or around the time of the acquisition of the Properties by the Chetrit Group from ROCO, Shadow Creek (as defined herein) contained either 221 or 222 apartment units; that, pursuant to an appraisal report prepared by Newmark Knight Frank dated as of June 13, 2019, the "As-Is Market Value" of Shadow Creek (as defined herein) was $21,500,000; that, pursuant to a final Settlement Statement circulated on June 19, 2019, the portion of the Mortgage Loan allocated to Shadow Creek (as defined herein) was $18,030,000.00.

71.   Both JPM and Borrower intended to include Shadow Creek Tract 2 in collateral backing the Mortgage Loan. This intent is reflected in numerous places in the Loan Documents and marketing materials for the Trust. For example, the rent roll attached as Schedule V of the original Loan Agreement indicates that the Mortgage Loan is supported by rents from both Shadow Creek Tract 1 and Shadow Creek Tract 2. The Preliminary Offering Circular used to market the Certificates describes Shadow Creek as a 221-unit apartment complex, incorporating the apartments from Shadow Creek Tract 1 and Shadow Creek Tract 2. And the reported historical NOI and projected NOI for Shadow Creek provided by the Chetrits and used to underwrite the Mortgage Loan incorporate income and operating expenses from both Shadow Creek Tract 1 and Shadow Creek Tract 2. The appraisal conducted on Shadow Creek and provided to prospective Certificateholders determined value based on projected income generated by Shadow Creek Tract 1 and Shadow Creek Tract 2, considered together.

**Answer:** Paragraph 71 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise admit that Shadow Creek Tract 2 was intended to be a part of the collateral backing the Mortgage Loan, and deny knowledge or information sufficient to form a belief as to the truth of all other allegations in Paragraph 71.

72.   Borrower conveyed a security interest in Shadow Creek to JPM through a Deed of Trust, in accordance with Texas law. The Deed of Trust conveyed title of Shadow Creek Tract 1 to Ronald Addison, in his capacity as Trustee under the Deed of Trust (the "Shadow Creek Trustee"), but in what can only be explained as an egregious scrivener's error, failed to convey title of Shadow Creek Tract 2. Specifically, the Deed of Trust included, as Exhibit A, a "Legal

Description" of the real property conveyed that included a description of Shadow Creek Tract 1 but not Shadow Creek Tract 2.

**Answer:** Paragraph 72 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that Shadow Creek Owner LLC executed a Deed of Trust to Ronald Addison as Trustee for the benefit of JPM, which covered Shadow Creek Tract 1 but not Shadow Creek Tract 2; and deny all other allegations in Paragraph 72.

73.    Notwithstanding this error, the Borrower and the Trustee continued to treat Shadow Creek Tract 2 as part of the collateral for the Mortgage Loan, and Borrower stipulated to inclusion of the Shadow Creek Tract 2 in the Receivership Estate established in a separate action pending before this Court (the "Receivership Action").[4] Borrower, however, has refused to execute and record a corrected Deed of Trust that would properly convey the intended security interest to the Trustee and pave the way for non-judicial foreclosure.

**Answer:** Paragraph 73 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that the Trust has always had the full benefit of all income from Shadow Creek Tract 2; that, in connection with the Receivership Action, the Trustee, Borrower, and 3100 Daniel McCall Drive, LLC jointly stipulated that Shadow Creek Tract 2 is "subject to the Receivership Order and shall be managed and administered by the Receiver pursuant to the Receivership Order, in each case as

---

[4] The Receivership Action is captioned, *Wells Fargo Bank, Nat'l Ass'n v. Barrington Park Owner, LLC*, Case No. 23-cv-09972 (DEH) (S.D.N.Y.).

if [Shadow Creek] Tract 2 is part of the Collateral Properties and part of the Receivership Estate"
(Case No. 23-cv-9972, ECF No. 138 at 3).  Deny all other allegations in Paragraph 73, and
specifically aver that Defendants Shadow Creek Owner and 3100 Daniel McCall Drive have
sought to resolve any outstanding issues concerning Shadow Creek Tract 2.  While not conceding
the applicability of the Interim Order Appointing Receiver issued in the Receivership Action (Case
No. 23-cv-9972, ECF No. 71) to their proposed conduct or conceding any liability on any of the
claims concerning Shadow Creek Tract 2 alleged in the Complaint, and reserving all rights, in an
abundance of caution, Defendants Shadow Creek Owner and 3100 Daniel McCall Drive expressly
requested the consent of Plaintiff and the Receiver to engage in certain ameliorative steps.
Specifically, on June 2, 2025, counsel to Defendants Shadow Creek Owner and 3100 Daniel
McCall Drive transmitted a letter to Plaintiff and the Receiver (each through counsel) requesting
Plaintiff's and the Receiver's consent to engage in the following steps:  (i) 3100 Daniel McCall
Drive shall transfer Shadow Creek Tract 2 to Shadow Creek Owner by Special Warranty Deed, to
be duly recorded, and made effective as of June 19, 2019; (ii) as set forth in the Special Warranty
Deed, 3100 Daniel McCall Drive shall waive and disclaim any right, title, or interest in Shadow
Creek Tract 2; and (iii) Shadow Creek Owner shall file a corrective instrument pursuant to Texas
Property Code § 5.029(a)(1)(C) by which Shadow Creek Tract 2 shall be added to the Deed of
Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated June 19,
2019, recorded under County Clerk's File Number 2019-00383292 Official Records of Angelina
County, Texas on June 27, 2019, which shall be effective as of the date of the original instrument
of conveyance's effective date.  The June 2, 2025 letter to Plaintiff and the Receiver—including
executable copies of the Special Warranty Deed and the Corrective Instrument, appended thereto
as Exhibits A and B, respectively—is attached to this Answer as Exhibit 1.

74.    The absence of an effective Deed of Trust conveying a security interest in Shadow Creek Tract 2 has caused extraordinary prejudice to the Trust. In particular, the Trustee is not able to conduct a non-judicial foreclosure in respect of Shadow Creek Tract 2 due to the defective documentation. Moreover, Shadow Creek Tract 1 is not marketable when split from Shadow Creek Tract 2. As such, the defective Deed of Trust for Shadow Creek has prevented the Trustee from exercising its default remedies in respect of the Shadow Creek property and will continue to do so indefinitely.

**Answer:** Paragraph 74 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74.

75.    The failure to convey a security interest in Shadow Creek Tract 2 in the Shadow Creek Deed of Trust is a Material Document Defect under the MLPA and forms a separate basis for the Trustee's demand, discussed below, that JPM repurchase the Shadow Creek portion of the Mortgage Loan.

**Answer:** Paragraph 75 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75, and incorporate by reference the Chetrit Defendants' answer to Paragraph 73 hereof.

76.    In the "Further Assurances" section of the Loan Agreement, the Borrower agreed that:

> Borrower shall, at Borrower's sole cost and expense: … execute and deliver to Lender such documents, instruments, certificates,

> assignments and other writings, and do such other acts necessary or
> desirable, to evidence, preserve and/or protect the collateral at any
> time securing or intended to secure the obligations of Borrower
> under the Loan Documents, as Lender may reasonably require.

Ex. 3 (Loan Agreement) § 5.1.9(b).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that Plaintiff has accurately quoted the cited document in Paragraph 76, deny any allegation that is inconsistent with the writing, and incorporate by reference the Chetrit Defendants' answer to Paragraph 73 hereof.

77.   In addition, the Borrower agreed that:

> Borrower shall, at Borrower's sole cost and expense: … do and
> execute all and such further lawful and reasonable acts, conveyances
> and assurances for the better and more effective carrying out of the
> intents and purposes of this Agreement and the other Loan
> Documents, as Lender shall reasonably require from time to time.

*Id.* § 5.1.9(c).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that Plaintiff has accurately quoted the cited document in Paragraph 77, deny any allegation that is inconsistent with the writing, and incorporate by reference the Chetrit Defendants' answer to Paragraph 73 hereof.

78.   Under Texas Property Code § 5.029, "the parties to the original transaction … may execute a correction instrument to make a material correction to the recorded original instrument of conveyance, including a correction to: … add: … land to a conveyance that correctly conveys other land." Tex. Prop. Code § 5.029(a)(1)(C).

**Answer:** Respectfully refer the Court to the cited statute for its complete and accurate contents. To the extent a response is required, admit that Plaintiff has accurately quoted the cited

statute in Paragraph 78, deny any allegation that is inconsistent with the statute, and incorporate by reference the Chetrit Defendants' answer to Paragraph 73 hereof.

79.    Accordingly, Borrower is obligated under the Loan Agreement to execute a correction instrument to add Shadow Creek Tract 2 to conveyance in the Deed of Trust for Shadow Creek.

**Answer:** Paragraph 79 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny the allegations in Paragraph 79, and incorporate by reference the Chetrit Defendants' answer to Paragraph 73 hereof.

80.    As noted above, Borrower has refused to do so.

**Answer:** Deny the allegations in Paragraph 80, and incorporate by reference the Chetrit Defendants' answer to Paragraph 73 hereof.

## IV.    The Chetrits Learn Of The Defect And Cause Shadow Creek Owner To Fraudulently Transfer Its Interest In Shadow Creek Tract 2

81.    When the Chetrits learned about the defective Shadow Creek Deed of Trust, they did not try to correct the error. Instead, they attempted to capitalize on it.

