# EXHIBIT 13

```
 1

 2              UNITED STATES DISTRICT COURT                        08:22
                SOUTHERN DISTRICT OF NEW YORK
 3
    WELLS FARGO BANK, NATIONAL
 4  ASSOCIATION, as Trustee for
    the Benefit of the
 5  Certificateholders of J.P.    CASE NO.
    Morgan Chase Commercial       1:25-cv-01943-DEH
 6  Mortgage Securities Trust
    2019-MFP, Commercial
 7  Mortgage Pass-Through
    Certificates, Series
 8  2019-MFP, by and through
    Situs Holdings, LLC, as
 9  Special Servicer under the
    Trust and Servicing
10  Agreement, dated as of July
    18, 2019,
11
                 Plaintiff,
12
          -against-
13
    JPMORGAN CHASE BANK
14  NATIONAL ASSOCIATION; MEYER
    CHETRIT; SHADOW CREEK
15  OWNER, LLC; and 3100 DANIEL
    MCCALL DRIVE, LLC,
16
                 Defendants.
17

18          *** CONFIDENTIAL TRANSCRIPT ***

19        VIDEO-RECORDED DEPOSITION OF
                  ELIZABETH KING
20      Quinn Emanuel Urquhart & Sullivan, LLP
                  295 Fifth Avenue
21          New York, New York 10016
                   01/22/2026
22                 9:04 (EST)

23

24   REPORTED BY:  AMANDA GORRONO, CLR
     CLR NO. 052005-01
25   JOB NO. J13934488
```



```
 1
 2                         01/22/2026
 3                          9:04 (EST)
 4
 5      VIDEO-RECORDED DEPOSITION OF ELIZABETH
 6   KING, held at Quinn Emanuel Urquhart &
 7   Sullivan, LLP 295 Fifth Avenue New York,
 8   New York 10016, before Amanda Gorrono,
 9   Certified Live Note Reporter, and Notary
10   Public of the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



```
 1

 2   A P P E A R A N C E S

 3   ON BEHALF OF PLAINTIFF:

 4      Blair Adams, Esquire
        Quinn Emanuel Urquhart & Sullivan, LLP
 5      295 Fifth Avenue
        New York, New York 10016
 6      PHONE:  +1 212 849 7615
        E-MAIL: Blairadams@quinnemanuel.com
 7
              -AND-
 8
        Amy Hood, Esquire
 9      Quinn Emanuel Urquhart & Sullivan, LLP
        295 Fifth Avenue
10      New York, New York 10016
        PHONE: +1 212 849 7186
11      E-MAIL: Amyhood@quinnemanuel.com

12   ON BEHALF OF DEFENDANT JPMORGAN CHASE
     BANK:
13
        Jonathan S. Carter, Esquire
14      Sullivan & Cromwell LLP
        125 Broad Street
15      New York, NY 10004-2498
        PHONE: +1-212-558-4000
16      E-MAIL: Carterjo@sullcrom.com

17            -AND-

18      Gulliver Brady, Esquire
        Sullivan & Cromwell LLP
19      125 Broad Street
        New York NY 10004-2498
20      PHONE: +1-212-558-4000
        E-MAIL: Bradyg@sullcrom.com

21

22
     ALSO PRESENT:
23
     Silvio Facchin, Videographer
24   Charles Hampton, Esquire - In-house
     Counsel at JPMorgan

