SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

125 Broad Street
New York, New York 10004-2498

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.
BRUSSELS • FRANKFURT • LONDON • PARIS
BEIJING • HONG KONG • TOKYO
MELBOURNE • SYDNEY

September 18, 2026

Hon. Dale E. Ho,
U.S. District Court for the Southern District of New York,
40 Foley Square, Courtroom 905,
New York, NY 10007.

Re: *Wells Fargo Bank, N.A.* v. *JPMorgan Chase Bank, N.A., et al.*, Case No. 25-cv-01943

Dear Judge Ho:

Pursuant to Rule 4(a) of Your Honor's Individual Rules, I write on behalf of JPMorgan Chase Bank, N.A. ("JPMorgan") to respectfully seek leave to move for summary judgment on Plaintiff's sole remaining repurchase claim against JPMorgan. This action arises from a $481 million loan ("Loan") JPMorgan made to affiliates of the Chetrit Group ("Buyer") in June 2019 and securitized through a CMBS trust. Buyer used the Loan to acquire 43 multifamily properties from ROCO Real Estate LLC ("ROCO"). Years later, in 2023, ROCO's co-CEO pled guilty to falsifying financial records. Plaintiff (the CMBS Trustee) now seeks to hold JPMorgan liable for ROCO's fraud, even though JPMorgan did not deal directly with ROCO and knew nothing of any fraud. If anything, JPMorgan was a *victim* of ROCO's fraud, which the criminal court found was "difficult to trace or would not show up in the documents" such that JPMorgan neither "knew [n]or should have known" of it. (ECF No. 44-1, Ex. 2 at 9.) Plaintiff's repurchase claim fails as a matter of law for at least the following reasons.[1]

## I. Plaintiff Cannot Show "Actual Knowledge" of Any Fraud or Material Falsity.

Plaintiff claims JPMorgan breached its representation in the July 2019 Mortgage Loan Purchase Agreement ("MLPA") that "[t]o the best of [JPMorgan's] Knowledge . . . after due inquiry," "no monetary or material non-monetary Event of Default" existed. (ECF No. 1-1 (MLPA), Ex. A ¶ 4.) The MLPA defines "Knowledge" as the "actual knowledge" of JPMorgan individuals "actively involved in originating, administration or servicing" of the Loan. (*Id.*)

Plaintiff's claim that JPMorgan had "actual knowledge" of ROCO's fraudulent manipulation of financial statements has collapsed in discovery. Plaintiff initially alleged that JPMorgan knew that ROCO inflated net operating income in the properties' trailing twelve-month financial statements ("T12s") by more than $10 million. (Compl. ¶¶ 105-06.) That allegation rests on three factual predicates, each of which discovery has disproved.

[1] JPMorgan reserves the right to (i) make additional arguments in full briefing on any motion for summary judgment, and (ii) separately move to exclude certain opinions of Plaintiff's experts.

*First*, Plaintiff has abandoned the Complaint's core allegation that JPMorgan knew of ROCO's $10 million fraud because it had "the raw data from ROCO's internal accounting system that could be used to validate the accuracy of information" in the T12s. (*Id.* ¶ 61.) Plaintiff's own expert conceded that JPMorgan did *not* have access to ROCO's internal accounting system (Yardi) and thus could not have done the T12-to-Yardi comparison on which Plaintiff's case depends. (Ex. A (Klein Tr. 207-208, 212).)

*Second*, discovery proved that Plaintiff's allegation regarding "$2.6 million in underreported repairs and maintenance costs" is a red herring. (Compl. ¶ 61.) The difference between expenses reported on the T12s and the "right-sized" expenses in Buyer's pro forma business plan have nothing to do with falsity or fraud, but instead reflect a difference of opinion between Buyer and seller (ROCO) regarding expected expenses on a go-forward basis. JPMorgan witnesses, and Plaintiff's own expert, confirmed as much. (*See, e.g.*, Ex. B (King Tr. 98-99); Ex. C (Colella Tr. 220-22); Ex. D (Buono Tr. 140, 176-77); Ex. E (Tenzer Tr. 85-86).)

*Third*, discovery has also disproved Plaintiff's allegation that JPMorgan knew the T12s reflected $3.5 million in other income that "did not exist." (Compl. ¶ 58.) This allegation rests on a single e-mail exchange in February 2019—dated *before* JPMorgan even signed a term sheet, and concerning a much larger portfolio of properties than ultimately served as collateral for the Loan. Buyer's advisor (Patrick Perone) wrote to JPMorgan that Buyer had "identified $3.5MM of other income" in the T12s that they "did not believe was actually being collected." (Ex. F (JPMC-WF-00071189).) JPMorgan sought clarification and Perone advised that the properties' "accrual based cash flows" included fees that Buyer did not think were "real or being collected." (*Id.*) Nothing in this email suggested falsity or fraud. On the contrary, discovery proved that accrual-based financials may (and often do) reflect income that has been charged but not collected.

Perrone testified that ROCO's statements were "accrual based," that "most real estate operators don't run cash books, so you rely on accrual statements," and that accrued-but-uncollected charges are "not atypical." (Ex. G (Perone Tr. 208-09, 211).) Borko Milosev, who conducted Buyer's diligence, confirmed that the disputed items were "real charges" (Ex. H (Milosev Tr. 311-12)), and Plaintiff's own expert conceded that the charges had a contractual basis and thus could have been collected by different management (Ex. A (Klein Tr. 151, 153, 179-82), which Buyer planned to implement (Ex. D (Buono Tr. 89-92, 119, 153-54)).

