# EXHIBIT A

# In the Matter Of:

Wells Fargo Bank vs JPMorgan Chase Bank

1:25-cv-01943-DEH

---

## GORDON KLEIN

*June 24, 2026*

---

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

there's a contractual agreement to adopt it.
Q. And again, there was no voluntary adoption of GAAP by ROCO, correct?
A. That's correct.
Q. And there's no contractual basis that ROCO was required to have its financial statements conform to GAAP, correct?
A. That is correct.
Q. Okay. So then you rely on SEC Staff Accounting Bulletin Number 9, right?
MR. HESS: Objection to form.
THE WITNESS: Can I hear that question back?
(Whereupon the court reporter read back the last question.)
THE WITNESS: No.
BY MR. CARTER:
Q. So you -- I'll ask it, because I don't think it was picked up by the court reporter.
In your report, you rely on SEC Staff Accounting Bulletin Number 99; is that correct?
A. That is correct.
Q. And SAB 99 by its terms is an interpretation by SEC staff of disclosure requirements of the Federal Securities laws,

account the specific facts and circumstances under which those financial statements are being reviewed; is that right?

A. Sure.

Q. And here, those facts and circumstances relate to a value-add transaction, right?

A. Those facts and circumstances, with regard to my opinion, relate to whether the statements were true, complete, and accurate in a material manner.

Q. I'm asking a different question. The facts and circumstances surrounding the context in which these financial statements were being reviewed, is in the context of a value-add real estate acquisition, right?

A. Yes.

Q. Okay. So it's important to take into consideration the context of the value-add real estate acquisition in assessing the financial statements, right?

A. Not necessarily, if the representation is that the financial statements historically fairly represent the historical activities of the enterprise.

Q. But we're talking about qualitative

materiality, right?
A. We are.
Q. Okay. So doesn't the assessment of qualitative materiality require a consideration of the facts and circumstances specific to the circumstances in which those financial statements are being reviewed?
A. Which would also include the nature of the parties having negotiated representation, that'd be yes.
Q. That's one element. Another element would be the context that this is a value-add transaction, right?
A. Yes.
Q. Okay.
MR. CARTER: Let's take a break. Is five minutes, okay?
THE WITNESS: Yep.
THE VIDEOGRAPHER: We're now going off the record. It's 11:36 a.m.
(Off the record.)
THE VIDEOGRAPHER: We're now going back on the record. The time is 11:53 a.m.
BY MR. CARTER:
Q. Welcome back.

A. In addition to looking at accrual of revenues, we also look at other accruals such as expenses and losses. Again, we're looking not at simply money going out the door as a disbursement. We're looking at the economic incurrence of an expense, whether money is dispersed or not dispersed.

And if it is dispersed, irrespective of the timing of disbursement, whether it is preceding the economic incurrence simultaneous with the incurrence or subsequent to the economic incurrence.

Q. You said cash basis accounting is very objective. Does accrual basis accounting require more subjective analysis?

A. To some degree, yes, it does.

Q. In assessing whether certain charges will be collected, there's an exercise of judgment; is that fair?

A. Yeah, that's correct.

Q. Okay. Paragraph 15 of the background section here, you're discussing that in early February 2019, the buyer's advisors identified certain issues in the historical operating results provided by ROCO.

under accrual accounting, that you report the gross amount of potential collections, and then you have a negating element or an offsetting element, which in accounting we call a contra, C-O-N-T-R-A, account.

Q. And you'd agree that in determining the amount of what would be collectible or uncollectible that requires an exercise of judgment; is that right?

A. Yes.

Q. There's some subjectivity to that analysis?

A. Some, but it's always tethered to, as a baseline, historical.

Q. But it would involve some subjectivity?

A. I'm sorry?

Q. It would involve some subjectivity, correct?

A. It involves starting fundamentally with the history, and then subjectively evaluating whether history is likely to repeat itself, plus or minus.

Q. And that involves an exercise of judgment?

MR. HESS: Object to form.

THE WITNESS: To that limited range, that is correct.

BY MR. CARTER:

Q. It's possible, right, that a other income charge is not collected by one manager of a property, but that a different manager, with different skills or interest, might be able to collect those amounts; is that fair?

MR. HESS: Objection to form. Are you asking about on historical financial information or about --

MR. CARTER: I'm just asking generally --

MR. HESS: Go forward.

BY MR. CARTER:

Q. If there are -- if there are charges, right, that one manager of a property doesn't believe it can collect, it's possible that a different manager could in fact collect those amounts?

That's fair, right?

A. As a possibility, all is possible.

Q. Okay. And whether something is collectible or not collectible, again, involves an exercise of judgment?

A. Yes.

Q. Okay. You state three lines down here that the advisors had concluded that ROCO had charged tenants for these fees and had recorded them as other income, but it had failed to write off or establish a reserve for the amounts it did not expect to collect.

A. Let me just jump in, because you said three lines down. I don't know what your starting point was.

Q. Apologies. Apologies. Page six. We're at the top of the page talking about uncollectible amounts. I think it's four lines down, where it says the advisors concluded.

Do you see where I am?

A. I do.

Q. The advisors concluded that ROCO had charged tenants for these fees, and had recorded them as other income, but it had failed to write off or establish a reserve for the amounts it did not expect to collect.

Do you see that?

A. Yes.

Q. So here you agree with me that the charges were real, correct?

MR. HESS: Objection to form.

THE WITNESS: Well, I think there's an arguable ambiguity in the use of the word real here.

BY MR. CARTER:

Q. Okay. Do you have any evidence that the charges for these fees were not in fact charged to the tenants?

A. Charged as in a bill was submitted, for example, or a communication was given. I have no reason to believe that the tenants were not informed that they owe these sums.

