# EXHIBIT D

**In the Matter Of:**

Wells Fargo Bank vs JPMorgan Chase Bank

1:25-cv-1943-DEH

---

**MARK BUONO**

*July 02, 2026*

---

*Confidential*

ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

M. Buono, PhD

testified that you couldn't think of a single document that would cause you to question whether JPMorgan received inaccurate historical financial statements? 12:14 12:15 12:15 12:15 12:15

MR. CARTER: Object to form. 12:15

A. I don't think so. 12:15

BY MR. ADAMS: 12:15

Q. And so it's your testimony, sir, that if you were told that 3 and a half million dollars of income in a loan you were being asked to originate was not real and not being collected, that would not even cause you to have any questions about the accuracy of those financial statement? 12:15 12:15 12:15 12:15 12:15 12:15 12:15

MR. CARTER: Object to form. 12:16

A. I think that they -- I don't know what they meant by "not real and not collected" in that February email. Looks like they did more investigation, and they found out -- they didn't say that the -- here they are not saying that they -- the fees or that income was not real. They just say that in our budget going forward. 12:16 12:16 12:16 12:16 12:16 12:16 12:16 12:16

M. Buono, PhD

They don't say here that the -- that the things aren't real. In fact, the charges I think were real in terms of that line item. And, you know, here they are saying that in our budget, we don't think we're going to be able to collect those kind of fees going forward. 12:16

BY MR. ADAMS: 12:16

Q. And -- and so what you just described is a statement they made about their budget, not about the accuracy of the historical financials that they said were not real -- 12:16

MR. CARTER: Object to form. 12:16

BY MR. ADAMS: 12:17

Q. Correct? 12:17

MR. CARTER: Object to form. Misstates. 12:17

A. I said that I don't know what they mean -- in February before they had done due diligence, I don't know what they meant by not real and not being collected. 12:17

BY MR. ADAMS: 12:17

Q. And it wouldn't even raise a 12:17

M. Buono, PhD

question in your mind at the time about whether there were inaccuracies that statement? 12:17

MR. CARTER: Object to form. 12:17

A. I think when a broker gives -- when a broker gives you financials, you're going to investigate every line item in that because the broker generally is going to be -- going to try to give you the best possible, you know, view of the property. 12:17

BY MR. ADAMS: 12:17

Q. And isn't it incredible that in this case the broker who's generally going to try and give you the best view of the property is the one who's actually telling you that 3 and a half million dollars in the financials they are giving you is not real? 12:17

MR. CARTER: Object to form. Argumentative. 12:17

A. I read that email, and I think he was bragging about the fact that they got a price reduction. 12:17

BY MR. ADAMS: 12:18

M. Buono, PhD

Q. Well, if he was bragging, I guess he was bragging about finding income that was not real in the finals, correct? That's what he said? 12:18

MR. CARTER: Object -- object to form. 12:18

A. I don't know what he meant by that. Again, we talked about that. He may have just said that we don't think it's going to be as high so we -- we decided that we're going to -- our future cash flows are going to be lower than that, so we used that to negotiate a lower price. 12:18

BY MR. ADAMS: 12:18

Q. But again, you would have to follow up to understand what "not real" meant, correct? 12:18

A. Again, I think we would want to investigate all of the financials that are given to us. 12:18

Q. That's not my question. My question is: You have to investigate to understand what "not real" meant in the 12:18

M. Buono, PhD

an analysis showing a consolidated NOI of 43.3 million for the 55 ROCO properties as compared to 47.2 million consolidated NOI provided by ROCO for 2018. It is not surprising that the purchaser of a value-add property would make adjustments to historical performance in connection with evaluating how it expected the properties to perform under the Chetrits' management. 01:29 01:29 01:29 01:29 01:29 01:29 01:29 01:29 01:29 01:30

Do you see that? 01:30

A. Yes. 01:30

Q. But, in fact, that -- that wasn't the explanation they gave at the time, was it? 01:30 01:30 01:30

MR. CARTER: Object to form. 01:30

A. What explanation did they give at the time? 01:30 01:30

BY MR. ADAMS: 01:30

Q. Well, the pro forma was attached to the email that said that they had identified miscellaneous income they didn't believe was being collected, correct? 01:30 01:30 01:30 01:30 01:30

M. Buono, PhD

for the Underwriting column, there is a repairs and maintenance figure of 6.7 million? 01:55

Do you see that? 01:55

A. Yes. 01:55

Q. And that's drawn from the Year 1 budget, correct, sir? 01:55

A. That's my understanding. 01:55

Q. And, in fact, you opine in your report that it is a perfectly appropriate for them to draw from the Year 1 budget to identify heightened expenses with respect to repairs and maintenance, correct, sir? 01:55

A. I think hopefully what I said was that, you know, the new borrower was going to have their expectations of how much they were going to -- how much they need to spend to operate the properties properly. And so it was -- it's fine for them to use that -- that in their underwriting. 01:55

