# EXHIBIT E

# In the Matter Of:

## WELLS FARGO BANK vs JPMORGAN CHASE BANK

1:25-cv-01943-DEH

---

## GARY TENZER

*June 23, 2026*

---

ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

MR. HESS: Objection to the form.
THE WITNESS: I don't think that's what Mr. Perone was saying.
BY MR. SACKS:
Q. You don't? 11:16
A. He wasn't talking about performing. He was talking about the numbers they were looking at, the existing numbers.
Q. I'm sorry, what's your basis for that, that he was talking about an inaccuracy in existing 11:16 numbers as opposed to rightsizing expenses for the manner in which the new owner would operate the property?
A. I think he's also relating to the fact that roughly $200 per unit per month is in such and 11:16 it had to be increased to be a supportable number.
Q. Going forward under the way in which they would operate these properties; correct?
MR. HESS: Objection to the form.
BY MR. SACKS: 11:16
Q. He wasn't talking about a falsity in the existing numbers; he was talking about the fact that in this acquisition the way in which the purchaser would operate the properties would be to spend more on them to improve them? 11:17

MR. HESS: Objection to the form.
THE WITNESS: On expenses, yes, not on income.
BY MR. SACKS:
Q. But the rightsizing that you referred to was prospective, not historical? 11:17
MR. HESS: Objection to the form.
THE WITNESS: Yes, on expenses.
BY MR. SACKS:
Q. We'll talk about the other later on. The statement you are referring to occurred before a term sheet had even been written; right? 11:17
A. Yes, I believe so.
Q. How much time after that did JP Morgan take performing due diligence? 11:17
A. The process took about four months -- three or four months.
Q. There was a lot of back and forth during that four months, wasn't there?
MR. HESS: Objection to the form. 11:18
THE WITNESS: Back and forth between whom?
BY MR. SACKS:
Q. Between the JP Morgan team and Mr. Verrone and Mr. Perone and the Iron Hound folks and the other representatives of the Chetrits? 11:18

A. No.
Q. You don't -- you didn't make any comparison of what was the income on any bank statements against what was shown on an operating statement, did you? 12:14
A. As I said, I relied on what Mr. Klein did, his procedures.
Q. He didn't do anything with the bank statements?
MR. HESS: Objection to the form -- 12:15
BY MR. SACKS:
Q. Do you know whether Mr. Klein did any analysis of bank statements as part of his work in this case?
A. I don't recall. 12:15
Q. Do you know whether plaintiff in this case made any effort to obtain the bank statements during discovery?
A. No.
Q. Do you know whether they were part of the 12:15 discovery record?
A. No.
Q. Did you ask for them in connection with your report?
A. No, it wasn't part of the scope. 12:15

Q. It wasn't part of the scope because you were told it wasn't part of the scope or because you determined it wasn't part of the scope?
A. I didn't -- I understood what my assignment was and I didn't believe that auditing bank statements was part of my assignment. 12:16
I didn't know there was a CPA that was doing that -- doing any type of numerical analysis that needed to be done and I could rely on the CPA.
Q. But you offer an opinion here in your report that says "had they been looked at, they could have been tied out and things could have been uncovered." 12:16
That strikes me as speculation; isn't it?
MR. HESS: Objection to the form. 12:16
BY MR. SACKS:
Q. You don't know what, in fact, would have been tied out or would have been discovered; right?
A. That's true.
Q. On paragraph 132, you refer to items that you describe as one-time charges; do you see that? 12:16
A. Yes.
Q. You refer to pet fees, cleaning fees, damage fees, et cetera; do you see that?
A. Yes. 12:17

everything that was relevant.

Q. If you would look at paragraph 155, please.

A. Yes.

Q. You referenced a response -- 154, you -- you are referencing here a sequence of e-mails. In 154, you referenced Ms. Yousefian's question in response. 13:44

What are the misrepresentations made by the seller you were referring to below, "If financials are incorrect, we need corrected financials," do you see that? 13:44

A. Yes.

Q. You testified about that earlier this morning; right? 13:45

A. I did.

Q. This is a response from Mr. Perone.

And the information that he was referring to by that sentence was that the unit count was off by six units out of 10,300? 13:45

You wouldn't regard that as material, would you?

MR. HESS: Objection to the form.

THE WITNESS: No. It's a strange discovery, you know how many units are in the 13:45

building, 43 buildings, I don't know why there was a mis-count.

It just -- I want to ask questions about that.

BY MR. SACKS: 13:46

Q. Let me you ask a different question, you were aware that some of these units were student housing?

A. Yes.

Q. Were you aware of -- did anyone in the material they provided to you make you aware that there was some issue that needed to be run down as to whether they were counting by bed or by physical unit? 13:46

MR. HESS: Objection to the form. Assumes facts. 13:46

THE WITNESS: I don't recall discussion about that.

I do know that's an issue when you have student housing. 13:46

BY MR. SACKS:

Q. So you don't know whether that could have been part of why out of 10,300 there were six units off?

A. That was a matter of beds versus units. 13:46

Q. Let's go on back to paragraph 155, 156. There is a difference in tax figures presented of $325,000; do you see that?
A. Yes.
Q. In the context of the size of this deal, was that material? 13:51
MR. HESS: Objection to the form.
THE WITNESS: Not particularly material.
BY MR. SACKS:
Q. And so -- 13:51
A. It's one percent of income.
Q. So when you then in the next paragraph referred to a significant inaccuracy, that's an overstatement of the difference between 10,294 and 10,300 and a $325,000 tax issue? 13:52
A. What paragraph are we on?
Q. Paragraph 157.
A. I think you have to put it in context.
The context of they were informed that the numbers were misrepresented. 13:52
As I said, if I was told that as a lender, I would do a lot more due diligence before I went forward with the loan.
Q. Did anyone say that these numbers were misrepresented than they were simply an error. 13:52