# EXHIBIT K

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, as Trustee for the Benefit of the Certificateholders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2019-MFP, Commercial Mortgage Pass-Through Certificates, Series 2019-MFP, by and through Situs Holdings, LLC, as Special Servicer under the Trust and Servicing Agreement, dated as of July 18, 2019,<br><br>Plaintiff,<br><br>v.<br><br>JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, MEYER CHETRIT, SHADOW CREEK OWNER, LLC, and 3100 DANIEL MCCALL DRIVE, LLC,<br><br>Defendants. | Case No. 1:25-cv-01943 |

EXPERT REPORT OF ERIC SUSSMAN

May 21, 2026

# Table of Contents

I. Background, Assignment, and Summary of Opinions ..... 1

A. Background ..... 1

B. Assignment ..... 4

C. Summary of Opinions ..... 4

II. Qualifications, Compensation, and Documents Relied Upon ..... 8

III. Nature of Financial and Accounting Data Typically Furnished in Connection with the Acquisition and Financing of Multifamily Assets ..... 9

A. T12 Financial Statements Are But One Piece of a Broader Set of Information Reviewed, Evaluated, and Analyzed in the Acquisition and Financing of Value-Add Multifamily Assets ..... 11

B. The Financial Information Contained in T12 Financial Statements Is Routinely Adjusted When Preparing Financial Models Related to Value-Add Properties ..... 12

C. Historical Financial Statements Prepared in the Context of Value-Add Real Estate Acquisitions Are Rarely Prepared in Accordance with GAAP ..... 14

IV. Mr. Klein's Analysis of "Indications That the T12 Statements Contained Material Misstatements" Is Fundamentally Flawed, Rendering His Conclusions Misleading ..... 15

A. Mr. Klein's Analysis Is Misleading Because It Fails to Appropriately Address the Value-Add Nature of the Collateral at Issue and How That Nature Informs How Historical Financial Information Is Used in the Acquisition Process ..... 16

B. Mr. Klein's Analysis Related to "Seller's Alterations" Is Fundamentally Flawed, Rendering His Conclusions Unreliable and Misleading ..... 19

C. Mr. Klein's Analysis of Purported "Errors and Underwriting Adjustments" Identified by Buyer's Consultants Is Fundamentally Flawed, Rendering His Conclusions Unreliable and Misleading ..... 21

D. Mr. Klein's Materiality Conclusions Are Based on the Inappropriate Application of Inapplicable Guidance ..... 34

E. Mr. Klein's "Red-Flag" Analysis Is Inconsistent with Industry Practice and Misleading ..... 38

F. Mr. Klein Fails to Demonstrate that JPMC Had Actual Knowledge of Material Inaccuracies, Much Less Fraud, in the ROCO Historical Financial Information ..... 43

V. Mr. Klein's Repurchase Price Calculation Fails to Address Several Fundamental Considerations ..... 45

VI. Mr. Tenzer's Estimate of "Losses" Due to Purported "Inaccurate Financial Information" Is Fundamentally Flawed and Misleading ............ 50

# I. Background, Assignment, and Summary of Opinions

## A. Background

1. ROCO Real Estate LLC and ROCO Management LLC (collectively, "ROCO"), commercial real estate investment firms that purchased, managed, and sold multi-family residential properties in various states including Ohio, Indiana and Mississippi among others, were formed in 2011.[1] By 2018, ROCO's portfolio of properties included 58 properties (the "ROCO Portfolio").[2]

2. In December 2018, LLCs created by ROCO entered into a Purchase Agreement with the Chetrit Group, LLC ("Chetrit" or "Buyer") to sell the ROCO Portfolio for a total of $745 million.[3] Subsequently, three properties were removed from the transaction, resulting in a reduction in the sales price to $700.0 million.[4] According to the Purchase Agreement, ROCO was to provide various operational and financial materials, including financial statements covering the most recent 12-month period ("T12s").[5]

3. To assist in the diligence process, Chetrit engaged Iron Hound Management ("Iron Hound") and Post Road Management ("Post Road" together with Iron Hound, "Buyer's Consultants").[6] In connection with this process, Iron Hound obtained a year-end 2018 T12 from ROCO on or around January 25, 2019.[7]

4. JPMorgan Chase Bank, N.A. ("JPMC") was first contacted on January 12, 2019 regarding potentially financing the Buyer's purchase of the ROCO Portfolio.[8] After Iron Hound provided JPMC with initial financial information concerning the ROCO properties Robert

---

[1] IronHound_0015001–203 at 063.
[2] IronHound_0015001–203 at 001.
[3] IronHound_0015001–203 at 001, 004.
[4] JPMC-WF-00069711.
[5] IronHound_0015001–203 at 174.
[6] Deposition of Robert Verrone, January 7, 2026 ("Verrone Deposition"), 11:14–21, 18:6–17, 19:7–14; Deposition of Patrick Perone, January 12, 2026 ("Perone Deposition"), 23:25–24:25.
[7] PostRoad_0008625–626 at 625; PostRoad_0008627. Subsequently, ROCO provided Buyer with trailing 12-month financial reports for the periods ended February 28, 2019, March 31, 2019, and April 30, 2019 (ROCO-WF_00046732; ROCO-WF_00025968). Together with the T12 financial information for the year ended December 31, 2018, I refer to these financial statements as the "ROCO Historical Financial Information."
[8] Verrone Deposition 43:16–44:17.