**Answer:** Deny the allegations in Paragraph 81.

82.    Like the defective Deed of Trust from Shadow Creek Owner to JPM, the special warranty deed that conveyed title of Shadow Creek from the previous owner, an affiliate of ROCO known as ROCO-Shadow Creek, LLC ("ROCO-Shadow Creek"), to Shadow Creek Owner contained the same scrivener's error: it conveyed Shadow Creek Tract 1 but not Shadow Creek Tract 2.

**Answer:** Paragraph 82 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents.

Otherwise admit that ROCO-Shadow Creek, LLC conveyed Shadow Creek Tract 1 to Shadow Creek Owner by Special Warranty Deed, which did not cover Shadow Creek Tract 2; and deny all other allegations in Paragraph 82.

83.    Thus, when the transaction closed on June 19, 2019, Shadow Creek Owner did not have formal title to Shadow Creek Tract 2 because of the defective special warranty deed. But Shadow Creek Owner had a legal and beneficial interest in Shadow Creek Tract 2 because ROCO-Shadow Creek had agreed to convey Shadow Creek to Shadow Creek Owner but failed to do so, and because the special warranty deed that conveyed Shadow Creek Tract 1 contained a scrivener's error that was subject to reformation.

**Answer:** Paragraph 83 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that, since the closing of the acquisition on or around June 19, 2019, continuing through the present, Shadow Creek Owner has not had title to Shadow Creek Tract 2; and deny all other allegations in Paragraph 83.

84.    As a result, ROCO-Shadow Creek held bare title to Shadow Creek Tract 2 in constructive trust for Shadow Creek Owner, and Shadow Creek Owner held a legal interest in Shadow Creek Tract 2 through, among other things, its entitlement to receive formal title to Shadow Creek Tract 2 under its purchase-and-sale agreement with ROCO-Shadow Creek and a cause of action for reformation of the special warranty deed.

**Answer:** Paragraph 84 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to

the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny the allegations in Paragraph 84.

85.   Once the Chetrits and Shadow Creek Owner learned that the special warranty deed conveying title from ROCO-Shadow Creek was defective, they opportunistically seized on the defect to attempt to convey Shadow Creek Tract 2 to a non-Borrower affiliate known as 3100 Daniel McCall Drive, LLC (defined earlier as "3100 Daniel McCall Drive")—an entity they created on or about April 9, 2024, specifically for the purpose of taking ownership of Shadow Creek Tract 2 outside the reach of the Trustee's security interest. 3100 Daniel McCall Drive, as a non-Borrower entity, is not subject to the Loan Agreement and is not included in the Guaranty Agreement.

**Answer:** Paragraph 85 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise admit that 3100 Daniel McCall Drive, LLC was formed on or around April 9, 2024; that 3100 Daniel McCall Drive, LLC is a non-Borrower entity and is not party to the Loan Agreement or included in the Guaranty Agreement; and deny all other allegations in Paragraph 85.

86.   On or around May 2024, Shadow Creek Owner, acting by and through the Chetrits, asserted its legal interest in Shadow Creek Tract 2 in communications with ROCO-Shadow Creek. Rather than insist that ROCO-Shadow Creek transfer Shadow Creek Tract 2 to Shadow Creek Owner, Shadow Creek Owner instead transferred its right to receive title to Shadow Creek Tract 2 to its non-Borrower affiliate, 3100 Daniel McCall Drive in exchange for no value. In doing so, Shadow Creek Owner bargained, transferred, and disposed of its legal interest in Shadow Creek

Tract 2. And, as a result, ROCO-Shadow Creek conveyed legal title to Shadow Creek Tract 2 to

3100 Daniel McCall Drive.

**Answer:** Paragraph 86 purports to state legal arguments and/or conclusions of law, to

which no response is required. To the extent a response is required, admit that by Special Warranty

Deed executed on or around May 17, 2024, ROCO-Shadow Creek, LLC conveyed Shadow Creek

Tract 2 to 3100 Daniel McCall Drive, LLC; and deny all other allegations in Paragraph 86.

87.    Shadow Creek Owner never sought Trustee's consent for Shadow Creek Owner's

transfer of its legal interest in Shadow Creek to 3100 Daniel McCall Drive, and the Trustee never

provided consent.

**Answer:** Paragraph 87 purports to state legal arguments and/or conclusions of law, to

which no response is required. To the extent a response is required, deny the allegations in

Paragraph 87.

88.    As a result, Shadow Creek Owner's transfer of its legal interest in Shadow Creek

was a prohibited Transfer under the Loan Agreement. Specifically, Loan Agreement Section

5.2.10(b)(i) provides:

> Without the prior written consent of Lender, and except to the extent
> otherwise set forth in this Section 5.2.10 (including, without
> limitation, Section 5.2.10(d) hereof), Borrower shall not, and shall
> not permit any Restricted Party do any of the following
> (collectively, a "**Transfer**"): (i) sell, convey, mortgage, grant,
> bargain, encumber, pledge, assign, grant options with respect to, or
> otherwise transfer or dispose of (directly or indirectly, voluntarily or
> involuntarily, by operation of law or otherwise, and whether or not
> for consideration or of record) any Individual Property or any part
> thereof or any legal or beneficial interest therein … other than …
> (B) Permitted Transfers."

Ex. 3 (Loan Agreement) § 5.2.10(b)(i). "Permitted Transfers" are those that result from the death

or legal incapacity of any natural person holding direct or indirect ownership interests in the

Borrower. *Id.* § 1.1 ("Permitted Transfer" definition).

**Answer:** Paragraph 88 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny the allegations in Paragraph 88.

89. Loan Agreement Section 5.2.10(d) permits Transfers of direct and indirect ownership interests in the Borrower without Lender's consent if that transfer meets certain specified requirements. *Id.* § 5.2.10(d). The Transfer of Shadow Creek Owner's legal interest in Shadow Creek Tract 2 involved a Transfer of a legal interest in on of the Properties, not in any Borrower, and therefore does not fit within the parameters of Section 5.2.10(d).

**Answer:** Paragraph 89 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny the allegations in Paragraph 89.

90. Loan Agreement Section 5.2.10(e) permits a one-time transfer of the fee interest in the Properties and assumption of the Loan by the transferee if certain conditions are met. *Id.* § 5.2.10(e). The Transfer of Shadow Creek Owner's legal interest in Shadow Creek Tract 2 did not involve a one-time transfer of the fee interest in the Properties or assumption of the Loan by the transferee, and in any event did not satisfy the enumerated conditions in Section 5.2.10(e) for such a Transfer.

**Answer:** Paragraph 90 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny the allegations in Paragraph 90.

91.    As such, the Transfer of Shadow Creek's legal interest in Shadow Creek Tract 2 constituted a Transfer that was neither a Permitted Transfer nor a transfer permitted under any other provision of Section 5.2.10 of the Loan Agreement. It was therefore a Transfer that was not permitted by the Loan Agreement.

**Answer:** Paragraph 91 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny the allegations in Paragraph 91.

92.    When Shadow Creek Owner made this prohibited Transfer, it was insolvent because the only asset it retained was Shadow Creek Tract 1, which is worth far less than the portion of the Mortgage Loan balance allocated to Shadow Creek Owner.

**Answer:** Paragraph 92 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny that a prohibited Transfer occurred, and otherwise deny knowledge or information sufficient to form a belief as to the truth of all other allegations in Paragraph 92.

## V.    JPM Refuses To Fulfill Its Repurchase Obligations

93.    On April 19, 2024, the Trustee delivered written notice (the "April 19 Repurchase Notice") to JPM, as Seller under the MLPA, of a Material Document Defect in respect of the Deed of Trust for Shadow Creek. The April 19 Repurchase Notice stated that the Deed of Trust was defective because it failed to provide a security interest in Shadow Creek Tract 2 to the Trustee. The April 19 Repurchase Notice demanded that JPM "repurchase the affected Mortgage Loan at the applicable Repurchase Price."

**Answer:** Paragraph 93 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to

the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 93.

94.    On June 5, 2024, JPM responded by refusing to repurchase the Shadow Creek portion of the Mortgage Loan.

**Answer:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 94.

95.    On November 26, 2024, Lender delivered an additional notice (the "November 26 Repurchase Notice") to JPM, as Seller under the MLPA, of a Material Breach of the No Event of Default Representation in Exhibit A to the MLPA. The Trustee stated that JPM had actual knowledge of multiple false representations and warranties by Borrower related to the accuracy of financial statements delivered to the original lender, which caused an Event of Default under the Loan Agreement at the time of loan origination.

**Answer:** Paragraph 95 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95.

96.    On February 24, 2025, JPM responded refusing to repurchase the Mortgage Loan.

**Answer:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96.

### Causes of Action

### Count 1: Breach Of Contract
### Against Defendant JPMorgan Chase Bank, National Association
*Seeking Specific Performance And, Alternatively, Money Damages*
Repurchase Of The Mortgage Loan

97.   The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

**Answer:** The Chetrit Defendants incorporate by reference and repeat their answers to the foregoing allegations as if fully restated herein.

98.   The Loan Agreement, MLPA, and TSA are valid and enforceable contracts under New York law.

**Answer:** Paragraph 98 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny the allegations in Paragraph 98.

99.   Under the MLPA, JPM transferred all of its right, title, and interest in the Mortgage Loan and the Mortgage Loan Documents, including the Loan Agreement, to its affiliate, JPMCC.

**Answer:** Paragraph 99 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 99.

100.  Under the TSA, JPMCC, as Depositor, deposited the Mortgage Loan into the Trust and conveyed to the Trustee all of the its right, title, and interest in the Mortgage Loan and its rights and remedies under the MLPA. *See* Ex. 5 (TSA) § 2.1.