25
```



|   |   |   |
|---|---|---|
| 1 | E. King | |
| 2 | A. Most likely not. I would have | 02:58 |
| 3 | reviewed the presentation before it got | 02:58 |
| 4 | sent to committee. | 02:58 |
| 5 | Q. Would you have reviewed any | 02:58 |
| 6 | script for the presentation to the | 02:58 |
| 7 | committee? | 02:59 |
| 8 | A. That would be unusual. | 02:59 |
| 9 | Q. Do you recall attending this | 02:59 |
| 10 | May 28th credit committee meeting? | 02:59 |
| 11 | A. I think I listened to the | 02:59 |
| 12 | committee, yes. I don't think it was in | 02:59 |
| 13 | person. | 02:59 |
| 14 | Q. So this is 2019. I guess it's | 02:59 |
| 15 | on a conference line? | 02:59 |
| 16 | A. I think it was. I don't exactly | 02:59 |
| 17 | recall. We've switched to Zoom since | 02:59 |
| 18 | COVID. It's possible it was in person at | 02:59 |
| 19 | the time. I don't remember. It was | 02:59 |
| 20 | either a call or we were sitting in a | 02:59 |
| 21 | conference room. | 02:59 |
| 22 | Q. Okay. Do you recall how this | 02:59 |
| 23 | May 28th meeting went? | 02:59 |
| 24 | MR. CARTER: Object to form. | 02:59 |
| 25 | A. I didn't recall the specifics, | 02:59 |



```
 1                    E. King
 2   but in reviewing certain documents, I know        03:00
 3   there were many follow-ups to the final           03:00
 4   credit committee.                                 03:00
 5   BY MR. ADAMS:                                     03:00
 6       Q.    Aside from what you saw in the          03:00
 7   documents -- and we'll go through some of         03:00
 8   them -- do you, sitting here today, have          03:00
 9   any recollection of any reactions,                03:00
10   responses, or comments provided by credit         03:00
11   committee memos to the presentation               03:00
12   provided?                                         03:00
13           MR. CARTER:  Object to form.              03:00
14       A.    Sitting here today, I hadn't            03:00
15   recalled, like, the actual final committee       03:00
16   or anything after it.                             03:00
17           (Whereupon, King Exhibit 21,              03:00
18       Script Bates Number JPMC-WF-335331            03:00
19       through 335334, was marked for                03:00
20       identification.)                              03:00
21   BY MR. ADAMS:                                     03:01
22       Q.    Placing in front of you a               03:01
23   document that's been marked exhibit --            03:01
24   King Exhibit 21.  It is a -- what appears         03:01
25   to be a script that was produced to us at         03:01
```