Moreover, no JPMorgan employee that received the email testified that they read it as suggesting fraud, or that follow-up inquiries failed to resolve the issue. (Ex. B (King Tr. 112-13); Ex. C (Colella Tr. 219-20); Ex. I (Stromberg Tr. 74-79); Ex. J (Geoghan Tr. 60-64); Ex. M (Baker Tr. 25-31).) Indeed, when JPMorgan followed up after the term sheet was signed and diligence commenced, Buyer made no mention of falsity or fraud, and instead represented that the "other income" items were "higher than what we have historically experienced so we took more conservative approach." (Ex. O (JPMC-WF-00136785).) Ultimately, Buyer provided JPMorgan an unqualified representation that "[a]ll financial data" provided to JPMorgan was "true, complete and correct in all material respects," which was "relied upon by Lender notwithstanding any investigation." (ECF No. 1-3, at 60, 70). As a matter of industry practice, "it was entirely reasonable for JPMorgan to rely on that representation." (Ex. N (Buono Rep. ¶ 74).)

At best, Plaintiff's case (or what is left of it) comes down to how uncollected charges should have been treated as a matter of GAAP accounting. But Plaintiff's own expert has conceded that ROCO's T12s were not subject to GAAP (Ex. A (Klein Tr. 112), and Plaintiff cannot show

that judgmental accounting assumptions are "material," particularly in the context of a value-add transaction. (*See* Ex. K (Sussman Rep. 5-6, 12-15, 21-26); Ex. A (Klein Tr. 129-30, 143, 150-52).) Plaintiff thus cannot show actual knowledge of material falsity, let alone fraud.[2]

## II. Plaintiff Cannot Show That JPMorgan Failed to Conduct "Due Inquiry."

Having failed to adduce any evidence that JPMorgan had "actual knowledge" of ROCO's fraud, Plaintiff argues instead that JPMorgan failed to conduct "due inquiry." But there can be no dispute that JPMorgan made extensive inquiries over a multi-month diligence period regarding the portfolio properties, including review of financial statements, pro forma statements, rent rolls, occupancy history, receivables, tax bills, appraisals, and property condition reports. (Ex. N (Buono Rep. ¶¶ 43, 58-94.) Moreover, JPMorgan retained Situs—an arm of the very same special servicer directing this litigation—to assist with diligence, including analysis of bank statements, reconciliation of operating statements, review of other-income line items, and preparation of a memo describing year-over-year variances in financials. (*See* Ex. L (SITUS_0020386).) Situs conducted this analysis based on the same data JPMorgan received. But Situs never identified ROCO's fraud notwithstanding its analysis, further undercutting Plaintiff's claim that JPMorgan had—or should have with "due inquiry"—"actual knowledge" of material falsity or fraud.

Plaintiff claims that JPMorgan's review of bank statements was somehow insufficient because Buyer only obtained them for five properties. But Situs itself analyzed those statements and identified *positive* cash flows. (Ex. B (King Tr. 268-70).) Plaintiff's arguments about "what could have been uncovered" if additional statements were reviewed are pure speculation. Plaintiff chose not to subpoena *any* additional bank statements, so there is no evidence in the record of what they would show. In fact, and Plaintiff's own expert conceded that, without reviewing them, he has no basis to opine that, "had they been looked at," the fraud "could have been uncovered." (Ex. E (Tenzer Tr. 112-13).) In any event, as JPMorgan's underwriting expert explained, bank statements generally confirm *rent* collection, not the non-rental "other income" or operating expenses on which Plaintiff's allegations are based. (Ex. D (Buono Tr. 149-50).)

Perhaps recognizing the weakness of its position, Plaintiff (via its expert) pivots to argue that the *underwriting* JPMorgan performed somehow did not comport with the "*due diligence*" standards Plaintiff's expert would have applied. But "due inquiry" is not the same as "due diligence" for purposes of underwriting, and JPMorgan did not represent or warrant that its due diligence (which was extensive in any event) met any specific industry standard. Plaintiff's conflation of "due inquiry" with "due diligence" cannot be squared with the plain language of the MPLA, and interpreting "due inquiry" as an affirmative representation or warranty about the level of underwriting diligence JPMorgan performed would eviscerate the "actual knowledge" limitation. *See GPB Cap. Holdings, LLC* v. *Dibre*, 126 N.Y.S.3d 656, 657 (2020). In any event, as JPMorgan's expert opined, JPMorgan's diligence was "comprehensive" and "consistent with both industry standards and JPMorgan's Guidelines." (Ex. N (Buono Rep. ¶¶ 60, 82-83.)

## III. Plaintiff Cannot Seek Repurchase Where Properties Have Already Been Sold.

Because all but six of the 43 properties have already been sold, repurchase is impossible, so any claim under the MLPA is limited to indemnification "for the losses directly related to" any "Material Breach" (ECF No. 1-1 (MLPA § 8(a))), which Plaintiff cannot show.

---

[2] Plaintiff also cited a June 4, 2019 email regarding small discrepancies in unit count and tax figures, but Plaintiff's expert conceded these items are not material. (Ex. E (Tenzer Tr. 137-38, 143).)

Sincerely,

/s/ *Robert A. Sacks*
Robert A. Sacks

cc: All counsel of record (via ECF)