Q. Okay. The issue, as you understood, that the advisors were addressing was not that the tenants were not charged for these other income amounts, but that, "it had failed to write off or establish a reserve for the amounts it did not expect to collect;" is that correct?

MR. HESS: Objection to form.

THE WITNESS: Yes, I'm willing to accept that these charges likely were indeed communicated and perhaps a contractual obligation.

I'm speaking to whether from an accounting standpoint they were reported in a

income was not being collected?"

And then Perone responds: "Various fees that were running through the accrual-based cash flows provided to us by the seller were not real or being collected."

Do you see that?

A. Yes.

Q. So I think you already said you did not review John Colella's deposition testimony about the meaning of this; is that right?

A. Correct.

Q. Did you review Borko's testimony about what not real or being collected meant?

A. I'm sure I did, but I don't have a specific recollection of what he said.

Q. Do you recall Borko's testimony that the charges were real, but they were just not being written off?

A. I do recall that, yes.

MR. HESS: Objection to form.

BY MR. CARTER:

Q. You recall that testimony from Mr.- --

A. Yeah.

Q. And how did that testimony impact your interpretation of the charges that were not

being collected?
MR. HESS: Objection to form.
THE WITNESS: As I stated previously, I have no basis for disputing that, indeed, a charge was communicated to the tenants. My concern is with them being real from an accounting presentation standpoint, not the existence of the charge, but whether them being real, true, and accurate reflection of the economics that should appear in the financial statements.
BY MR. CARTER:
Q. Okay. Did you do any analysis to determine whether the charges were allowed for under the lease agreements that underlie the financial statements?
A. No. I have no reason to believe that they, as I testified, were not allowed for.
Q. Okay. You --
A. It's not relevant to my analysis.
Q. Sorry. How is it not relevant to your analysis?
A. Because my analysis is not as the gross amount, it's just the net amount, which is to say the gross may well have been charges that

were permissible, contractually, and communicated.

My concern is with the accounting for them, which is that every dollar is not going to come in, and yet they were reported as if roughly every dollar was going to come in.

Q. So you're not disputing that the charges were real, your opinion is just they were not accounted for correctly under the accounting?

MR. HESS: Objection to form, misstates.

THE WITNESS: I'm not disputing that there was arguably a contractual entitlement to them, nor am I disputing that such contractual entitlements were communicated.

I am disputing whether the financial accounting presentation of them as to the full amount or nearly the full amount was proper.

BY MR. CARTER:

Q. And you're not disputing that if the charges were charged, that a different manager of the property could collect those amounts, correct?

MR. HESS: Objection to form.

THE WITNESS: I don't know whether they could collect them or not. I guess it's a theoretical possibility.
BY MR. CARTER:
Q. But someone else could collect them, right?
MR. HESS: Objection to form.
THE WITNESS: Could as a possibility, I think as you asked earlier, as a possibility, yes.
BY MR. CARTER:
Q. And if collected, those amounts would be properly reflected as other income, right?
MR. HESS: Objection to form.
THE WITNESS: Not on the historical statements, no.
BY MR. CARTER:
Q. But going forward on a pro forma basis --
A. On a pro forma basis --
Q. -- those charges could be collected?
A. -- if a deed you believed you could collect every dollar, it'd be proper on a pro forma basis where you start with the historical and adjust them. Yes.

Q. Are there any differences that you're aware of between the Yardi accounting system that was used by ROCO, and what might be used by other entities in the real estate space?

A. I don't know enough about Yardi vis-à-vis others to identify any unique difference.

Q. So have you used Yardi data before in your expert work?

A. Not to my knowledge.

Q. Okay. Have you used it in any other capacity?

A. Not to my knowledge.

Q. You agree that J.P. Morgan was never provided ROCO's internal Yardi data, right?

MR. HESS: Objection to form.

THE WITNESS: I'm not aware of them having ever been provided it, no.

BY MR. CARTER:

Q. Okay. And you cite no evidence in your report that J.P. Morgan was ever provided access to ROCO's internal Yardi accounting system, right?

MR. HESS: Objection to form.

THE WITNESS: I don't know if they

were given the access or not.

BY MR. CARTER:

Q. Okay. But you have no evidence that J.P. Morgan was given access to the internal Yardi system, correct?

MR. HESS: Objection to form.

THE WITNESS: I have no evidence that they were given the access or requested it.

BY MR. CARTER:

Q. Okay. And you'd agree that it would be unusual in a CMBS transaction for a lender to obtain and review raw internal accounting data like Yardi, right?

MR. HESS: Objection to form.

THE WITNESS: I don't agree with that in a context where you're representing that the historical financial statements are true, complete, and accurate.

BY MR. CARTER:

Q. And what is that based on? What experience do you have to have that view?

A. That when you're making a representation that the historical statements are true, complete, and accurate, you would normally want to analyze them to see if, in

different. It relies on a comparison between the NOI the seller reported to what was ultimately disclosed in the CMBS offering; is that right?
A. That is right.
Q. Okay. So let's focus on 1 and 2 now that we've clarified that.
A. You got it.
Q. Table 1 and 2. In making -- we've established that you have no evidence that J.P. Morgan was provided access to internal Yardi data, correct?
MR. HESS: Objection to form.
THE WITNESS: Correct.
BY MR. CARTER:
Q. Okay. And therefore, J.P. Morgan could not have done the analysis that is reflected in Table 1 and Table 2 of your report, right?
MR. HESS: Objection to form.
THE WITNESS: They could have requested the access. They apparently did not. Could they have done it without looking at it? Of course not.
BY MR. CARTER:
Q. Could you have done your analysis