Q. In fact, you wouldn't expect a borrower to overstate what they expected to spend, correct, sir? That wouldn't be 01:56

M. Buono, PhD

that understanding? 02:04

A. No. 02:04

Q. So in this sentence, you're just relaying Mr. Geoghan's testimony, correct, sir? 02:04 02:04 02:04

A. Yes. 02:04

Q. If you go to Page 18, please, of your report. You say in the third line down: Tenzer does not opine on what, quote, due inquiry, end quote, means in this context, referring to the language in the mortgage loan purchase agreement. 02:04 02:05 02:05 02:05 02:05 02:05

Are you offering an opinion as to what due inquiry means? 02:05 02:05

A. I believe that's a legal term, and I'm not offering an opinion as to that. 02:05 02:05 02:05

Q. If you go to Page 20, are you there? 02:05 02:06

A. I'm there. 02:06

Q. You say at the top of Page 20: Bank statements are not always obtained by a lender in underwriting a loan, but when they are, they are primarily used to 02:06 02:06 02:06 02:06

M. Buono, PhD

confirm collection of rent reflected in property rent rolls; they are generally not used to confirm other aspects of T12 such as nonrental income or operating expenses. 02:06

Do you see that? 02:06

A. Yes. 02:06

Q. Okay. Are you offering an opinion that bank statements cannot be used for those purposes? 02:06

A. I believe they're -- I believe they're typically used to confirm rent income as of rent. 02:06

Q. That's what you say here, but I'm asking a different question. I'm asking whether you're offering an opinion that they cannot be used for the purpose of varying other -- verifying other income items. 02:07

A. I'm not sure they can be used in every case for that. 02:07

Q. Are you -- have you ever done a cash flow reconciliation using bank accounts? 02:07

M. Buono, PhD

being collected, correct, sir? 02:09

MR. CARTER: Objection -- object to form. 02:09 02:09

A. I don't think I would say that. At the end of the day, they got an explanation of what was going on there. And that explanation did not consist of -- continued to say that wasn't real. 02:09 02:09 02:09 02:09 02:09

BY MR. ADAMS: 02:09

Q. In other words, that explanation had changed a lot over time, correct, sir? 02:09 02:09

MR. CARTER: Object to form. Misstates testimony. 02:09 02:09

A. I think as they did due diligence, they discovered the difference between the borrower's view and other income and the historical financials. 02:09 02:09 02:09 02:09

BY MR. ADAMS: 02:09

Q. In other words, they got different explanations from the borrower at different points of time regarding why there was a very large anomaly with respect to the historical other income figures in the financial statements, 02:09 02:09 02:09 02:10 02:10 02:10

M. Buono, PhD

correct, sir? 02:10

MR. CARTER: Object to form. Misstates the testimony. Lack of foundation. 02:10

A. I don't think it was an anomaly. I think that -- I guess the testimony I've seen is the charges existed. They were -- they were real charges. And the new owners, the Chetrits, and their people working with them believed that they would not be able to collect -- they're -- not collect -- they didn't believe that the income going forward would be as high. 02:10

BY MR. ADAMS: 02:10

Q. And the testimony you're referring to there, whose testimony is that? 02:10

A. I think we saw explanations from -- what the associates or the people working for Chetrits that the reason why they were using in their budget a lower number was that they didn't believe they were going to collect as many of the other income for the properties. 02:11

M. Buono, PhD

makes no sense to fault JPMorgan for using the borrower's operating expenses in its underwritten NOI? 02:50

Do you see that? 02:50

A. On 90? 02:50

Q. Do you see that sentence? 02:50

A. Yes. 02:50

Q. You go on to say: JPMorgan knew throughout the underwriting process that borrower viewed the ROCO portfolio as a value-add proposition. As stated in the March memo, the borrower told JPMorgan that it intended to invest an estimated 39.5 million across value-add capital projects and deferred maintenance items. By the time of May memo -- of the May memo, this planned investment had increased to 40 million and was to be accompanied by an investment of 14.9 million or $333 per unit per year for ongoing capital needs across the entire portfolio over the five-year loan term. 02:51

And you say: In these circumstances, it would be reasonable to 02:51

M. Buono, PhD

-- and I would expect to -- underwrite operating expenses to the borrower's pro forma budget? 02:51

Do you see that? 02:51

A. Yes. 02:51

Q. So are you drawing a connection between the anticipated CapEx expenditures and the increased OpEx expectation? 02:51

MR. CARTER: Object to form. 02:51

A. I think they -- I guess my -- I'm drawing a conclusion is that they intended to operate the portfolio differently and they said they were going to spend more money in -- on repairs and maintenance over that period of time. And they were going to be doing a lot of renovations and -- and fixing the deferred maintenance, so I think that's reasonable that they would have used the borrower's operating -- their pro forma budget as opposed to historical expense numbers. 02:52

BY MR. ADAMS: 02:52

Q. I guess my question is: Does the fact that they're spending CapEx on 02:52