Verrone (Principal at Iron Hound), wrote to JPMC on January 30, 2019 to request preliminary pricing for the loan.[9]

5. Following a meeting on February 5, 2020 between Buyer, Buyer's Consultants, and ROCO,[10] Buyer negotiated with ROCO a further reduction in the purchase price for 55 of the properties (i.e., a "retrade") from $700.0 million to $632.5 million.[11]

6. On February 22, 2019, Patrick Perone (Vice President at Iron Hound), informed JPMC that eight properties would be "assumed" (i.e., removed from the transaction).[12]

7. On or around March 7, 2019, JPMC prepared a presentation titled "ROCO Portfolio Preliminary Credit Committee."[13] This presentation stated that the 47 properties remaining in the ROCO Portfolio were to be acquired for a purchase price of $552.5 million, that those 47 properties had an aggregate estimated value of $642.0 million, and that $529.8 million in total debt would be provided by JPMC to finance the acquisition.[14]

8. On May 27, 2019, JPMC circulated its final committee memorandum for proposed financing for the acquisition of the ROCO Portfolio. Within the memorandum, JPMC reported that its proposed loan of $529.8 million would finance the purchase of 47 properties in total, for $554.0 million.[15] Two days later, JPM's CMBS Underwriting Committee (the "Committee") requested a reduction in the loan amount and for further due diligence to be completed.[16]

9. On June 1, 2019, Iron Hound provided updated information on the ROCO Portfolio to JPMC.[17] Iron Hound noted that an additional four properties would be removed from the transaction, resulting in a reduced purchase price for the portfolio of approximately $15 million.[18] Subsequently, the purchase price was reduced an additional $10 million due to the Seller's inability to convey the four properties in Shaker Heights, Ohio, as well as other items

---

[9] JPMC-WF-00169055–058 at 055.
[10] Deposition of Borko Milosev, February 6, 2026 ("Milosev Deposition"), 200:21–202:20.
[11] JPMC-WF-00069711.
[12] IronHound_0016080–081 at 080.
[13] JPMC-WF-00209845–873.
[14] JPMC-WF-00209845–873 at 850.
[15] JPMC-WF-00003905.
[16] JPMC-WF-00169586.
[17] JPMC-WF-00005141–142 at 141.
[18] JPMC-WF-00005141–142 at 141.

that were identified in connection with the diligence conducted by the Buyer's Consultants and JPMC.[19]

10. On June 11, 2019, JPMC provided the Committee with the "Final Credit Committee – Follow up Addendum."[20] This presentation identified the four Shaker Heights properties that were removed from the transaction and reported that the remaining portfolio of 43 units would have a purchase price of $522.0 million. The loan ultimately issued by JPMC was further reduced to $490.0 million from $529.8 million previously.[21]

11. On June 19, 2019, Buyer entered a Loan Agreement with JPMC to borrow $481 million to finance its purchase of the ROCO Portfolio.[22] On June 27, 2019, JPMC finalized its offering circular to securitize the loan issued to Buyer.[23] Approximately one month later, on July 18, 2019, JPMC sold the loan to its affiliate JPMCC.[24]

12. On July 9, 2022, the Loan was transferred to special servicing due to a maturity default.[25]

13. In September 2023, Tyler Ross (former CEO of ROCO), pled guilty to falsifying financial documents, including with respect to properties in the ROCO Portfolio that are relevant to this matter.[26] The sentencing order issued by the Court in connection with that plea found that Tyler Ross had provided falsified financial information with the understanding that JPMC would review that financial information in connection with its lending decision; that "many of the falsified categories were expenses that would be difficult to trace or would not show up in the documents provided"; and that JPMC neither "knew [n]or should have known the extent of the false information in the T12s (namely, the NOIs)."[27]

---

[19] JPMC-WF-00005141–142 at 141.

[20] JPMC-WF-00007540.

[21] JPMC-WF-00007541–584 at 547.

[22] Complaint, *Wells Fargo Bank, National Association v. JPMorgan Chase Bank, National Association, et al.*, March 10, 2025, and Exhibits ("Complaint"), Exhibit 3.

[23] JPMC-WF-00124586–972.

[24] Complaint, ¶ 27.

[25] SITUS_0077406–412 at 407.

[26] "Real Estate Executive Pleads Guilty to Multi-Year Conspiracy to Falsify Financial Statements," *U.S. Department of Justice*, September 29, 2023, available at https://www.justice.gov/archives/opa/pr/real-estate-executive-pleads-guilty-multi-year-conspiracy-falsify-financial-statements.

[27] *Order Finding that Sentencing Enhancements Pursuant to Guidelines §§ 2B1.1(b)(17)(A) and (D) Apply in this Case*, United States District Court for the Eastern District of Michigan, Southern Division ("Sentencing Order"), ECF 39, PageID.1037–41.

### B. Assignment

14. I have been engaged by counsel for JPMC to review and respond to the expert report of Gordon Klein regarding JPMC's purported knowledge that financial information provided to JPMC in connection with a $481 million mortgage loan ("Loan") to affiliates of Chetrit had been falsified and was inaccurate.[28] Specifically, I have been asked to evaluate and respond to the opinions set forth in Mr. Klein's report regarding "the amount and materiality of the falsifications in the T12 statements; […] that Buyer's Advisors identified certain errors and underwriting adjustments that alerted JPM to the inaccuracy of the T12 statements for the Properties; and […] that the Buyer and JPM received multiple indications that the T12 statements did not reflect the actual results for the Properties and therefore the operating results disclosed to investors were materially inaccurate."[29] I have been also asked to evaluate and respond to Mr. Klein's calculation of the Repurchase Price in accordance with the relevant provisions set forth in the Mortgage Loan Trust Servicing Agreement.[30] Lastly, I have been asked to review and respond to "Opinion 6" set forth in the expert report of Gary M. Tenzer ("Mr. Tenzer"): "[t]he inaccurate financial information contained in the T12s caused losses totaling over $100 million."[31, 32]

15. My work in this matter is ongoing, and the opinions presented in this report are based on information available to me as of the report date. I reserve the right to revise any portion of my conclusions if additional information becomes available. I also reserve the right to respond to any additional declarations, report(s), opinions, or arguments offered by other experts, as well as any testimony given during depositions or at trial.