**Answer:** Paragraph 100 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 100.

101.  Accordingly, the Trustee, acting by and through the Special Servicer, has the right to enforce all rights and remedies under the Loan Agreement and the MLPA.

**Answer:** Paragraph 101 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 101.

102.  Loan Agreement Section 8.1(a)(v) provides that it is an Event of Default under the Loan Agreement "if any representation or warranty made by Borrower herein … shall have been false or misleading in any material respect as of the date the representation or warranty was made." Ex. 3 (Loan Agreement) § 8.1(a)(v).

**Answer:** Paragraph 102 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that Plaintiff has accurately quoted the cited document in Paragraph 102, and deny any allegation that is inconsistent with the writing.

103.  In Loan Agreement Section 4.1.11, the Borrower represented and warranted that:

> [a]ll financial data, including, without limitation, the statements of
> cash flow and income and operating expense, that have been

delivered to Lender by Borrower in connection with the Loan (a) are true, complete and correct in all material respects, (b) accurately represent the financial condition of Borrower and each Individual Property, as applicable, as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with GAAP throughout the periods covered, except as disclosed therein.…

*Id.* § 4.1.11 (defined earlier as the "<u>Financial Information Representation</u>").

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  To the extent a response is required, admit that Plaintiff has accurately quoted the cited document in Paragraph 103, and deny any allegation that is inconsistent with the writing.

104. In Loan Agreement Section 4.1.33, Borrower represented and warranted that:

[a]ll information submitted by and on behalf of Borrower to Lender and in all financial statements, rent rolls (including the rent roll attached hereto as Schedule V), reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are true, complete and correct in all material respects. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or would reasonably be expected to materially and adversely affect the use, operation or value of any Individual Property or the business operations or the financial condition of Borrower. Borrower has not failed to disclose any material fact that would be reasonably be expected to cause any Provided Information or representation or warranty made herein to be materially misleading.

*Id.* § 4.1.33 (defined earlier as the "<u>Disclosure Representation</u>").

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  To the extent a response is required, admit that Plaintiff has accurately quoted the cited document in Paragraph 104, and deny any allegation that is inconsistent with the writing.

105. The Financial Information Representation and the Disclosure Representation were false when made because the Chetrits delivered materially inaccurate and incorrect T12s to JPM that overstated historical NOI that the Properties generated by over $10 million.

**Answer:** Paragraph 105 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 105.

106. These misrepresentations caused an Event of Default under Loan Agreement Section 8.1(a)(v) on the date that JPM originated the Mortgage Loan.

**Answer:** Paragraph 106 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny the allegations in Paragraph 106.

107. In MLPA Exhibit A, JPM represented and warranted that:

> [t]o the best of the Seller's Knowledge (as defined below) after due inquiry, (a) there is no monetary or material non-monetary Event of Default (as defined in the Loan Agreement) existing under any of the Mortgage Loan Documents, (b) there is no event which, with the passage of time or with notice and the expiration of any applicable grace or cure period, would constitute a material Event of Default under any of the Mortgage Loan Documents and (c) the Seller has not waived any Event of Default. "Seller's Knowledge" means the actual knowledge of any of the individuals at the Seller who were actively involved in the origination, administration or servicing of the Mortgage Loan.

Ex. 1 (MLPA) Ex. A, Rep. 4 (defined earlier as the "No Event Of Default Representation" or "Representation 4").

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 107.

108.  The No Event Of Default Representation was materially false when made because (a) the Chetrits delivered the false T12s to JPM; (b) the delivery of the false T12s violated the Financial Information Representation and the Disclosure Representation in the Loan Agreement; (c) those misrepresentations constituted an Event of Default under Loan Agreement Section 8.1(a)(v); and (d) JPM had knowledge of the Borrower's misrepresentations or would have become aware of them if JPM had performed the due inquiry that it represented it had performed.

**Answer:** Paragraph 108 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise deny the allegations in Paragraph 108.

109.  Under MLPA Section 8(a), "if there is a breach of any representation or warranty made by the Seller relating to the Mortgage Loan as set forth in Exhibit A hereto," and such "breach materially and adversely affects the value of the Mortgage Loan or the interest of the Purchaser (or the holders of the Certificates) therein … (a … 'Material Breach,' … )," then "the party discovering such … Material Breach shall promptly notify the Seller." Ex. 1 (MLPA) § 8(a).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 109.

110.  "Within 90 days" of receipt of such notice, "the Seller shall either (x) repurchase the Mortgage Loan … at an amount equal to the Repurchase Price (as defined in the [TSA]), (y) promptly cure such … Material Breach, as the case may be, in all material respects or (z) if such … Material Breach is not related to the Mortgage Loan not being a Qualified Mortgage, indemnify the Trust for the losses directly related to such Material Breach … , subject, in the case

of any partial repurchase or indemnity in lieu of a repurchase, to receipt of a Rating Agency Confirmation from each Rating Agency with respect to such action." Ex. 1 (MLPA) § 8(a).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 110.

111. JPM received notice of its Material Breach of the MLPA on November 26, 2024, in the November 26 Repurchase Notice.

**Answer:** Paragraph 111 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 111.

112. The ninety-day period for JPM to repurchase the Mortgage Loan elapsed on February 24, 2025.

**Answer:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112.

113. JPM has refused to repurchase the Mortgage Loan as required by MLPA Section 8(a).

**Answer:** Paragraph 113 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 113.

114.  The MLPA provides that JPM's obligation to repurchase the Mortgage Loan is the "sole remedy" available for JPM's breaches of the representations and warranties in the MLPA.

**Answer:** Paragraph 114 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 114.

115.  Based on this sole-remedy provision, in accordance with governing New York law, the Trustee is entitled to specific performance of JPM's contractual obligation to repurchase the Mortgage Loan for the Repurchase Price plus prejudgment interest as of the date of JPM's breaches, which occurred when they were made on July 18, 2019.

**Answer:** Paragraph 115 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 115.

116.  In the alternative, the Trustee is entitled to money damages in the amount of the Repurchase Price and prejudgment interest as of the date of JPM's breaches, which occurred when they were made on July 18, 2019.

**Answer:** Paragraph 116 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 116.

117. For Properties that have been foreclosed upon and sold, the Trustee seeks the difference, if any, between the actual amounts received in that sale and the Repurchase Price for the Property that was sold, or such other amount that may be determined by the Court.

**Answer:** Paragraph 117 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 117.

**Count 2: Breach Of Contract**
**Against Defendant JPMorgan Chase Bank, National Association**
*Seeking Specific Performance And, Alternatively, Money Damages*
<u>Repurchase Of The Portion Of The Mortgage Loan Comprising Shadow Creek</u>

118. The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

**Answer:** The Chetrit Defendants incorporate by reference and repeat their answers to the foregoing allegations as if fully restated herein.

119. The Loan Agreement, MLPA, and TSA are valid and enforceable contracts under New York law.

**Answer:** Paragraph 119 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny the allegations in Paragraph 119.

120. Under the MLPA, JPM transferred all of its right, title, and interest in the Mortgage Loan and the Mortgage Loan Documents, including the Loan Agreement, to its affiliate, JPMCC.

**Answer:** Paragraph 120 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents.

Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 120.

121.  Under the TSA, JPMCC, as Depositor, deposited the Mortgage Loan into the Trust and conveyed to the Trustee all of the its right, title, and interest in the Mortgage Loan and its rights and remedies under the MLPA. *See* Ex. 5 (TSA) § 2.1.

**Answer:** Paragraph 121 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121.

122.  Accordingly, the Trustee, acting by and through the Special Servicer, has the right to enforce all rights and remedies under the Loan Agreement and the MLPA.

**Answer:** Paragraph 122 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 122.

123.  Under MLPA Section 8(a), "[i]f any document required to be delivered to the Purchaser or its designee pursuant to Section 3 … is defective (… a 'Defect')," and such "Defect …materially and adversely affects the value of the Mortgage Loan or the interest of the Purchaser (or the holders of the Certificates) therein … (a 'Material Document Defect' …)," then "the party discovering such Material Document Defect … shall promptly notify the Seller." Ex. 1 (MLPA) § 8(a).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123.

124.  And, "[w]ithin 90 days" of receipt of such notice, "the Seller shall either (x) repurchase the Mortgage Loan … at an amount equal to the Repurchase Price (as defined in the [TSA]), (y) promptly cure such Material Document Defect … in all material respects or (z) if such Material Document Defect … is not related to the Mortgage Loan not being a Qualified Mortgage, indemnify the Trust for the losses directly related to such Material Breach … , subject, in the case of any partial repurchase or indemnity in lieu of a repurchase, to receipt of a Rating Agency Confirmation from each Rating Agency with respect to such action."  Ex. 1 (MLPA) § 8(a).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 124.

125.  Borrower conveyed a security interest in Shadow Creek to JPM through a Deed of Trust, in accordance with Texas law.

**Answer:** Paragraph 125 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise admit that Shadow Creek Owner LLC executed a Deed of Trust to Ronald Addison as Trustee for the benefit of JPM, which covered Shadow Creek Tract 1 but not Shadow Creek Tract 2; and deny all other allegations in Paragraph 125.

126. The Deed of Trust was defective because it conveyed title only to Shadow Creek Tract 1, and not Shadow Creek Tract 2.

**Answer:** Paragraph 126 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that the Deed of Trust from Shadow Creek Owner LLC to Ronald Addison as Trustee for the benefit of JPM covered Shadow Creek Tract 1 but not Shadow Creek Tract 2; and deny all other allegations in Paragraph 126.