```
 1                    E. King
 2    JPMC-WF-335331 to 335334.                              03:01
 3              Have you ever seen this document             03:01
 4    before?                                                03:01
 5       A.    No.                                           03:01
 6       Q.    Okay.  Did you prepare this                   03:01
 7    document?                                              03:01
 8       A.    No.                                           03:01
 9       Q.    I assume so, from the answer to               03:01
10    your last question, but I had to ask.                  03:01
11              And again, sitting here today,               03:01
12    you don't recall anything about the                    03:02
13    presentation or response to that                       03:02
14    presentation that occurred at that                     03:02
15    meeting?                                               03:02
16       A.    No.  I hadn't -- I didn't                     03:02
17    remember the actual committee.                         03:02
18       Q.    If you go to the last page of                 03:02
19    this presentation the one bearing Bates                03:02
20    5333 --                                                03:02
21       A.    Yes.                                          03:02
22       Q.    -- do you see that there is a                 03:03
23    discussion of:  Our underwriting of 38                 03:03
24    million is not capturing any of this                   03:03
25    projected rental and occupancy upside.  We             03:03
```



| | | |
|---|---|---|
| 1 |                 E. King | |
| 2 | are underwriting to the March 2019 rent | 03:03 |
| 3 | rolls and TTM concessions and credit loss? | 03:03 |
| 4 |     A.    Yes. | 03:03 |
| 5 |     Q.    And then it says:  For other | 03:03 |
| 6 | income, you'll notice we're underwriting | 03:03 |
| 7 | to Year 1 budget which is actually below | 03:03 |
| 8 | TTM. | 03:03 |
| 9 |         Do you see that? | 03:03 |
| 10 |     A.    Yes. | 03:03 |
| 11 |     Q.    It says:  This is because other | 03:03 |
| 12 | income includes a lot of termination | 03:03 |
| 13 | payments, cleaning and damages fees which | 03:03 |
| 14 | the sponsor believes will actually be | 03:03 |
| 15 | reduced as the overall tenant quality | 03:03 |
| 16 | across the portfolio is improved.  So | 03:03 |
| 17 | while this is a loss of revenue in the | 03:03 |
| 18 | near term, it will drive rental and | 03:03 |
| 19 | occupancy growth in the long-term. | 03:03 |
| 20 |         Do you see that? | 03:03 |
| 21 |     A.    Yes. | 03:03 |
| 22 |     Q.    And again, no mention here of | 03:03 |
| 23 | the prior comments from Mr. Perone about | 03:03 |
| 24 | other income not being real? | 03:04 |
| 25 |         MR. CARTER:  Object to form. | 03:04 |



|   |   |   |
|---|---|---|
| 1 | E. King | |
| 2 | BY MR. ADAMS: | 03:04 |
| 3 |    Q.    Correct? | 03:04 |
| 4 |    A.    Correct. | 03:04 |
| 5 |    Q.    And you don't recall, sitting | 03:04 |
| 6 | here today, that being discussed outside | 03:04 |
| 7 | of this script? | 03:04 |
| 8 |    A.    No. | 03:04 |
| 9 |    Q.    There is a paragraph towards the | 03:04 |
| 10 | end that says:  To conclude, I just want | 03:04 |
| 11 | to address the main consideration of the | 03:04 |
| 12 | deal, leverage, which is outlined on | 03:04 |
| 13 | Page 12.  Our rated mortgage represents an | 03:04 |
| 14 | LTV of 75.7 percent and total mortgage | 03:04 |
| 15 | loan represents LTV of 84.5 percent. | 03:04 |
| 16 |      Do you see that? | 03:04 |
| 17 |    A.    Yes. | 03:04 |
| 18 |    Q.    Do you recall the leverage in | 03:05 |
| 19 | this deal being a topic of conversation | 03:05 |
| 20 | during the credit committee process? | 03:05 |
| 21 |    A.    Not specifically, no.  Leverage | 03:05 |
| 22 | is one of our most common considerations. | 03:05 |
| 23 |    Q.    And this is a high leverage | 03:05 |
| 24 | deal, correct? | 03:05 |
| 25 |    A.    It's a bit on the higher side, | 03:05 |