### C. Summary of Opinions

16. My opinions to date are summarized below. The sections that follow contain the bases for these opinions.

---

[28] Opening Expert Report of Gordon Klein, dated April 10, 2026 ("Klein Report"), ¶¶ 40–42.
[29] Klein Report, ¶ 42.
[30] Klein Report, ¶ 41.
[31] Opening Expert Report of Gary M. Tenzer, April 10, 2026 ("Tenzer Report"), ¶ 22.
[32] I have not been asked to address all of the opinions and assertions set forth in the Klein Report and Tenzer Report. Accordingly, to the extent there is an opinion or assertion set forth in either the Klein Report or Tenzer Report that I have not addressed in this report, the absence of a response should not be interpreted as my agreement with that opinion or assertion.

- In order to arrive at reliable opinions regarding whether JPMC had actual knowledge of material inaccuracies in the financial information provided by Buyer's Consultants in connection with the sale and financing of the ROCO Portfolio, it is necessary to evaluate the context in which that information is generated, reviewed, evaluated, and used. While Mr. Klein offers various opinions regarding the material accuracy of historical financial information provided to commercial real estate buyers and lenders in connection with the acquisition of multifamily assets, he fails to acknowledge in his report (much less evaluate in his analysis) that the ROCO Portfolio consisted strictly of "value-add" properties. Unlike "turnkey" assets, value-add properties are acquired with the expectation that significant operational and capital improvements will be made to the acquired assets, substantially altering their future cash flows. As a result, historical financial information is of limited relevance and, to the extent it is incorporated into the buyer's or lender's financial models, it is typically adjusted to reflect the operational and capital improvements that the buyer anticipates making as part of its acquisition business plan. These adjustments rarely represent "corrections" to the historical financial information, but instead pro forma adjustments to reflect what the buyer anticipates will occur following the acquisition. Furthermore, historical financial information in the context of value-add acquisitions between private parties is rarely prepared in accordance with Generally Accepted Accounting Principles ("GAAP") or audited.
- Mr. Klein opines that the ROCO Historical Financial Information was materially misstated due to "Seller's alterations" that purportedly overstated NOI.[33] However, Mr. Klein's analysis in support of this opinion is fundamentally flawed in multiple respects. Mr. Klein performs no analysis of the differences he observes between the financial information extracted from ROCO's accounting system and the ROCO Historical Financial Information. Such analysis is necessary to establish what portion of the observed differences represents a misstatement as opposed to adjustments that are made to raw accounting data in the course of a typical financial reporting process. Furthermore, Mr. Klein has failed to evaluate contemporaneous evidence that contradicts

---

[33] Klein Report, § V.A. I note that the "Seller's alterations" Mr. Klein refers to in his report are the same falsifications that Mr. Ross pled guilty to in 2023, more than four years after the Loan was issued.

his conclusion that the NOI reported in the ROCO Historical Financial Information was overstated by up to 34%.

- Mr. Klein opines that JPMC was "alerted" to material inaccuracies in the ROCO Historical Financial Information due to adjustments proposed by Buyer's Consultants.[34] Again, the analysis provided by Mr. Klein in support of this opinion is fundamentally flawed in multiple respects. First, Mr. Klein fails to appropriately evaluate the adjustments that were identified by Buyer's Consultants in the context of value-add acquisitions and what significance, if any, these adjustments had with respect to the reliability of the ROCO Historical Financial Information. His analysis of adjustments to "Other Income" also fails to acknowledge and address the judgmental determinations involved in these adjustments. His analysis of "Operating Expenses" acknowledges, but fails to address, that the adjustment was proforma and therefore did not establish that the historical figure was misstated.
- Mr. Klein opines that JPMC was provided with "clear evidence of inaccurate financial reporting" in the ROCO Historical Financial Information through materials provided by ROCO.[35] However, the "red flags" analysis offered by Mr. Klein in support of this opinion is fundamentally inconsistent with how historical financial information is used in the value-add acquisition process, generally, as well as deposition testimony regarding the due diligence and other work performed by Buyer's Consultants, JPMC, and others in this matter, specifically. In addition, Mr. Klein's analysis inappropriately introduces hindsight bias, rendering his conclusions misleading.
- Throughout his report, Mr. Klein offers opinions that the differences and adjustments he identifies are "material" based on guidance issued by the SEC, Staff Accounting Bulletin No. 99 ("SAB 99"). However, Mr. Klein's materiality analysis is almost exclusively based on a quantitative assessment. The fundamental purpose of SAB 99 is to make clear that appropriate materiality determinations *cannot* be based strictly on quantitative evaluations but must also include evaluation of qualitative considerations. Mr. Klein's qualitative evaluation appears to be limited to an incomplete and misleading recitation of

---

[34] Klein Report, § V.B.
[35] Klein Report, § V.C.

numerous factors that may have impacted the performance of the Loan and then ensure that his estimate of losses does not incorporate the impact of these factors. Mr. Tenzer failed to perform any such analysis.

## II. Qualifications, Compensation, and Documents Relied Upon

17. I have an extensive background in all aspects of real estate investment, development, property and asset management, accounting, and finance. I am a licensed CPA in the State of California and a full-time faculty member at UCLA's Anderson School of Management, where I have taught courses in Real Estate Investment and Finance, Real Estate Entrepreneurship, Accounting (financial and managerial, from beginning to advanced), Finance, Corporate Financial Reporting, and Financial Statement Analysis and Equity Valuation since 1995. I have also taught "global immersion" courses in China, Brazil, and Dubai and the United Arab Emirates, traveling with groups of graduate business students, with a focus on real estate investment and development. I also have taught graduate level business courses at UC Berkeley's Haas School of Management (Real Estate Investment and Finance), George Washington University (Managerial Accounting), and the Helsinki School of Economics (Cost Accounting). I have received a number of teaching awards (18 in total) and recognition by Bloomberg Businessweek as one of the top ten most popular business school faculty members in the United States.