127. The Deed of Trust for Shadow Creek was a Material Document Defect under the MLPA.

**Answer:** Paragraph 127 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 127.

128. JPM received notice of Material Document Defect on April 19, 2024, in the April 19 Repurchase Notice.

**Answer:** Paragraph 128 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 128.

129. On June 5, 2024, JPM responded by refusing to repurchase the Shadow Creek portion of the Mortgage Loan.

**Answer:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 129.

130. The ninety-day period for JPM to repurchase the Mortgage Loan elapsed on July 18, 2024.

**Answer:** Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 130.

131. JPM has failed to repurchase the Shadow Creek portion of the Mortgage Loan as required by MLPA Section 8(a).

**Answer:** Paragraph 131 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 131.

132. The MLPA provides that JPM's obligation to repurchase the Shadow Creek portion of the Mortgage Loan is the "sole remedy" available for JPM's breaches of the representations and warranties in the MLPA.

**Answer:** Paragraph 132 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 132.

133.  Based on this sole-remedy provision, in accordance with governing New York law, the Trust is entitled to specific performance of JPM's contractual obligation to repurchase the Shadow Creek portion of the Mortgage Loan in the amount of the Repurchase Price plus prejudgment interest as of the date of JPM's breaches, which occurred when they were made on July 18, 2019.

**Answer:** Paragraph 133 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 133.

134.  In the alternative, the Trust is entitled to money damages for the Shadow Creek portion of the Mortgage Loan in the amount of the Repurchase Price plus prejudgment interest as of the date of JPM's breaches, which occurred when they were made on July 18, 2019.

**Answer:** Paragraph 134 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 134.

**Count 3: Breach Of Contract**
**Against Defendant Shadow Creek Owner, LLC**
*Seeking Specific Performance And, Alternatively, Money Damages*
Execution Of A Correction Instrument Under Loan Agreement Section 5.1.9

135.  The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

**Answer:** The Chetrit Defendants incorporate by reference and repeat their answers to the foregoing allegations as if fully restated herein.

136. The Loan Agreement, MLPA, and TSA are valid and enforceable contracts under New York law.

**Answer:** Paragraph 136 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny the allegations in Paragraph 136.

137. Under the MLPA, JPM transferred all of its right, title, and interest in the Mortgage Loan and the Mortgage Loan Documents, including the Loan Agreement, to its affiliate, JPMCC.

**Answer:** Paragraph 137 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 137.

138. Under the TSA, JPMCC, as Depositor, deposited the Mortgage Loan into the Trust and conveyed to the Trustee all of the its right, title, and interest in the Mortgage Loan and its rights and remedies under the MLPA. *See* Ex. 5 (TSA) § 2.1.

**Answer:** Paragraph 138 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 138.

139. Accordingly, the Trustee, acting by and through the Special Servicer, has the right to enforce all rights and remedies under the Loan Agreement and the MLPA.

**Answer:** Paragraph 139 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 139.

140. Borrower and JPM intended to include Shadow Creek Tract 2 in the collateral backing the Mortgage Loan.

**Answer:** Paragraph 140 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, admit that Shadow Creek Tract 2 was intended to be a part of the collateral backing the Mortgage Loan.

141. The intent of Borrower and JPM to include Shadow Creek Tract 2 in the collateral backing the Mortgage Loan is reflected in numerous places in the Loan Documents and marketing materials to Certificateholders.

**Answer:** Paragraph 141 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise admit that Shadow Creek Tract 2 was intended to be a part of the collateral backing the Mortgage Loan, and deny knowledge or information sufficient to form a belief as to the truth of all other allegations in Paragraph 141.

142. For example, the rent roll attached as Schedule V of the original Loan Agreement indicates that the Mortgage Loan is supported by rents from both Shadow Creek Tract 1 and Shadow Creek Tract 2. The Preliminary Offering Circular used to market the Certificates describes Shadow Creek as a 221-unit apartment complex, incorporating the apartments from Shadow Creek

Tract 1 and Shadow Creek Tract 2. The purported historical NOI and projected NOI are both predicated on the inclusion of Shadow Creek Tract 1 and Shadow Creek Tract 2 as collateral for the Mortgage Loan. And the appraisal conducted on Shadow Creek and reported to prospective Certificateholders determined value based on projected income generated by Shadow Creek Tract 1 and Shadow Creek Tract 2, considered together.

**Answer:** Respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. To the extent a response is required, admit that Shadow Creek Tract 2 was intended to be a part of the collateral backing the Mortgage Loan, and otherwise deny knowledge or information sufficient to form a belief as to the truth of all other allegations in Paragraph 142.

143. Borrower conveyed a security interest in Shadow Creek to JPM through a Deed of Trust, in accordance with Texas law.

**Answer:** Paragraph 143 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that Shadow Creek Owner LLC executed a Deed of Trust to Ronald Addison as Trustee for the benefit of JPM, which covered Shadow Creek Tract 1 but not Shadow Creek Tract 2; and deny all other allegations in Paragraph 143.

144. The Deed of Trust was defective because it conveyed title only to Shadow Creek Tract 1, and not Shadow Creek Tract 2, to the Shadow Creek Trustee, and therefore failed to properly document the Trustee's security interest in Shadow Creek Tract 2.

**Answer:** Paragraph 144 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to

the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that the Deed of Trust from Shadow Creek Owner LLC to Ronald Addison as Trustee for the benefit of JPM covered Shadow Creek Tract 1 but not Shadow Creek Tract 2; and deny all other allegations in Paragraph 144.

145. Notwithstanding this error, the Borrower and the Trustee have always treated Shadow Creek Tract 2 as part of the collateral for the Mortgage Loan, and Borrower stipulated to inclusion of the Shadow Creek Tract 2 in the Receivership Estate established in the Receivership Action.

**Answer:** Paragraph 145 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that the Trust has always had the full benefit of all income from Shadow Creek Tract 2; that, in connection with the Receivership Action, the Trustee, Borrower, and 3100 Daniel McCall Drive, LLC jointly stipulated that Shadow Creek Tract 2 is "subject to the Receivership Order and shall be managed and administered by the Receiver pursuant to the Receivership Order, in each case as if [Shadow Creek] Tract 2 is part of the Collateral Properties and part of the Receivership Estate" (Case No. 23-cv-9972, ECF No. 138 at 3); and deny all other allegations in Paragraph 145.

146. Borrower, however, has refused to execute and record a corrected Deed of Trust that would properly convey Lender's security interest and pave the way for non-judicial foreclosure.

**Answer:** Paragraph 146 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in

Paragraph 146, and incorporate by reference the Chetrit Defendants' answer to Paragraph 73 hereof.

147. Under the Loan Agreement, Borrower agreed that:

> Borrower shall, at Borrower's sole cost and expense: … execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Lender may reasonably require.

Ex. 3 (Loan Agreement) § 5.1.9(b).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, admit that Plaintiff has accurately quoted the cited document in Paragraph 147, and deny any allegation that is inconsistent with the writing.

148. Additionally, Borrower agreed that:

> Borrower shall, at Borrower's sole cost and expense: … do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

*Id.* § 5.1.9(c).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, admit that Plaintiff has accurately quoted the cited document in Paragraph 148, and deny any allegation that is inconsistent with the writing.

149. Under Texas Property Code § 5.029, "the parties to the original transaction … may execute a correction instrument to make a material correction to the recorded original instrument

66

of conveyance, including a correction to: … add: … land to a conveyance that correctly conveys other land." Tex. Prop. Code § 5.029(a)(1)(C).

**Answer:** Respectfully refer the Court to the cited statute for its complete and accurate contents. To the extent a response is required, admit that Plaintiff has accurately quoted the cited statute in Paragraph 149, and deny any allegation that is inconsistent with the statute.

150. Accordingly, Borrower is obligated under the Loan Agreement to execute a correction instrument to add Shadow Creek Tract 2 to the Deed of Trust for Shadow Creek, and correct any other instrument of transfer or deed necessary to give effect the intended transfer of security interest in Shadow Creek Tract 2 to the Trustee.

**Answer:** Paragraph 150 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 150.

151. Based on Loan Agreement Section 5.1.9, the Trust is entitled to specific performance of Borrower's contractual obligation to execute and deliver a correction instrument in compliance with Texas Property Code Section 5.029(a)(1)(C) that conveys Shadow Creek Tract 2 alongside Shadow Creek Tract 1, as such correction instrument evidences, preserves, or protects the collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents and more effectively carries out the intents and purposes of the Loan Agreement and the other Mortgage Loan Documents.

**Answer:** Paragraph 151 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny the allegations in Paragraph 151.

152. Specific performance is an appropriate remedy here because money damages may be difficult quantify with reasonable certainty and suitable substitute performance may be difficult to procure. Under Loan Agreement Section 9.3, the Borrower acknowledged that an action for specific performance may be appropriate to enable the Lender to enforce and realize upon its interest under the Note.

**Answer:** Paragraph 152 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny the allegations in Paragraph 152.

153. Additionally, the Trust is entitled to money damages in an amount to be determined by the Court for Shadow Creek's depreciation in value during the time period in which Borrower failed to execute the correction instrument.

**Answer:** Paragraph 153 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 153.

154. In the alternative, the Trust is entitled to money damages in an amount to be determined by the Court for (a) the Borrower's failure to execute the correction instrument and (b) Shadow Creek's depreciation in value during the time period in which Borrower failed to execute the correction instrument.

**Answer:** Paragraph 154 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 154.

**Count 4: Reformation**
**Against Defendant Shadow Creek Owner, LLC**
*Seeking Reformation Of The Deed Of Trust*

155. The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

**Answer:** The Chetrit Defendants incorporate by reference and repeat their answers to the foregoing allegations as if fully restated herein.