```
 1                    E. King
 2   but it's an acquisition.                              03:05
 3         Q.    And that's -- it's a bit on the           03:05
 4   higher side even though the appraised                 03:05
 5   value for the properties is higher than               03:05
 6   the actual purchase price for the                     03:05
 7   properties by a substantial amount,                   03:05
 8   correct?                                              03:05
 9               MR. CARTER:  Object to form.              03:05
10         A.    Say that again.                           03:05
11   BY MR. ADAMS:                                         03:05
12         Q.    In other words, the LTV of                03:06
13   84.5 percent reflected in this script,                03:06
14   that LTV is loan to value determined by               03:06
15   the appraisals not loan to the cost of the            03:06
16   acquisition, which is lower than the                  03:06
17   appraised value?                                      03:06
18               MR. CARTER:  Object to form.              03:06
19         A.    Okay.                                     03:06
20   BY MR. ADAMS:                                         03:06
21         Q.    You agree with that, correct?             03:06
22         A.    So it's a positive that the LTC           03:06
23   is lower.                                             03:06
24         Q.    Unless the LTC reflects the               03:06
25   actual value of the portfolio?                        03:06
```



| | | |
|---|---|---|
| 1 | E. King | |
| 2 | A.    The LTC reflects the actual | 03:06 |
| 3 | purchase price and cost associated with | 03:06 |
| 4 | buying the portfolio. | 03:06 |
| 5 | Q.    Right.  What a willing buyer and | 03:06 |
| 6 | seller actually are willing to pay to | 03:06 |
| 7 | acquire the portfolio? | 03:06 |
| 8 | A.    Yes. | 03:06 |
| 9 | Q.    Which is of course what an | 03:06 |
| 10 | appraisal is supposed to reflect, correct? | 03:06 |
| 11 | A.    Appraisal is supposed to reflect | 03:06 |
| 12 | market value. | 03:06 |
| 13 | Q.    Okay.  Between a willing buyer | 03:06 |
| 14 | and a willing seller? | 03:06 |
| 15 | A.    Yes. | 03:06 |
| 16 | Q.    The May 28th credit committee | 03:06 |
| 17 | did not approve this transaction, correct? | 03:07 |
| 18 | A.    I believe there were follow-up | 03:07 |
| 19 | questions and analysis requested. | 03:07 |
| 20 | Q.    How frequently do final credit | 03:07 |
| 21 | committee meetings not result in an | 03:07 |
| 22 | approval of a transaction? | 03:07 |
| 23 | A.    There are often follow-ups after | 03:07 |
| 24 | committee. | 03:07 |
| 25 | Q.    Was the level of follow-ups with | 03:07 |



|     |                                                                      |       |
| --- | -------------------------------------------------------------------- | ----- |
| 1   | E. King                                                              |       |
| 2   | respect to this transaction higher than in                           | 03:07 |
| 3   | other transactions?                                                  | 03:07 |
| 4   | A.   I would say it was higher than                                  | 03:07 |
| 5   | average, but not higher than we've seen on                           | 03:07 |
| 6   | other deals on occasion.                                             | 03:07 |
| 7   | Q.   One of the things that the                                      | 03:08 |
| 8   | credit committee wanted was to see a lower                           | 03:08 |
| 9   | loan amount, correct?                                                | 03:08 |
| 10  | A.   I don't remember.                                               | 03:08 |
| 11  | (Whereupon, King Exhibit 22,                                         | 03:08 |
| 12  | Email Bates Number JPMC-WF-169585, was                               | 03:08 |
| 13  | marked for identification.)                                          | 03:08 |
| 14  | BY MR. ADAMS:                                                        | 03:08 |
| 15  | Q.   Okay.  Placing in front of you a                                | 03:08 |
| 16  | document that's been marked King                                     | 03:08 |
| 17  | Exhibit 22.  It's an email from Brian                                | 03:08 |
| 18  | Baker to what looks to be members of the                             | 03:08 |
| 19  | credit committee that gets forwarded to                              | 03:08 |
| 20  | you by Joe Geoghan.  It was produced at                              | 03:09 |
| 21  | JPMC-WF-169585.                                                      | 03:09 |
| 22  | You may have testified to this                                       | 03:09 |
| 23  | earlier, but who is Brian Baker?                                     | 03:09 |
| 24  | A.   He is Joe Geoghan's boss.                                       | 03:09 |
| 25  | Q.   And in the email that gets                                      | 03:09 |



```
 1                      E. King
 2    forwarded it says:  We need to recommittee          03:09
 3    this.                                               03:09
 4              Do you see that?                          03:09
 5         A.    Yes.                                     03:09
 6         Q.    What does that mean?                     03:09
 7         A.    He wants us to take it back to           03:09
 8    committee with the follow-up items he               03:09
 9    wants to see.                                       03:09
10         Q.    It says:  I want confirmation            03:09
11    ASAP that the borrower is aware that $              03:09
12    will be lower minimum 15 million can't              03:09
13    know the final number because of the                03:09
14    amount of unknown info.                             03:09
15              Do you see that?                          03:09
16         A.    Yes.                                     03:09
17         Q.    Is it fair to say that the               03:09
18    credit committee did not feel that the              03:09
19    information that they were provided about           03:09
20    this transaction at the May 28th credit             03:09
21    committee meeting was complete?                     03:09
22              MR. CARTER:  Object to form.              03:10
23         A.    I can say only that based on             03:10
24    this email, Brian Baker had follow-ups              03:10
25    that he wanted to see.                              03:10
```



800.211.DEPO (3376)
EsquireSolutions.com