18. Outside of my academic appointment, I am President of Amber Capital, Inc., former President of Clarion Management, Inc. ("Clarion"), and managing member of Clear Capital, LLC ("Clear Capital"), Fountain Management, LLC, and a number of additional real estate entities, which collectively own and manage nearly 5,000 multifamily residential units and in excess of 500,000 square feet of commercial property in Southern California, Texas, Colorado, Arizona, Utah, and Oregon. Clear Capital is a real estate private equity firm, acquiring multifamily assets on behalf of accredited investors, while Clarion, wholly owned by the principals of Clear Capital, provided property management services to Clear Capital's California-based assets through the end of 2025. Meanwhile, Clear Capital provides asset management services to all assets in the firm's portfolio. As a principal or a consultant, I have been involved in real estate transactions exceeding $3.5 billion, which include, among other projects, ground-up developments, and I have raised hundreds of millions of dollars of real estate

debt and equity capital directly and through financial intermediaries, soliciting capital from accredited individual investors, family offices, and institutions. I was previously a licensed real estate broker in the State of California.

19. In addition, I serve as Chairman of the Audit Committee of Causeway Capital's group of mutual funds (former overall Chairperson, 2012–2018), which collectively have over $21.0 billion in assets under management, and I am also on the Boards of Blueprint, Inc. (formerly Pacific Charter School Development, Inc.), a non-profit developer of charter schools, UCLA Hillel, the University Credit Union, and the advisory Board for Bulltick La Firma Capital Real Estate Fund, having previously served on other Boards. I received my MBA from Stanford University with honors (top 10%), in 1993, after graduating summa cum laude from UCLA in 1987, with a bachelor's degree in Economics-Business.

20. My background and professional qualifications are described in greater detail in my curriculum vitae, which is attached as **Appendix A** to this report and includes a list of the testimony I have provided by trial or by deposition during the previous four years. I am being compensated for my work on this matter at my hourly rate of $1,300. I have been assisted by staff of Cornerstone Research, who worked under my direction. Neither my compensation in this matter, nor Cornerstone Research's compensation, is in any way contingent or based upon the content of my opinion or the outcome of this or any other matter. In preparing this report, I reviewed documents provided to me or obtained via my own independent research, upon which I relied in forming opinions set forth in this report. The full list of the documents I relied upon can be found in **Appendix B**.

## III. Nature of Financial and Accounting Data Typically Furnished in Connection with the Acquisition and Financing of Multifamily Assets

21. Broadly, Mr. Klein's opinions relate to the accuracy of information that was provided by ROCO in connection with a potential sale of commercial real estate properties.[38] However, in order to evaluate Mr. Klein's opinions, it is necessary to first consider how financial and accounting data (such as the ROCO Historical Financial Information) is typically furnished and relied upon in connection with the acquisition and financing of multifamily assets, especially

[38] Klein Report, ¶ 41.

value-add properties to which the buyer intends to make significant improvements (i.e., upgrades to unit interior, property amenities) in order to change the tenant profile, increase rents, and increase underlying asset values.

22. Commercial real estate investment relates to the acquisition of income-producing commercial properties, which may fall into a number of different categories (e.g., offices, retail, multi-family housing, and industrial properties).[39] The value of each individual property is impacted by a variety of factors, including idiosyncratic local market and property attributes. The vast majority of commercial real estate assets (approximately 90% as of June 2024 as estimated by the Federal Reserve)[40] are privately-owned. Furthermore, the commercial real estate market is highly fragmented, as there are hundreds of independent investment firms that actively invest in the commercial real estate sector, ranging from large international firms that invest in a variety of assets, to smaller niche firms that operate within specific local markets and invest in a narrower set of assets.[41]

23. Given the idiosyncratic and fragmented nature of commercial real estate properties and the market more broadly, the investment process may vary significantly from one transaction to another, and will be shaped by the risk tolerance, investment thesis and business plan of the buyer, as well as the class of asset (assets) that is (are) being purchased.

24. In the following sections, I briefly discuss a number of considerations relevant to Mr. Klein's assessment of the ROCO Historical Financial Information. Specifically, I discuss the various sources of financial and operational information that are typically provided in the context of commercial real estate transactions; the iterative process through which that information is reviewed, evaluated, analyzed, and updated during due diligence by principals, their advisors, and lenders; how adjustments made to the historical financial information may (or may not) impact the investment process; and the typical lack of application of GAAP when preparing historical financial information.

---

[39] William B. Brueggeman, et al., *Real Estate Finance and Investments*, Fourteenth Edition (New York, NY: McGraw-Hill Irwin, 2011) ("Brueggeman, et al. (2011)"), pp. 254–256.

[40] "Private Real Estate," *Blackstone*, available at https://www.blackstone.com/wp-content/uploads/sites/2/blackstone-secure/Essentials-of-Private-Real-Estate-Americas.pdf?v=1759771924.

[41] Brueggeman, et al. (2011), p. 340.

### A. T12 Financial Statements Are But One Piece of a Broader Set of Information Reviewed, Evaluated, and Analyzed in the Acquisition and Financing of Value-Add Multifamily Assets

25. When considering any commercial real estate investment opportunity, principals and lenders consider a wide range of market and property-level data, including financial and operation-related information. Examples of the data typically considered by buyers include historical financial statements, rent rolls, service contracts (e.g., waste disposal, cable and internet security, landscaping, HVAC and other maintenance agreements), inspection reports for all major systems, property tax bills, and a list of capital expenditures made by the seller or its agents.[42]

26. The extent to which buyers and lenders rely on this data generally depends on the type of asset being purchased and the buyer's business plan. This matter relates to the acquisition of 43 value-add properties.[43] In a value-add acquisition, while the buyer is acquiring the physical units and other property improvements, prospective buyers do not intend to manage and operate the property and its improvements as has been done in the past. Instead, such acquisitions are specifically made with the intent of implementing significant changes to the physical condition (e.g., capital improvements), operation (e.g., improved collection, improved back office, different leasing agreements), and target tenants (e.g., different credit profile) of the property(ies).[44] Each of these changes is expected to significantly impact each property's financial performance going forward. Given the understanding and expectation that the financial performance of the properties will significantly change going forward, historical financial information related to those properties is deemed far less relevant to the investment decision, to both owners and their capital partners, including lenders. Conversely, in a "turnkey" acquisition, properties are acquired with the expectation that they will be operated in a manner consistent with their pasts, with minimal or any change.[45] Therefore, when acquiring turnkey properties, their recent historical financial performance is far more probative and relevant.