156. The Loan Agreement, MLPA, and TSA are valid and enforceable contracts under New York law.

**Answer:** Paragraph 156 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny the allegations in Paragraph 156.

157. Under the MLPA, JPM transferred all of its right, title, and interest in the Mortgage Loan and the Mortgage Loan Documents, including the Loan Agreement, to its affiliate, JPMCC.

**Answer:** Paragraph 157 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 157.

158. Under the TSA, JPMCC, as Depositor, deposited the Mortgage Loan into the Trust, and the Trustee, acting by and through the Special Servicer, is entitled to enforce all of Depositor's rights and remedies under the MLPA. *See* Ex. 5 (TSA) § 2.1.

**Answer:** Paragraph 158 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to

the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 158.

159.  Accordingly, the Trustee, acting by and through the Special Servicer, has the right to enforce all rights and remedies in connection with the Mortgage and other Mortgage Loan Documents securing the Note.

**Answer:** Paragraph 159 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 159.

160.  Borrower and JPM intended to include Shadow Creek Tract 2 in the collateral backing the Mortgage Loan.

**Answer:** Paragraph 160 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, admit that Shadow Creek Tract 2 was intended to be a part of the collateral backing the Mortgage Loan.

161.  The intent of Borrower and JPM to include Shadow Creek Tract 2 in the collateral backing the Mortgage Loan is reflected in numerous places in the Loan Documents and marketing materials to Certificateholders.

**Answer:** Paragraph 161 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise admit that Shadow Creek Tract 2 was intended to be a part of the collateral backing the

Mortgage Loan, and deny knowledge or information sufficient to form a belief as to the truth of all other allegations in Paragraph 161.

162. For example, the rent roll attached as Schedule V of the original Loan Agreement indicates that the Mortgage Loan is supported by rents from both Shadow Creek Tract 1 and Shadow Creek Tract 2. The Preliminary Offering Circular used to market the Certificates describes Shadow Creek as a 221-unit apartment complex, incorporating the apartments from Shadow Creek Tract 1 and Shadow Creek Tract 2. The purported historical NOI and projected NOI are both predicated on the inclusion of Shadow Creek Tract 1 and Shadow Creek Tract 2 as collateral for the Mortgage Loan. And the appraisal conducted on Shadow Creek and reported to prospective Certificateholders determined value based on projected income generated by Shadow Creek Tract 1 and Shadow Creek Tract 2, considered together.

**Answer:** Respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents.  To the extent a response is required, admit that Shadow Creek Tract 2 was intended to be a part of the collateral backing the Mortgage Loan, and otherwise deny knowledge or information sufficient to form a belief as to the truth of all other allegations in Paragraph 162.

163. Borrower conveyed a security interest in Shadow Creek to JPM through a Deed of Trust, in accordance with Texas law.

**Answer:** Paragraph 163 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise admit that Shadow Creek Owner LLC executed a Deed of Trust to Ronald Addison as Trustee for

the benefit of JPM, which covered Shadow Creek Tract 1 but not Shadow Creek Tract 2; and deny all other allegations in Paragraph 163.

164. The Deed of Trust contained a scrivener's error because it conveyed title only to Shadow Creek Tract 1, and not Shadow Creek Tract 2.

**Answer:** Paragraph 164 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that the Deed of Trust from Shadow Creek Owner LLC to Ronald Addison as Trustee for the benefit of JPM covered Shadow Creek Tract 1 but not Shadow Creek Tract 2; and deny all other allegations in Paragraph 164.

165. Notwithstanding this scrivener's error, the Borrower and the Lender have always treated Shadow Creek Tract 2 as part of the collateral for the Mortgage Loan, and Borrower stipulated to inclusion of the Shadow Creek Tract 2 in the Receivership Estate established in the Receivership Action.

**Answer:** Paragraph 165 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that the Trust has always had the full benefit of all income from Shadow Creek Tract 2; that in connection with the Receivership Action, the Trustee, Borrower, and 3100 Daniel McCall Drive, LLC jointly stipulated that Shadow Creek Tract 2 is "subject to the Receivership Order and shall be managed and administered by the Receiver pursuant to the Receivership Order, in each case as if [Shadow Creek] Tract 2 is part of the Collateral Properties and part of the Receivership Estate" (Case No. 23-cv-9972, ECF No. 138 at 3); and deny all other allegations in Paragraph 165.

166.  Reformation is appropriate to remedy the Borrower's and JPM's mutual mistake in executing the Deed of Trust containing the scrivener's error and to set forth their actual agreement in a reformed Deed of Trust, which was to convey a security interest in both Shadow Creek Tract 1 and Shadow Creek Tract 2 to JPM through the Deed of Trust.

**Answer:** Paragraph 166 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny the allegations in Paragraph 166.

**Count 5: Breach Of Contract**
**Against Defendant Meyer Chetrit**
*Seeking Money Damages*
Breach of Guaranty Section 1.1
In Connection With Material Misrepresentations Of The T12s

167.  The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

**Answer:** The Chetrit Defendants incorporate by reference and repeat their answers to the foregoing allegations as if fully restated herein.

168.  The Guaranty Agreement, MLPA, and TSA are valid and enforceable contracts under New York law.

**Answer:** Paragraph 168 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents.  Otherwise deny the allegations in Paragraph 168.

169.  Under the MLPA, JPM transferred all of its right, title, and interest in the Mortgage Loan and the Mortgage Loan Documents, including the Guaranty Agreement, to its affiliate, JPMCC.

**Answer:** Paragraph 169 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 169.

170. Under the TSA, JPMCC, as Depositor, transferred, assigned, and conveyed the Guaranty Agreement to the Trust, and the Trustee, acting by and through the Special Servicer, is entitled to enforce all of Depositor rights and remedies under the Guaranty Agreement. *See* Ex. 5 (TSA) § 2.1.

**Answer:** Paragraph 170 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 170.

171. Under the Guaranty Agreement, Defendant Meyer Chetrit agreed:

> Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

Ex. 2 (Guaranty Agreement) § 1.1.

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, admit that Plaintiff has accurately quoted the cited document in Paragraph 171, and deny any allegation that is inconsistent with the writing.

172. The Guaranty Agreement defines "Guaranteed Obligations" as the Recourse Liabilities described in Loan Agreement Section 9.3. *Id.* § 1.2 ("As used herein, the term 'Guaranteed Obligations' means all obligations and liabilities of Borrower pursuant to Section 9.3 of the Loan Agreement." (emphasis omitted)).

**Answer:** Paragraph 172 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise admit that "Guaranteed Obligations" is defined in the Guaranty Agreement by reference to Section 9.3 of the Loan Agreement, and deny all other allegations in Paragraph 172.

173. Under the Guaranty Agreement, Meyer Chetrit agreed that Lender may pursue recovery from him without first seeking to exhaust its remedies against the Borrower. *Id.* § 1.6.

**Answer:** Paragraph 173 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that Section 1.6 of the Guaranty Agreement provides that "[i]t shall not be necessary for Lender …, in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower…"; and deny all other allegations in Paragraph 173.

174. Meyer Chetrit also agreed he was liable for all costs and expenses, including attorney's fees, incurred by Lender in enforcing and/or preserving its rights under the Guaranty Agreement. *Id.* § 1.8. This covenant survives the payment and performance of the Guaranteed Obligations. *Id.*

**Answer:** Paragraph 174 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to

the cited material, which is a written document that speaks for itself as to its contents.  Otherwise deny the allegations in Paragraph 174.

175. Under the Guaranty Agreement, Meyer Chetrit is personally liable for all of Borrower's Recourse Liabilities under Loan Agreement Section 9.3.

**Answer:** Paragraph 175 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny the allegations in Paragraph 175.

176. Under Loan Agreement Section 9.3(b)(i),

> Borrower shall be fully and personally liable and subject to legal action, for any loss, cost, out of pocket expense, damage … , claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of or in connection with … material misrepresentation by any Individual Borrower, Principal or Guarantor in the Loan Documents or any document required to be delivered by Borrower, Principal or Guarantor pursuant to the Loan Documents.

Ex. 3 (Loan Agreement) § 9.3(b)(i).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise admit that Plaintiff has accurately quoted the cited document in Paragraph 176, and deny any allegation that is inconsistent with the writing.

177. In Loan Agreement Section 4.1.11, the Borrower represented and warranted that:

> [a]ll financial data, including, without limitation, the statements of cash flow and income and operating expense, that have been delivered to Lender by Borrower in connection with the Loan (a) are true, complete and correct in all material respects, (b) accurately represent the financial condition of Borrower and each Individual Property, as applicable, as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with GAAP throughout the periods covered, except as disclosed therein.…

*Id.* § 4.1.11 (defined earlier as the "<u>Financial Information Representation</u>").

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, admit that Plaintiff has accurately quoted the cited document in Paragraph 177, and deny any allegation that is inconsistent with the writing.

178. In Loan Agreement Section 4.1.33, Borrower represented and warranted that:

> [a]ll information submitted by and on behalf of Borrower to Lender and in all financial statements, rent rolls (including the rent roll attached hereto as Schedule V), reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are true, complete and correct in all material respects. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or would reasonably be expected to materially and adversely affect the use, operation or value of any Individual Property or the business operations or the financial condition of Borrower. Borrower has not failed to disclose any material fact that would be reasonably be expected to cause any Provided Information or representation or warranty made herein to be materially misleading.

*Id.* § 4.1.33 (defined earlier as the "<u>Disclosure Representation</u>").