---

[42] Brueggeman, et al. (2011), pp. 265, 303; Peter Linneman and Bruce Kirsch, *Real Estate Finance and Investments: Risks and Opportunities*, Fifth Edition (Philadelphia, PA: Linneman Associates, 2022) ("Linneman and Kirsch (2022)"), pp. 99–100.

[43] JPMC-WF-00423590–618 at 595.

[44] Brueggeman, et al. (2011), pp. 342–345.

[45] "An Investor's Guide to Turnkey Commercial Real Estate Investments," *First National Realty Partners*, November 12, 2021, available at https://fnrpusa.com/blog/turnkey-commercial-real-estate-for-investors/?utm_term=blog%2Bturnkey-commercial-real-estate-for-investors.

27. In the context of a value-add transaction, principals and lenders will typically place far less emphasis on historical financial information, simply because the transaction is being entered into with the understanding that the assets being purchased will be significantly improved and managed differently. Accordingly, the financial modeling that underpins that investment decision in such transactions is typically more heavily informed by the buyer's own financial projections.[46] These projections themselves may be informed by a combination of property appraisals, the buyer's capital improvement plans, the buyer's past experience operating similar assets in similar markets, and broader market and economic trends.[47]

28. Accordingly, it would not be reasonable to evaluate purported inaccuracies in historical financial information, including the materiality of those purported inaccuracies, without appropriately evaluating how, and the extent to which, such historical financial information was incorporated into the buyer's investment decision.

### B. The Financial Information Contained in T12 Financial Statements Is Routinely Adjusted When Preparing Financial Models Related to Value-Add Properties

29. As discussed above, buyers and their capital partners (whether joint venture partners, investors, and/or lenders) are principally interested in future cash flows, particularly in the context of value-add properties. These projections are typically prepared on a pro-forma basis and may, or may not, incorporate some or all of the historical financial data provided by sellers.

30. Accordingly, T12 financial statements may serve as a starting point, but are adjusted to help project *proforma* or future cash flows. The process through which historical financial information is prepared by sellers, evaluated by buyers and lenders, and incorporated into the financial models that underpin investment decisions may vary significantly from transaction to transaction. However, the process typically involves adjustments that may be made at any point in this process. For example, when preparing historical financial information to be provided to buyers, sellers may make adjustments to the information that is extracted from their accounting systems. For example, the seller may wish to modify historical results to address non-recurring

[46] Brueggeman, et al. (2011), p 281; Linneman and Kirsch (2022), p. 7; The Appraisal Institute, "Guide Notes to the Standards of Professional Practice of the Appraisal Institute," 2021.

[47] Adam Whitmire, "The Anatomy of a Successful Value-Add Real Estate Strategy," *Arabella Capital*, available at https://arabellacapital.com/the-anatomy-of-a-successful-value-add-real-estate-strategy/.

or extraordinary items, or to adjust reserves.[48] Such adjustments are typical in any financial reporting process. Analogously, buyers may also make adjustments to the historical financial information received from sellers for any number of reasons, including to incorporate their own expectations as to how the acquired assets will perform going forward (as discussed in Section III.A above).

31. Adjustments made by buyers, their consultants, or prospective lenders should not be interpreted as evidence that historical financial information provided by sellers is false or fraudulent or otherwise subject to an audit. Owners and operators of commercial real estate, including multifamily landlords, rarely, if ever, are required to prepare or provide audited financial statements. In my more than 30 years in commercial real estate, I cannot recall ever receiving audited financial statements from a seller and have certainly never engaged independent auditors to engage in an audit of our firm's historical financial information, either at an individual property or portfolio level. This is particularly true in the context of value-add acquisitions because the historical financial information has less relevance to the investment decision and even to the extent historical financial information is incorporated into the financial modeling, that information is typically adjusted based on other data and information considered or learned by the buyer during its due diligence and inspections.

32. Accordingly, the fact that historical financial information is adjusted—whether that adjustment is made by sellers, buyers, buyer's consultants, and/or lenders—does not establish that the historical financial information was materially misstated. Nor would such adjustments necessarily cause buyers or lenders to question the reliability of the information provided by sellers. In fact, such adjustments are routine and standard industry practice, particularly in value-add acquisitions.

33. Furthermore, to the extent buyers or lenders adjust historical financial information provided by sellers, it would not be typical for the historical financial information to be "corrected" by the seller. In my more than 30 years in commercial real estate, I have never requested or heard of any buyer or lender requesting that a seller provide corrected or "restated" historical financial information. There simply is no reason to do so. Historical financial information is rarely, if ever, evaluated on a stand-alone basis and incorporated into financial

---

[48] The Appraisal Institute, *The Appraisal of Real Estate*, Fifteenth Edition (Chicago, IL: Appraisal Institute, 2020), pp. 426, 453, 455.

modeling on an as-is basis. Instead of requesting corrected or restated historical financial information, the buyer and/or lender may, based on the adjustments they have made, change deal terms (e.g., sales price, extensions of due diligence period, seller holdbacks).