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, admit that Plaintiff has accurately quoted the cited document in Paragraph 178, and deny any allegation that is inconsistent with the writing.

179. The Financial Information Representation and the Disclosure Representation were false when made because the Chetrits delivered materially inaccurate and incorrect T12s to JPM that overstated historical NOI that the Properties generated by over $10 million.

**Answer:** Paragraph 179 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 179.

180. These material misrepresentations rendered the Borrower and Meyer Chetrit, as the Guarantor, fully and personally liable and subject to legal action, for any loss, cost, out of pocket expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of and in connection with the material misrepresentations.

**Answer:** Paragraph 180 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 180.

181. Accordingly, the Trust is entitled to money damages, including attorney's fees and court costs, from Meyer Chetrit in an amount to be determined by the Court for the material misrepresentations in respect of the financial data (including the T12s) plus prejudgment interest.

**Answer:** Paragraph 181 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 181.

**Count 6: Breach Of Contract**
**Against Defendant Meyer Chetrit**
*Seeking Money Damages*
Breach of Guaranty Section 1.1
In Connection With Material Misrepresentations In
The Rent Roll Attached As Loan Agreement Schedule V

182. The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

**Answer:** The Chetrit Defendants incorporate by reference and repeat their answers to the foregoing allegations as if fully restated herein.

183. The Guaranty Agreement, MLPA, and TSA are valid and enforceable contracts under New York law.

**Answer:** Paragraph 183 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny the allegations in Paragraph 183.

184. Under the MLPA, JPM transferred all of its right, title, and interest in the Mortgage Loan and the Mortgage Loan Documents, including the Guaranty Agreement, to its affiliate, JPMCC.

**Answer:** Paragraph 184 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 184.

185. Under the TSA, JPMCC, as Depositor, transferred, assigned, and conveyed the Guaranty Agreement to the Trust, and the Trustee, acting by and through the Special Servicer, is entitled to enforce all of Depositor's rights and remedies under the Guaranty Agreement. *See* Ex. 5 (TSA) § 2.1.

**Answer:** Paragraph 185 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents.

Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 185.

 186. Under the Guaranty Agreement, Defendant Meyer Chetrit agreed:

> Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

Ex. 2 (Guaranty Agreement) § 1.1.

 **Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, admit that Plaintiff has accurately quoted the cited document in Paragraph 186, and deny any allegation that is inconsistent with the writing.

 187. The Guaranty Agreement defines "Guaranteed Obligations" as the Recourse Liabilities described in Loan Agreement Section 9.3. *Id.* § 1.2 ("As used herein, the term 'Guaranteed Obligations' means all obligations and liabilities of Borrower pursuant to Section 9.3 of the Loan Agreement." (emphasis omitted)).

 **Answer:** Paragraph 187 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise admit that "Guaranteed Obligations" is defined in the Guaranty Agreement by reference to Section 9.3 of the Loan Agreement, and deny all other allegations in Paragraph 187.

 188. Under the Guaranty Agreement, Meyer Chetrit agreed that Lender may pursue recovery from him without first seeking to exhaust its remedies against the Borrower. *Id.* § 1.6.

**Answer:** Paragraph 188 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise admit that Section 1.6 of the Guaranty Agreement provides that "[i]t shall not be necessary for Lender …, in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower…"; and deny all other allegations in Paragraph 188.

189.  Meyer Chetrit also agreed he was liable for all costs and expenses, including attorney's fees, incurred by Lender in enforcing and/or preserving its rights under the Guaranty Agreement. *Id.* § 1.8. This covenant survives the payment and performance of the Guaranteed Obligations. *Id.*

**Answer:** Paragraph 189 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise deny the allegations in Paragraph 189.

190.  Under the Guaranty Agreement, Meyer Chetrit is personally liable for all of Borrower's Recourse Liabilities under Loan Agreement Section 9.3.

**Answer:** Paragraph 190 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents.  Otherwise deny the allegations in Paragraph 190.

191.  Under Loan Agreement Section 9.3(b)(i),

> Borrower shall be fully and personally liable and subject to legal action, for any loss, cost, out of pocket expense, damage …, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender

> arising out of or in connection with … material misrepresentation by any Individual Borrower, Principal or Guarantor in the Loan Documents or any document required to be delivered by Borrower, Principal or Guarantor pursuant to the Loan Documents.

Ex. 3 (Loan Agreement) § 9.3(b)(i).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that Plaintiff has accurately quoted the cited document in Paragraph 191, and deny any allegation that is inconsistent with the writing.

192. In Loan Agreement Section 4.1.33, Borrower represented and warranted that "[a]ll information submitted by and on behalf of Borrower to Lender and in all … rent rolls (including the rent roll attached hereto as Schedule V) … are true, complete and correct in all material respects." *Id.* § 4.1.33.

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, admit that Plaintiff has accurately quoted the cited document in Paragraph 192, and deny any allegation that is inconsistent with the writing.

193. This representation was false when made because the Borrower knew that the rent rolls, including the rent roll attached as Loan Agreement Schedule V, indicated that the Mortgage Loan is supported by rents from both Shadow Creek Tract 1 and Shadow Creek Tract 2.

**Answer:** Paragraph 193 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 193.

194. Thus, to the extent that Borrower now contends that Shadow Creek Tract 2 was not a part of the collateral supporting the Mortgage Loan, the rent rolls (including the rent roll attached to the Loan Agreement as Schedule V) were not true, complete, and correct in all material respects,

and the Borrower's representation otherwise was a material misrepresentation rendering the Borrower and Meyer Chetrit, as the Guarantor, fully and personally liable and subject to legal action, for any loss, cost, out of pocket expense, damage, claim or other obligation (including without limitation reasonable attorneys' fees and court costs) incurred or suffered by Lender arising out of and in connection with the material misrepresentation.

**Answer:** Paragraph 194 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 194.

195. Accordingly, the Trust is entitled to money damages, including attorney's fees and court costs, from Meyer Chetrit in an amount to be determined by the Court for the material misrepresentation in respect of the rent rolls as they pertain to Shadow Creek plus prejudgment interest.

**Answer:** Paragraph 195 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 195.

**Count 7: Actual Fraudulent Transfer**
**Against Defendant 3100 Daniel McCall Drive**
*Seeking Avoidance and, Alternatively, Money Damages*
Under NY DCL § 273(a)(1)

196. The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

**Answer:** The Chetrit Defendants incorporate by reference and repeat their answers to the foregoing allegations as if fully restated herein.

197. The Trustee is a creditor of Defendant Shadow Creek Owner, who is a Borrower under the Loan Agreement.

**Answer:** Paragraph 197 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that Shadow Creek Owner is an Individual Borrower under the Loan Agreement, and deny knowledge or information sufficient to form a belief as to the truth of all other allegations in Paragraph 197.

198. As of June 19, 2019, Shadow Creek Owner had a legal and beneficial interest in Shadow Creek Tract 2 because ROCO-Shadow Creek had agreed to convey Shadow Creek to Shadow Creek Owner but failed to do so.

**Answer:** Paragraph 198 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 198.

199. As a result, ROCO-Shadow Creek held bare title to Shadow Creek Tract 2 in constructive trust for Shadow Creek Owner, and Shadow Creek Owner held a legal interest in Shadow Creek Tract 2 through, among other things, its entitlement to receive formal title to Shadow Creek Tract 2 under its purchase-and-sale agreement with ROCO-Shadow Creek and a cause of action for reformation of the special warranty deed.

**Answer:** Paragraph 199 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny the allegations in Paragraph 199.

200.  Shadow Creek Owner instead transferred its right to receive title to Shadow Creek Tract 2 to its non-Borrower affiliate, 3100 Daniel McCall Drive—a transaction for which it received no consideration.

**Answer:** Paragraph 200 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny the allegations in Paragraph 200.

201.  Shadow Creek Owner was insolvent at the time of the transfer.

**Answer:** Paragraph 201 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny the allegations in Paragraph 201.

202.  Shadow Creek Owner made the transfer to 3100 Daniel McCall Drive with actual intent to hinder, delay, or defraud the Trustee. Such intent can be inferred from, among other things, the fact that the transfer was made by and for the benefit of insiders of Shadow Creek Owner, the transfer was made without consideration to Shadow Creek Owner, the transfer was made in violation of Shadow Creek Owner's affirmative obligations, including under Loan Agreement Section 5.2.10(b)(i), not to make such a transfer, the Transfer was made without any notice to the Trustee and at a time when Shadow Creek Owner knew that the Trustee was asserting a security interest in Shadow Creek Tract 2 that the transfer would frustrate, and Shadow Creek Owner was insolvent at the time of the transfer.

**Answer:** Paragraph 202 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise deny the allegations in Paragraph 202.

203. As a result of the transfer, the Trustee's ability to recover through enforcement mechanisms against Shadow Creek Owner and the Shadow Creek property have been entirely frustrated.

**Answer:** Paragraph 203 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 203.

204. The transfer is therefore voidable as an actual fraudulent transfer under the New York Debtor and Creditor Law.

**Answer:** Paragraph 204 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited statute for its complete and accurate contents. Otherwise deny the allegations in Paragraph 204.

205. 3100 Daniel McCall Drive is the direct transferee of Shadow Creek Owner's fraudulent transfer.

**Answer:** Paragraph 205 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 205.

206. Accordingly, the Trust is entitled to recover Shadow Creek Tract 2 from 3100 Daniel McCall Drive.

**Answer:** Paragraph 206 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 206.

207.  In the alternative, the Trust is entitled to recover monetary damages in an amount to be determined by the Court for the value of Shadow Creek Tract 2 plus prejudgment interest from Defendant 3100 Daniel McCall Drive for the actual fraudulent transfer of Shadow Creek Tract 2.