### C. Historical Financial Statements Prepared in the Context of Value-Add Real Estate Acquisitions Are Rarely Prepared in Accordance with GAAP

34. GAAP is a rules-based financial reporting framework that provides authoritative guidance regarding what information is required to be disclosed in financial statements and how that information is presented.[49] Certain entities are required to prepare their financial statements in accordance with GAAP (e.g., publicly traded companies that file their financial statements with the Securities and Exchange Commission). Other entities may elect to prepare its financial statements in accordance with GAAP, even if not required to do so.[50] If an entity not required to prepare its financial statements in accordance with GAAP elects to do so, it would typically make a representation as such, and compliance with GAAP is typically verified by an independent auditor. Users of those financial statements may then rely upon that disclosure and assume that the financial statements are prepared in accordance with GAAP.[51]

35. However, such an election requires that the extensive guidance in GAAP be applied appropriately, which may require sophisticated financial reporting capabilities and significant expense. Accordingly, many entities that are not required to prepare their financial statements in accordance with GAAP will not elect to and, therefore, will not be subject to its related reporting requirements. Historical financial information provided by sellers in a value-add acquisition is rarely, if ever, prepared in accordance with GAAP and, in my career, I do not recall any seller providing me, our firm, or those real estate investment firms with which I am affiliated, historical GAAP-compliant financial statements in the context of a value-add acquisition between private parties. Typically, historical financial information associated with both individual assets and portfolios of properties is prepared for purposes of distribution to the parties involved in the

---

[49] "What Is GAAP?" *Financial Accounting Foundation,* available at https://accountingfoundation.org/accounting-and-standards/about-gaap/what-is-gaap#Overview.

[50] "GAAP and Public Companies," *Financial Accounting Foundation,* available at https://accountingfoundation.org/accounting-and-standards/about-gaap/gaap-and-public-companies; "GAAP and Private Companies," *Financial Accounting Foundation,* available at https://accountingfoundation.org/accounting-and-standards/about-gaap/gaap-and-private-companies.

[51] "What is GAAP? The Qualities of GAAP," *Financial Accounting Foundation*, available at https://accountingfoundation.org/accounting-and-standards/about-gaap/what-is-gaap#The-Qualities-of-GAAP.

transaction, not for public investors. Accordingly, that financial information is not expected to be evaluated on a stand-alone basis, but instead to be considered in the context of the broader set of information that is evaluated in connection with that transaction.

36. Accordingly, in assessing whether there are "misstatements" in historical financial information provided by sellers in the context of a value-add acquisition, it would be inappropriate to suggest that such purported misstatements should be evaluated through a GAAP-based perspective. In other words, historical financial information provided by sellers in the context of a value-add acquisition are not GAAP-compliant financial statements subject to audit like those of an SEC registrant.

## IV. Mr. Klein's Analysis of "Indications That the T12 Statements Contained Material Misstatements" Is Fundamentally Flawed, Rendering His Conclusions Misleading

37. Mr. Klein offers various opinions regarding the accuracy of the ROCO Historical Financial Information and the extent to which JPMC should have been "alerted" to these purported inaccuracies.[52] Specifically, Mr. Klein opines that ROCO made "alterations" to the ROCO Historical Financial Information and that these "alterations" were material under GAAP.[53] Mr. Klein opines that "Buyer's Advisors[54] identified [two] issues with ROCO's financial reporting," one pertaining to a purported overstatement of Other Income and the other pertaining to a purported understatement of Repairs and Maintenance expense, that the purported overstatement of Other Income was material, and that these inaccuracies "alerted JPM[C] that the financial data provided by [ROCO] was inaccurate."[55] Mr. Klein also purports to identify "red flags" that he asserts "should have raised serious concerns about the accuracy of the [ROCO Historical Financial Information]."[56]

38. As explained in more detail below in the following Sections, the analysis described in the Klein Report in support of each of Mr. Klein's opinions is fundamentally flawed in multiple respects, rendering each of Mr. Klein's opinions misleading, incomplete, and/or inapplicable.

---

[52] Klein Report, § V.
[53] Klein Report, ¶ 41.i.
[54] Mr. Klein defines this term in his report to refer to Friedman Management, Iron Hound Management Company, and Post Road Management, collectively. (Klein Report, ¶ 10.)
[55] Klein Report, ¶ 41.ii.
[56] Klein Report, ¶ 41.iii.

### C. Mr. Klein's Analysis of Purported "Errors and Underwriting Adjustments" Identified by Buyer's Consultants Is Fundamentally Flawed, Rendering His Conclusions Unreliable and Misleading

48. In Section V.B of his report, Mr. Klein purports to establish that adjustments proposed by Buyer's Consultants "alerted JPM that the reported operating results provided by Sellers were also materially incorrect."[77] In support of this conclusion, Mr. Klein points to two items addressed in the course of Buyer's Consultants' procedures: an adjustment to a bad debt reserve impacting the "Other Income" line item within the ROCO Historical Financial Information,[78] and an adjustment to the "Repair and Maintenance" line item in the proforma projections.[79] However, Mr. Klein's analysis of each of these items is fundamentally flawed, as discussed in the following sections, and fails to demonstrate that JPMC had actual knowledge of material inaccuracies in the ROCO Historical Financial Information. In my opinion, the "adjustments" that Mr. Klein cites would not suggest that the ROCO Historical Financial Information provided to JPMC in connection with a value-add acquisition was materially inaccurate or incomplete, let alone fraudulent.