**Answer:** Paragraph 207 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny the allegations in Paragraph 207.

### Count 8: Constructive Fraudulent Transfer
### Against Defendant 3100 Daniel McCall Drive
*Seeking Avoidance and, Alternatively, Money Damages*
Under NY DCL § 273(a)(2), 274(a)

208.  The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

**Answer:** The Chetrit Defendants incorporate by reference and repeat their answers to the foregoing allegations as if fully restated herein.

209.  The Trustee is a creditor of Defendant Shadow Creek Owner, who is a Borrower under the Loan Agreement.

**Answer:** Paragraph 209 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  Otherwise admit that Shadow Creek Owner is an Individual Borrower under the Loan Agreement, and deny knowledge or information sufficient to form a belief as to the truth of all other allegations in Paragraph 209.

210.  As of June 19, 2019, Shadow Creek Owner had a legal and beneficial interest in Shadow Creek Tract 2 because ROCO-Shadow Creek had agreed to convey Shadow Creek to Shadow Creek Owner but failed to do so.

**Answer:** Paragraph 210 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny the allegations in Paragraph 210.

211.  As a result, ROCO-Shadow Creek held bare title to Shadow Creek Tract 2 in constructive trust for Shadow Creek Owner, and Shadow Creek Owner held a legal interest in Shadow Creek Tract 2 through, among other things, its entitlement to receive formal title to Shadow Creek Tract 2 under its purchase-and-sale agreement with ROCO-Shadow Creek and a cause of action for reformation of the special warranty deed.

**Answer:** Paragraph 211 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny the allegations in Paragraph 211.

212.  Shadow Creek Owner instead transferred its right to receive title to Shadow Creek Tract 2 to its non-Borrower affiliate, 3100 Daniel McCall Drive—a transaction for which it received no consideration.

**Answer:** Paragraph 212 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny the allegations in Paragraph 212.

213.  Shadow Creek Owner was insolvent at the time of the Transfer or became insolvent as a result of the Transfer because its remaining asset—Shadow Creek Tract 1, which is worth far less than the portion of the Mortgage Loan balance allocated to Shadow Creek Owner.

**Answer:** Paragraph 213 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny the allegations in Paragraph 213.

214.  Shadow Creek Owner was engaged in a business or a transaction for which its remaining asset—Shadow Creek Tract 1, which is worth far less than the portion of the Mortgage Loan balance allocated to Shadow Creek Owner—was unreasonably small in relation to the business or transaction.

**Answer:** Paragraph 214 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny the allegations in Paragraph 214.

215.  As a result of the transfer, the Trustee's ability to recover through enforcement mechanisms against Shadow Creek Owner and the Shadow Creek property have been entirely frustrated.

**Answer:** Paragraph 215 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 215.

216.  The transfer is therefore voidable as a constructive fraudulent transfer under the New York Debtor and Creditor Law.

**Answer:** Paragraph 216 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to

the cited statute for its complete and accurate contents. Otherwise deny the allegations in Paragraph 216.

217. Accordingly, the Trust is entitled to recover Shadow Creek Tract 2 from 3100 Daniel McCall Drive.

**Answer:** Paragraph 217 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 217.

218. In the alternative, the Trust is entitled to recover monetary damages in an amount to be determined by the Court for the value of Shadow Creek Tract 2 plus prejudgment interest from Defendant 3100 Daniel McCall Drive for the constructive fraudulent transfer of Shadow Creek Tract 2.

**Answer:** Paragraph 218 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, deny the allegations in Paragraph 218.

**Count 9: Breach of Contract**
**Against Defendant Meyer Chetrit**
*Seeking Money Damages*
<u>Breach of Guaranty Section 1.1</u>
<u>In Connection With Impermissible Transfer Of Shadow Creek Tract 2</u>

219. The Trustee incorporates by reference the foregoing allegations as if fully restated herein.

**Answer:** The Chetrit Defendants incorporate by reference and repeat their answers to the foregoing allegations as if fully restated herein.

220. The Guaranty Agreement, MLPA, and TSA are valid and enforceable contracts under New York law.

**Answer:** Paragraph 220 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny the allegations in Paragraph 220.

221. Under the MLPA, JPM transferred all of its right, title, and interest in the Mortgage Loan and the Mortgage Loan Documents, including the Guaranty Agreement, to its affiliate, JPMCC.

**Answer:** Paragraph 221 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 221.

222. Under the TSA, JPMCC, as Depositor, transferred, assigned, and conveyed the Guaranty Agreement to the Trust, and the Trustee, acting by and through the Special Servicer, is entitled to enforce all of Depositor's rights and remedies under the Guaranty Agreement. *See* Ex. 5 (TSA) § 2.1.

**Answer:** Paragraph 222 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 222.

223. Under the Guaranty Agreement, Defendant Meyer Chetrit agreed:

> Guarantor hereby irrevocably and unconditionally guarantees to Lender and its successors and assigns the payment and performance

> of the Guaranteed Obligations as and when the same shall be due and payable, whether by lapse of time, by acceleration of maturity or otherwise. Guarantor hereby irrevocably and unconditionally covenants and agrees that it is liable for the Guaranteed Obligations as a primary obligor.

Ex. 2 (Guaranty Agreement) § 1.1.

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, admit that Plaintiff has accurately quoted the cited document in Paragraph 223, and deny any allegation that is inconsistent with the writing.

224. The Guaranty Agreement defines "Guaranteed Obligations" as the Recourse Liabilities described in Loan Agreement Section 9.3. *Id.* § 1.2 ("As used herein, the term 'Guaranteed Obligations' means all obligations and liabilities of Borrower pursuant to Section 9.3 of the Loan Agreement." (emphasis omitted)).

**Answer:** Paragraph 224 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise admit that "Guaranteed Obligations" is defined in the Guaranty Agreement by reference to Section 9.3 of the Loan Agreement, and deny all other allegations in Paragraph 224.

225. Under the Guaranty Agreement, Meyer Chetrit agreed that Lender may pursue recovery from him without first seeking to exhaust its remedies against the Borrower. *Id.* § 1.6.

**Answer:** Paragraph 225 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise admit that Section 1.6 of the Guaranty Agreement provides that "[i]t shall not be necessary for

Lender …, in order to enforce the obligations of Guarantor hereunder, first to (i) institute suit or exhaust its remedies against Borrower…"; and deny all other allegations in Paragraph 225.

226. Meyer Chetrit also agreed he was liable for all costs and expenses, including attorney's fees, incurred by Lender in enforcing and/or preserving its rights under the Guaranty Agreement. *Id.* § 1.8. This covenant survives the payment and performance of the Guaranteed Obligations. *Id.*

**Answer:** Paragraph 226 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. Otherwise deny the allegations in Paragraph 226.

227. Under the Guaranty Agreement, Meyer Chetrit is personally liable for all of Borrower's Recourse Liabilities under Loan Agreement Section 9.3.

**Answer:** Paragraph 227 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny the allegations in Paragraph 227.

228. Under Loan Agreement Section 9.3(c)(ii)(B)(3), "the Debt shall be fully recourse to Borrower in the event … any Individual Borrower fails to obtain Lender's prior written consent to any Transfer to the extent such consent is required by this Agreement." Ex. 3 (Loan Agreement) § 9.3(c)(ii)(B)(3).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents. To the extent a response is required, admit that Plaintiff

has accurately quoted the cited document in Paragraph 228, and deny any allegation that is inconsistent with the writing.

229.  Under Loan Agreement Section 5.2.10(b)(i),

> "Without the prior written consent of Lender, and except to the extent otherwise set forth in this Section 5.2.10 (including, without limitation, Section 5.2.10(d) hereof), Borrower shall not, and shall not permit any Restricted Party do any of the following (collectively, a "**Transfer**"): (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) any Individual Property or any part thereof or any legal or beneficial interest therein … other than … (B) Permitted Transfers.

Ex. 3 (Loan Agreement) § 5.2.10(b)(i).

**Answer:** Respectfully refer the Court to the cited material, which is a written document that speaks for itself as to its contents.  To the extent a response is required, admit that Plaintiff has accurately quoted the cited document in Paragraph 229, and deny any allegation that is inconsistent with the writing.

230.  As of June 19, 2019, Shadow Creek Owner had a legal and beneficial interest in Shadow Creek Tract 2 because ROCO-Shadow Creek had agreed to convey Shadow Creek to Shadow Creek Owner but failed to do so.

**Answer:** Paragraph 230 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny the allegations in Paragraph 230.

231. As a result, ROCO-Shadow Creek held bare title to Shadow Creek Tract 2 in constructive trust for Shadow Creek Owner, and Shadow Creek Owner held a legal interest in Shadow Creek Tract 2 through, among other things, its entitlement to receive formal title to

Shadow Creek Tract 2 under its purchase-and-sale agreement with ROCO-Shadow Creek and a cause of action for reformation of the special warranty deed.

**Answer:** Paragraph 231 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny the allegations in Paragraph 231.

232. On or about May 2024, Shadow Creek Owner, acting by and through Meyer Chetrit, asserted its legal interest in Shadow Creek Tract 2 in communications with ROCO-Shadow Creek. During those communications, Shadow Creek Owner bargained, transferred, and disposed of its legal interest in Shadow Creek Tract 2 in exchange for ROCO-Shadow Creek's conveyance of legal title to Shadow Creek Tract 2 to 3100 Daniel McCall Drive, a non-Borrower affiliate of the Chetrits that is not bound by the Loan Agreement and not included in the Guaranty Agreement.