#### 1. Background Related to Adjustments to ROCO Historical Financial Information Proposed by Buyer's Consultants

49. On February 20, 2019, before a term sheet was executed,[80] Mr. Perone (Iron Hound) emailed several members of JPMC's CMBS loan origination team to provide an update on the ROCO acquisition. Mr. Perone informed JPMC that "a few things have changed, which have ultimately allowed us to go hard (last Friday) at a purchase price of $632.5MM for 55 properties totaling 10,300 units."[81] Among other changes, Mr. Perone explained that the prospective buyer had "identified $3.5MM of other income that [they] did not believe was actually being collected." He also stated that the prospective buyer "'right-sized' operating expenses by ~$375 per unit. As a result, [they] were able to negotiate a price reduction from $700.0MM down to

---

[77] Klein Report, ¶ 53.
[78] Klein Report, § V.B.2.
[79] Klein Report, § V.B.3.
[80] Correspondence shows that the term sheet was executed on or around March 8, 2019. JPMC-WF-00072069.
[81] JPMC-WF-00069711.

$632.5MM."[82] Mr. Perone also confirmed that an additional eight properties were removed from the ROCO Portfolio, further reducing the purchase price to $552.5 million.[83]

50. On February 21, 2019, John Colella, (Analyst within JPMC's Securitized Products – Real Estate group), asked Mr. Perone to "confirm what portion of other income was not being collected," and asked where the "right-sizing" was "captured" in the materials Iron Hound had provided.[84] Mr. Perone responded that the portions of other income not being collected were "[v]arious fees that were running through the accrual based cash flows provided to us by the seller that were not real or being collected," and that the "right-sizing" was captured in "[r]epairs and maintenance and turnover costs."[85]

51. JPMC performed diligence related to the "issues" identified by Iron Hound related to Other Income and Repairs & Maintenance.[86] For example, after receiving updated T12s for the ROCO properties as of February 2019 on March 15, 2019,[87] JPMC sent Iron Hound a list of due diligence questions "[b]ased on [JPMC's] review of the materials received so far."[88] In a set of "Cash Flow Questions," JPMC asked why the "2019 Budget NOI" for Riverside Ranch, Vista Place, and Colfax Apartments was lower than the trailing twelve months ("TTM") NOI as of February 2019.[89] JPMC also asked about a decline in miscellaneous revenue (i.e., other income) for the Steeplechase property.[90] Iron Hound responded on April 2, 2019 that, for Riverside Ranch and Vista Place, it had removed certain "Other Income" items that were one-time charges but had been reflected as recurring revenue, such as "one-time pet, cleaning, and damage fees."[91] For Colfax Apartments, Iron Hound explained that, due to the property's smaller size, it expected higher operating costs and had provided JPMC with a "controllable expenses" model for reference.[92] Regarding Steeplechase, Iron Hound stated that the prior owner, Connor Real Estate, "ran all of their deals in a unique way that is very fat on utility reimbursement and misc.

---

[82] JPMC-WF-00069711.
[83] IronHound_0016080–081 at 080.
[84] JPMC-WF-00209237–238 at 237.
[85] JPMC-WF-00209237–238 at 237.
[86] Deposition of Elizabeth King, January 22, 2026 ("King Deposition"), 113:6–14.
[87] JPMC-WF-00185016–021 at 016.
[88] JPMC-WF-00075725–727 at 725–726.
[89] JPMC-WF-00075725–727 at 726.
[90] JPMC-WF-00075725–727 at 726.
[91] JPMC-WF-00185524–526 at 525.
[92] JPMC-WF-00001179–183 at 181.

revenue. They have their own utility billing company that charges very high fees. Additionally, they charged very high cable and internet fees (to another one of the property owner's companies), and fees for all sorts of misc. stuff. When the Seller purchased this property, they reduced the expenses to make leasing efforts easier and switched third party billing providers."[93]

52. Further, on April 25, 2019, Michelle Yousefian, (employee at JPMC CMBS Originations), asked Mr. Perone to clarify Iron Hound's adjustments to Other Income and how Iron Hound "intend[s] to reduce that number post-acquisition."[94] On May 9, 2019, Mr. Perone responded, "[w]e believe those line items are higher than we have historically experienced so we took [a] more conservative approach."[95] In the same email, Mr. Perone wrote that ROCO "did not spend much on repairs and maintenance of the Properties. Therefore, we 'right-sized' this figure to conform to what we thought was realistic and what we typically spend across our other 8,000+ units."[96]

53. JPMC sent Iron Hound further due diligence questions on May 1, 2019, including one question concerning historical and budgeted "Repairs and Maintenance Expense": "Repairs and Maintenance expense was $5.05mm as of TTM February 2019 and is projected to increase to $6.9mm for the 2019 Budget. What is driving this budgeted increase in R&M expense? How does this interplay with the planned capital expenditure programs?"[97] Again explaining that Iron Hound had opted to take "a conservative approach," Iron Hound stated that, "[t]he Seller did not spend much on repairs and maintenance of the Properties. Therefore, we 'right-sized' this figure to conform to what we thought was realistic and what we typically spend across our other 8,000+ units. Capital expenditures will hopefully drive down th[ese] anticipated costs, but o[u]r 2019 projection for R&M represents a conservative approach."[98]

### 2. Adjustment to Bad Debt Reserve Related to Other Income

54. Mr. Klein cites a handful of internal communications related to the diligence procedures conducted by Buyer's Consultants and concludes that the amount of "Other Income" reported in

---

[93] JPMC-WF-00001179–183 at 181–182.
[94] JPMC-WF-00081940–943 at 940.
[95] JPMC-WF-00001518–519 at 519.
[96] JPMC-WF-00001518–519 at 518.
[97] JPMC-WF-00188104–107; JPMC-WF-00188108.
[98] JPMC-WF-00190126–127 at 126.

the ROCO Historical Financial Information was overstated by more than $3.1 million because the accounting for that figure "violate[d] the well-accepted requirement for accrual basis financial statements."[99] However, Mr. Klein's discussion of ROCO's "Other Income" historical figure is fundamentally flawed and misleading in a number of ways.