**Answer:** Paragraph 232 purports to state legal arguments and/or conclusions of law, to which no response is required. To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise admit that 3100 Daniel McCall Drive, LLC is a non-Borrower entity and is not party to the Loan Agreement or included in the Guaranty Agreement; and deny all other allegations in Paragraph 232.

233. The transfer of Shadow Creek Owner's legal interest in Shadow Creek Tract 2 was a Transfer, as defined in the Loan Agreement.

**Answer:** Deny.

234.  The transfer of Shadow Creek Owner's legal interest in Shadow Creek Tract 2 was not a Permitted Transfer, nor was it a Transfer that was allowed without prior consent of the Trustee pursuant to Sections 5.2.10(d) or 5.2.10(e) of the Loan Agreement.

**Answer:** Deny.

235.  Shadow Creek Owner did not request and did not receive the Trustee's consent, written or otherwise, for this Transfer.

**Answer:** Paragraph 235 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny the allegations in Paragraph 235.

236.  The Transfer was therefore an impermissible Transfer that was prohibited by the Loan Agreement.

**Answer:** Deny.

237.  Because Shadow Creek Owner failed to obtain the Trustee' prior written consent to the Transfer, as required by the Loan Agreement, under Loan Agreement Section 9.3(c)(ii)(B)(3), the Debt is "fully recourse to Borrower," and through the Guaranty Agreement, to Meyer Chetrit.

**Answer:** Paragraph 237 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, respectfully refer the Court to the cited materials, which are written documents that speak for themselves as to their contents. Otherwise deny the allegations in Paragraph 237.

238.  Accordingly, the Trust is entitled to money damages from Meyer Chetrit for the full amount of the Debt under the Guaranty Agreement, along with attorney's fees, court costs, and other costs of collection plus prejudgment interest.

**Answer:** Paragraph 238 purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny the allegations in Paragraph 238.

### Prayer For Relief

WHEREFORE, the Trust respectfully requests that the Court enter judgment in favor of the Trust and against JPM:

A.  Ordering JPM to specifically perform its obligation to repurchase the Mortgage Loan at the Repurchase Price, *less* the actual amounts that the Trust received from the prior sale of any Properties;

B.  Alternatively, awarding damages in favor of the Trust and against JPM in the amount of the Repurchase Price, *less* the actual amounts that the Trust received from the prior sale of any Properties;

C.  Ordering JPM to specifically perform its obligation to repurchase the Shadow Creek portion of the Mortgage Loan at the Repurchase Price;

D.  Alternatively, awarding damages in favor of the Trust and against JPM for the Shadow Creek portion of the Mortgage Loan in the amount of the Repurchase Price;

E.  Ordering Shadow Creek Owner to specifically perform its obligation to execute a correction instrument adding Shadow Creek Tract 2 to the Deed of Trust for the Shadow Creek Property;

F.  Awarding damages in favor of the Trust and against Shadow Creek Owner in an amount to be determined by the Court equal to Shadow Creek's depreciation in value during the time period in which Shadow Creek Owner failed to execute the correction instrument adding Shadow Creek Tract 2 to the Deed of Trust for the Shadow Creek Property;

G. Alternatively, awarding damages in favor of the Trust and against Shadow Creek Owner in an amount to be determined by the Court for the Shadow Creek Owner's failure to execute a correction instrument adding Shadow Creek Tract 2 to the Deed of Trust for the Shadow Creek Property;

H. Reforming the Deed of Trust to correct the scrivener's error and Shadow Creek Owner's and JPM's mutual mistake in order to convey a valid and enforceable security interest in Shadow Creek Tract 2 to the Trustee;

I. Awarding damages in favor of the Trust and against Meyer Chetrit in an amount to be determined by the Court for his breach of Guaranty Section 1.1 as a result of the material misrepresentations related to the Borrower's financial data (including the T12s);

J. Awarding damages in favor of the Trust and against Meyer Chetrit in an amount to be determined by the Court for his breach of Guaranty Section 1.1 as a result of the material misrepresentations related to the rent rolls (including the rent roll attached to as Loan Agreement Schedule V);

K. Awarding damages in favor of the Trust and against Meyer Chetrit for the full amount of the Debt for his breach of Guaranty Section 1.1 as a result of the Transfer of Shadow Creek Owner's legal interest in Shadow Creek Tract 2 to 3100 Daniel McCall Drive;

L. Avoiding the transfer of Shadow Creek Owner's legal interest in Shadow Creek Tract 2 to 3100 Daniel McCall Drive and awarding full legal title of Shadow Creek Tract 2 to Shadow Creek Owner, subject to the Trustee's security interest therein;

M.  Awarding money damages in favor of the Trust and against 3100 Daniel McCall Drive for the value of the legal interest in and title to Shadow Creek Tract 2 that Shadow Creek Owner fraudulently transferred to 3100 Daniel McCall Drive;

N.  Awarding pre-judgment interest, as of the date of the breaches and other misconduct asserted herein;

O.  Awarding attorney's fees, costs, and expenses, as required under the relevant contracts and permitted under applicable law; and

P.  Awarding such other and further relief, in law and equity, as this Court deems just and proper.

**Answer:** Plaintiff's Prayer for Relief purports to state legal arguments and/or conclusions of law, to which no response is required.  To the extent a response is required, deny that Plaintiff is entitled to the requested relief or to any relief.

## AFFIRMATIVE AND OTHER DEFENSES

Any allegations not specifically admitted above are hereby denied.  For further defenses, the Chetrit Defendants allege as follows:

### FIRST DEFENSE

The Complaint fails, in whole or in part, to state a claim upon which relief can be granted.

### SECOND DEFENSE

The Complaint fails, in whole or in part, because it is not pled with the specificity required under Federal Rule of Civil Procedure 9(b).

### THIRD DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of mutual mistake.

## FOURTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

## FIFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver.

## SIXTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of ratification.

## SEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands. The Chetrit Defendants incorporate by reference and repeat their answer to Paragraph 73 as if fully restated herein, and respectfully refer the Court to Exhibit 1.

## EIGHTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrines of negligent and/or fraudulent misrepresentation.

## NINTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by N.Y. Real Prop. Acts. Law § 1301 because foreclosure actions have been commenced on some or all of the Properties, and the courts in which the foreclosure actions were brought did not grant leave to pursue the claims in this action.[5]

## TENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by N.Y. Real Prop. Acts. Law § 1371 because foreclosure actions have been commenced on some or all of the Properties, and a deficiency judgment was not sought therein as prescribed under N.Y. Real Prop. Acts. Law § 1371,

---

[5] Alternatively, Plaintiff's claims are barred by any law analogous to N.Y. Real Prop. Acts. Law § 1301 under the law of any state in which a foreclosure action was commenced.

such that the proceeds of the foreclosure sales, regardless of amount, are deemed to be in full satisfaction of the debt, and no right to recover any deficiency in any action or proceeding exists.[6]

## ELEVENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of ripeness.

## TWELFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because Plaintiff has not suffered any injury or damages.

## THIRTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because any acts or omissions of the Chetrit Defendants were not the proximate cause of Plaintiff's alleged damages.

## FOURTEENTH DEFENSE

Plaintiff's claims are barred, in whole or in part, because of the contribution, the comparative fault, and/or the contributory negligence of Plaintiff, or of other entities or persons over which the Chetrit Defendants had no control.

## FIFTEENTH DEFENSE

To the extent Plaintiff has suffered damages or loss, which the Chetrit Defendants deny herein, Plaintiff's claims are barred, in whole or in part, because Plaintiff and its agents have failed to take reasonable steps to mitigate Plaintiff's alleged damages, if any, and to take necessary steps to avoid preventable consequences.

---

[6] Alternatively, Plaintiff's claims are barred by any law analogous to N.Y. Real Prop. Acts Law § 1371 under the law of any state in which a foreclosure action was commenced.

## SIXTEENTH DEFENSE

To the extent Plaintiff has suffered damages or loss, which the Chetrit Defendants deny herein, Plaintiff's claims are barred, in whole or in part, by the doctrines of improper double recovery and/or duplication of damages.

## DEFENSES RESERVED

The Chetrit Defendants each specifically denies any allegation in the Complaint that is not specifically admitted, has not knowingly or voluntarily waived any applicable defense, and reserves the right to assert, and rely upon, such additional defenses to the Complaint as may become available or apparent as discovery progresses in this action and at any other time.

## CHETRIT DEFENDANTS' PRAYER FOR RELIEF

**WHEREFORE**, the Chetrit Defendants respectfully request that this Court enter judgment in favor of the Chetrit Defendants and against Plaintiff as follows:

A. dismissing the Complaint, and each and every cause of action set forth therein, with prejudice; and

B. awarding such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
         June 10, 2025


                                      */s/ Bruce S. Kaplan*

                                      Bruce S. Kaplan
                                      Elizabeth K. Bierut
                                      Jason B. Koffler
                                      FRIEDMAN KAPLAN
                                         SEILER ADELMAN & ROBBINS LLP
                                      7 Times Square
                                      New York, New York 10036-6516
                                      (212) 833-1100
                                      bkaplan@fklaw.com
                                      ebierut@fklaw.com
                                      jkoffler@fklaw.com

                                      *Counsel for Defendants Meyer Chetrit,*
                                      *Shadow Creek Owner, LLC, and 3100*
                                      *Daniel McCall Drive, LLC*