#### (a) Mr. Klein Inappropriately Suggests the ROCO Historical Financial Information Was Required to Comply with GAAP

55. Mr. Klein inappropriately suggests that the ROCO Historical Financial Information was required to follow GAAP. For example, he suggests that ROCO was required to follow "requirements for accrual basis financial statements."[100] As support for this assertion, Mr. Klein cites a textbook definition of "Allowance for Uncollectible Accounts."[101] Mr. Klein's citation of this text further illustrates that he is employing an inappropriate, GAAP-based perspective. Specifically, the discussion within this text is focused on reporting requirements of publicly available financial statements.[102] Furthermore, Mr. Klein fails to acknowledge that this text explicitly addresses the judgmental nature of financial reporting generally, even when that financial reporting is governed by GAAP.[103] In addition, the text addresses the adjustments that are typically made in the financial reporting process.[104] I am aware of no requirement that the historical financials provided by ROCO be prepared in accordance with GAAP, nor am I aware of any evidence suggesting that they were ever represented to have been prepared in accordance with GAAP, and Mr. Klein cites to no such evidence. Ultimately, Mr. Klein provides no basis for his assertion that ROCO's historical Other Income figure violated a reporting requirement.

---

[99] Klein Report, ¶¶ 56–59.
[100] Klein Report, ¶ 58.
[101] Klein Report, ¶ 58, fn. 102, citing Peter D. Easton, et al., *Financial Accounting for MBAs*, Eighth Edition (Westmont, IL: Cambridge Business Publishers, 2021) ("*Financial Accounting for MBAs*").
[102] *See, e.g., Financial Accounting for MBAs*, Module 1.
[103] *Financial Accounting for MBAs*, p. 1-17.
[104] *Financial Accounting for MBAs*, Module 3.

### (b) Mr. Klein Fails to Address the Judgmental Nature of the Other Income Determination and Inappropriately Suggests the Adjustment Was Due to Fictitious Charges

56. Mr. Klein's discussion inappropriately suggests that the charges included in the "Other Income" figure were entirely fictitious,[105] thereby failing to address the fact that the reporting issue identified by the Buyer's Consultants may have been judgmental in nature. Mr. Klein offers no analysis of the "Other Income" charges reported within the ROCO Historical Financial Information to determine what, if any, portion of those charges ROCO may have been entitled to.

57. First, Mr. Klein fails to acknowledge and address the judgmental nature of the financial reporting determination at issue. Specifically, the "misstatement" Mr. Klein claims to have identified concerned a reserve account related to the Other Income line items reported in the ROCO Historical Financial Information. Under accrual accounting (as opposed to cash-based accounting), the receipt of cash (i.e., payment of amounts due from the counterparty) is not required in order for charges to be recognized as revenue.[106] Instead, uncertainty related to whether cash will ultimately be collected is sometimes addressed through an *allowance for uncollectible accounts* (or a *bad debt reserve*). This allowance is inherently judgmental because it is an estimate of the proportion of charges the entity is entitled to that it will not be able to ultimately collect. This estimate may be developed based on a number of considerations, including prior collections experience of the entity. The extent to which this estimate will (or will not) ultimately align with how much cash is ultimately collected will also depend on a number of factors, some of which may be influenced by the entity (e.g., efforts undertaken to collect amounts due, the credit worthiness of counterparties with which the entity conducts business) and others which may not be able to be influenced by the entity (e.g., macroeconomic factors that may cause counterparties financial distress and prevent them from being able to pay amounts they owe). Given the judgmental nature of these bad debt reserves, and the number of factors that may influence actual collection amounts, they often may need to be adjusted to address changing factors.

---

[105] *See, e.g.,* Klein Report, ¶¶ 15, 19, 56.

[106] *Financial Accounting for MBAs*, p. 2-15. For purposes of this discussion, I have not addressed other considerations relevant to the evaluation of the appropriate timing of revenue recognition (e.g., whether the performance obligation has been satisfied).

58. Deposition testimony in this matter highlights the judgmental nature of this reserve and the process through which the bad debt reserve was adjusted in the course of due diligence. For example, Mr. Milosev testified that, during the course of his conversations with ROCO personnel, questions were raised about the amount of "Other Income" that had historically been collected. Ultimately, based on these conversations, Buyer's Consultants and ROCO personnel "came up with some estimates" and Buyer's Consultants concluded that the reserve amount determined through this process "was in line of what [Buyer's Consultants were] seeing across [their own property] portfolios, so [they] went with that number."[107] This testimony clearly reflects the judgmental nature of these determinations, as well as the reality of how such historical financial information is typically used in the context of value-add transactions, as I discuss above in Section III. Again, the financial reporting sophistication of sellers varies significantly and the financial information provided by sellers often is not prepared in accordance with strict GAAP reporting requirements. This reality is part of why diligence firms such as Iron Hound and Post Road exist: to evaluate the financial information provided by sellers and propose adjustments for purposes of incorporating that financial information into the proforma cash flow projections that inform the financial structure of the deal.

59. Second, Mr. Klein fails to address testimony from JPMC personnel regarding their interpretation of the February 2019 communications cited extensively by Mr. Klein in support of his assertion that the Other Income amounts were "not real" or "not being collected." For example, when asked what her reaction was to the communication cited extensively by Mr. Klein containing the statement that Other Income amounts were "not real or being collected," Elizabeth King (Executive Director within JPMC's Securitized Products – Real Estate group) responded that she did not know what Mr. Perrone intended to convey with that statement, but that she "wanted to make sure we understood it and ask[ed] questions and [did] our due diligence."[108] She further testified that she did not interpret this communication as a suggestion on the part of the Buyer's Consultants that there was fraud.[109] Testimony from Mr. Colella further supports the view that the adjustments proposed by Buyer's Consultants did not establish that the ROCO Historical Financial Information was inaccurate or that the related charges were "not real."

---

[107] Milosev Deposition, 145:7–147:24.
[108] King Deposition, 112:15–113:14.
[109] King Deposition, 113:2–24.