# EXHIBIT N

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WELLS FARGO BANK, NATIONAL ASSOCIATION, As Trustee for the benefit of the Certificateholders of J.P. Morgan Chase Commercial Mortgage Securities Trust 2019-MFP, Commercial Mortgage Pass-Through Certificates, Series 2019-MFP, by and through Situs Holdings, LLC, as Special Servicer under the Trust and Servicing Agreement, dated as of July 18, 2019<br><br>*Plaintiff,*<br><br>v.<br><br>JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, MEYER CHETRIT, SHADOW CREEK OWNER, LLC, and 3100 DANIEL MCCALL DRIVE, LLC,<br><br>*Defendants.* | **Case No.: 1:25-cv-01943-DEH** |

REBUTTAL EXPERT REPORT OF DR. MARK BUONO, PH.D.

MAY 21, 2026

# TABLE OF CONTENTS

I. Assignment ........ 3

II. Summary of Rebuttal Opinions ........ 3

III. Qualifications ........ 5

IV. Background........ 6

A. Underwriting Process Overview........ 6

B. JPMorgan's Underwriting of the ROCO Loan........ 7

V. Rebuttal Opinions ........ 15

A. Tenzer's Report Suffers from Three Overarching Errors That Reflect a Fundamental Misunderstanding of the Purposes of Commercial Mortgage Underwriting and Its Application to This Case........ 15

B. Tenzer's Overview of "Customary Industry Practices and Procedures" (Opinion 1) Is Fatally Flawed Because It Places Undue Importance on Historical Financials Relative to Other Sources of Information. ........ 18

C. Despite Tenzer's Unsupported Criticisms (Opinion 2), JPMorgan's Diligence of the ROCO Loan Was Consistent with Both Industry Practice and JPMorgan's CMBS Underwriting Guidelines. ........ 20

1. A Loan's LTV and Debt Yield Do Not Change the Level of "Scrutiny" Applied in Underwriting the Loan........ 21
2. Tenzer's Critique of NOI Used in the Preliminary Underwriting Committee Memo Ignores JPMorgan's Extensive Review of Historical and Pro Forma NOI........ 22
3. JPMorgan Did Not "Waive[]" Bank Statement Reconciliation, as Tenzer Asserts, Nor Does Bank Statement Reconciliation Serve the Purpose Tenzer Claims. ........ 26
4. Tenzer's View of "Non-Recurring Income" Is Inconsistent with Underwriting Best Practices. ........ 29
5. JPMorgan Did Not "Accept[] the Borrower's Expense 'Right-Sizing' at Face Value." .... 31

D. Tenzer's Opinion That "Additional" Diligence Is Required in Certain Instances (Opinion 3) Is Incorrect and Irrelevant. ........ 33

E. Tenzer Resorts to a Grab-Bag of Factually Flawed Arguments (Opinion 4) to Argue That JPMorgan Failed to Investigate Falsity in ROCO's T12s. ........ 34

1. JPMorgan Did Not "Fail[] to Investigate or Demand Corrected T12s."........ 34
2. JPMorgan Did Not Knowingly Furnish Rating Agencies with False Information. ........ 35
3. Tenzer's Efforts to Undermine the Reliability of the Property Appraisals Are Unavailing. 36

F. Tenzer Fails to Show That Purportedly High LTV Impaired the Properties' Ability to Generate Income and Maintain Quality (Opinion 5). ........ 39

VI. Conclusion ........ 41

APPENDIX A. DOCUMENT LIST ........ 42

APPENDIX B. CURRICULUM VITAE OF MARK J. BUONO ........ 49

# I. ASSIGNMENT

1. I, Mark Buono, Managing Director of SEDA Experts, LLC ("SEDA"), have been retained as an independent expert witness by Sullivan & Cromwell LLP ("S&C"), on behalf of JPMorgan Chase Bank, N.A. ("JPMorgan"), a Defendant in the above-captioned action (the "Matter"). This rebuttal report (hereafter, the "Rebuttal Report") addresses certain assertions and opinions offered in the Expert Report of Gary M. Tenzer ("the Tenzer Report" or "Tenzer") dated April 10, 2026.[1]

2. SEDA is compensated at $1,200 per hour for my time and at SEDA's billable rates for other members of SEDA's staff working under my supervision on this Matter. SEDA bills for its services monthly. SEDA's fees are not contingent on the outcome of this Matter or the substance of my opinions.

3. This Rebuttal Report has been prepared solely for use in this Matter. The opinions I express reflect information available to me as of the date of this Rebuttal Report. In preparing this Rebuttal Report, I have utilized information from a variety of sources, each of which is of a type reasonably relied upon by experts in my field. The opinions and conclusions contained in this Rebuttal Report are based on my independent and objective review of documents and other information related to this Matter. See Appendix A for a list of information received from S&C.

4. I reserve the right to supplement, amend or correct my opinions and statements in this Rebuttal Report if any additional information is provided to me that may alter or change my opinions and understanding of the facts related to this case. Finally, this Rebuttal Report must not be construed as expressing opinions on matters of law, which are for the court to determine.

# II. SUMMARY OF REBUTTAL OPINIONS

5. Contrary to the scattershot assertions made in the Tenzer Report, JPMorgan's underwriting of the loan at issue in this action ("Loan") conformed to standard industry practice and JPMorgan performed its review of the assets in the underwriting in a commercially reasonable manner. Tenzer's opinions to the contrary are materially inconsistent with the general practices of commercial loan underwriting. Finally, Tenzer appears to misunderstand the

---

[1] This Rebuttal Report addresses the primary assertions and opinions as part of Opinions 1-5 of the Tenzer Report. If I do not address an assertion made or an opinion offered in the Tenzer Report, it does not imply my agreement with that assertion or opinion.

practical nature and purposes of commercial mortgage underwriting, especially for a value-add acquisition financing like the Loan in question.

6. For starters, Tenzer's Report suffers from three overarching errors that impact his overall analysis and render his opinions unreliable.

a. One such error is Tenzer's repeated attempts to fault JPMorgan for purportedly deviating from JPMorgan's CMBS Underwriting Guidelines ("Guidelines"). Tenzer misunderstands the purpose of a lender's underwriting guidelines. In my experience, guidelines generally and the JPMorgan Guidelines in particular are not a rigid set of rules that must be followed for every loan. Such an interpretation would be divorced from the reality of commercial mortgage underwriting, which necessarily varies loan by loan and based on the information available for each commercial mortgage loan. This is why the Guidelines specifically contemplate that underwriters at JPMorgan may deviate from the Guidelines and grant them the discretion to do so, as Tenzer himself acknowledges.

b. The second critical error Tenzer makes is premising his opinions on the unsupported assumption that JPMorgan should have conducted some additional diligence in underwriting the Loan because JPMorgan somehow "knew" in 2019 that the "historical financial data" it received were materially "inaccurate or incomplete." Tenzer does not support this premise with evidence or analysis to show why any specific financial information was inaccurate or incomplete, let alone fraudulent, or how or why relevant individuals at JPMorgan "knew" of any such inaccuracies, incompleteness or fraud. On the contrary, Tenzer's opinions suffer from hindsight bias based on Tyler Ross's guilty plea entered many years after the Loan was originated. This lack of support for a key premise of the Report renders Tenzer's opinions fatally flawed and unreliable.

c. A third error is Tenzer's failure to connect his various opinions to what I understand to be the claim at issue in this case, which is whether JPMorgan had "actual knowledge . . . after due inquiry" that financial information provided by the buyer was materially inaccurate or false. Most of Tenzer's Report is focused on what he believes JPMorgan should have done better in the course of underwriting the Loan rather than what JPMorgan knew or understood.

7. With respect to his specific "opinions" on underwriting, Tenzer's Report suffers from numerous flaws. Among other things, in describing industry practice and procedure, Tenzer places undue importance on the historical financials associated with the underwritten assets. Underwriting is intended to confirm whether the collateral properties would likely be sufficiently profitable to sustain a loan, and it is the borrower (*i.e.*, the property buyer) that will be operating the properties going forward, not the previous owner (*i.e.*, the seller). As such, it is reasonable for the lender to utilize the buyer's business plan and pro forma budget instead of the seller's historical operating statements for certain components of the lender's underwritten net operating income ("NOI") for the collateral properties. That is particularly true where, as here, the transaction involves a value-add acquisition, which contemplates that the buyer will make investments and improvements to the assets that will impact future cash flows. This fundamental misunderstanding of the purpose of a lender's underwriting may be a result of the fact that Tenzer has never worked as an underwriter at a commercial lender like JPMorgan. In addition, Tenzer errs by insisting on an artificial differentiation of the levels of diligence that must be conducted based on certain variables, like a loan's loan-to-value ("LTV") ratio. This is fundamentally wrong. Based on my experience in the industry, the same level of diligence should be performed on all loans regardless of the LTV level. A lender should always scrutinize the information it receives in an underwriting, as JPMorgan did here.

8. Finally, Tenzer tries to blame JPMorgan for the poor post-acquisition performance of the collateral properties by pointing to the fact that the Loan LTV was above 80%. As Tenzer would have it, this high LTV meant that the buyer had no available funds to invest in the properties after making debt service payments. But as reflected in the offering circular for the Loan securitization, the buyer reserved tens of millions of dollars for various capital improvement projects post-acquisition and to address deferred maintenance, and intended to bring in a professional manager to manage and operate the properties. This opinion thus makes no sense and is inconsistent with the factual record.

## III. QUALIFICATIONS

9. I am currently a Professor of Practice of Real Estate in the Finance Department and Director of the Carter Real Estate Center at the College of Charleston and a Managing Director at SEDA, a consulting firm that provides independent advice, data analytics, and valuation

services to corporations, government agencies, and regulatory bodies in the financial services industry. I am also a Board Observer for Claros Mortgage Trust. I am also a Director of the College of Charleston Foundation and Chair of the Investment Committee.

10. Previously, from 2014 to 2019, I was a Managing Director and Commercial Real Estate Portfolio Manager at Global Atlantic Financial Group. In my role I was responsible for all investments in the commercial real estate sector, including Commercial Mortgage-Backed Securities ("CMBS"), Commercial Real Estate Collateralized Loan Obligations ("CRE CLOs"), commercial real estate senior and mezzanine loans, and commercial real estate property investments.

11. Prior to Global Atlantic, I was a Managing Director at Goldman Sachs. I was employed at Goldman Sachs from 1993 to the end of 2013. During my 20-year tenure at Goldman Sachs, I was originally part of the fixed income research group specializing in residential and commercial real estate securities and later traded CMBS for the firm.

12. After trading CMBS, I was responsible for the origination of commercial mortgage loans and the sale of those loans via securitization. I also became responsible for the securitization of CRE CLOs. During the Great Recession, I was responsible for resolving distressed commercial real estate loans in the United States and Europe. During this period, I was also a member of the GS Bank Capital Committee.

13. Before joining Goldman Sachs in 1993, I was part of the trading group and the research group at Freddie Mac. I began my career as an assistant finance professor at Temple University and then Rutgers University.

14. I received a Ph.D. in Economics from the University of North Carolina – Chapel Hill in 1986.

15. My curriculum vitae (including a list of all publications that I authored in the last ten years and a list of all cases in which I testified as an expert at trial or by deposition in the last four years) is attached as Appendix B.

## IV. BACKGROUND

### A. Underwriting Process Overview

16. The underwriting process is designed to assess prospective loan transactions through the evaluation of a property's cash flows, future pro forma cash flows, and current and future

43. The Loan closed on June 19, 2019, and was securitized a month later. JPMorgan's final diligence checklist illustrates the extent of information that JPMorgan amassed during diligence and utilized in underwriting the Loan. The information included T12 as of February 2019 and three full years of financial statements for those properties owned for the three previous years (2016 through 2018), and pro forma financial statements provided by the borrower.[46] JPMorgan also received 3 years of capital expenditure histories, a detailed value-add capital expenditure budget per property, and tenant/occupancy information including rent rolls, occupancy history from 2016-2018, and property crime reports.[47] JPMorgan also received an aged receivables report, property tax bills over the trailing three-year period, and third-party reports including appraisals, property conditions assessments, environmental site assessments, seismic reports, and zoning reports.[48]

44. More than four years later, in September 2023, Tyler Ross, the former CEO of ROCO, pled guilty to falsifying financial documents, including with respect to properties in the ROCO portfolio that are relevant to this case. The sentencing order issued by the Court in connection with that plea found that Tyler Ross had provided falsified financial information, knowing that a financial institution (like JPMorgan) would review that financial information in connection with its lending decision; that "many of the falsified categories were expenses that would be difficult to trace or would not show up in the documents provided"; and that JPMorgan neither "knew or should have known the extent of the false information in the T12s (namely, the NOIs)."[49]

# V. Rebuttal Opinions

## A. Tenzer's Report Suffers from Three Overarching Errors That Reflect a Fundamental Misunderstanding of the Purposes of Commercial Mortgage Underwriting and Its Application to This Case.

45. Tenzer's Report begins with an overview of what Tenzer considers to be "customary industry practices and procedures that are used to underwrite commercial real estate loans,"[50] and

[46] JPMC-WF-00792561.

[47] *Id.*

[48] *Id.*

[49] Order Finding that Sentencing Enhancements Pursuant to Guidelines §§ 2B1.1(b)(17)(A) and (D) Apply in this Case at 8-9, *United States* v. *Ross*, No. 23-20451 (E.D. Mich. Aug. 2, 2024), ECF No. 34.

[50] Tenzer Report at 15.

then asserts that additional "scrutiny" should be applied by loan underwriters "when historical financial data is known to be inaccurate or incomplete."[51] But the opinions Tenzer sets forth are materially inconsistent with the general practices of commercial loan underwriting which I have observed during my thirty-year career in the industry. Tenzer's Report also attempts to apply underwriting principles in ways that have little-to-no application to what I understand to be the issues in this case. Thus, before addressing Tenzer's specific opinions and assertions, I summarize here what I believe are three overarching errors in Tenzer's Report that render his opinions unreliable.

46. *First*, throughout his Report, Tenzer incorrectly treats JPMorgan's Guidelines as strict rules or directives that must be followed to the letter in every loan underwriting JPMorgan conducts, and attempts to fault JPMorgan for purportedly deviating from the Guidelines in underwriting the Loan. Tenzer claims that "[e]ach deviation from the underwriting criteria in JPMorgan's Guidelines" would cause a "reasonable underwriter" to ensure that "its underwriting procedures were stringently followed."[52] This is inconsistent with both the language of the Guidelines and the typical use of such documents by loan originators.

47. JPMorgan's Guidelines "serve two primary purposes: (1) to minimize [JPMorgan's] credit exposure to individual loans; and (2) to provide a framework for underwriting which reflects the assumptions employed by the rating agencies and investors in evaluating loans."[53] The Guidelines further provide that a JPMorgan underwriter may "use a different assumption" if they "believe[] that the use of a specific portion of the[] Guidelines would result in an incorrect analysis of a Mortgaged Property."[54]

48. Like underwriting guidelines at any large financial institution, JPMorgan's Guidelines are not a strict set of rules that must be followed in every case. As Tenzer himself acknowledges, "JPMorgan establishes the criteria and can choose when to deviate from it."[55] And, in my experience, internal underwriting "guidelines" are nothing more than that—they are mere "guidelines" that may be deviated from when warranted by the commercial circumstances.

---

[51] Tenzer Report at 32.

[52] Tenzer Report at 23-24.

[53] JPMC-WF-00487307 at 7310.

[54] *Id.*

[55] Tenzer Report at 21.

Indeed, loan underwriting is an iterative process that requires reviewing a vast amount of information from many different sources. Lender guidelines are used to guide the process of reviewing this information and making certain key decisions about a potential loan, but they are meant to be flexible, not rigid as Tenzer suggests. Not all information identified in the Guidelines will be reviewed in every case for every loan. In my view, Tenzer's opinions on this score are likely colored by the fact that he has never worked as an underwriter at a commercial mortgage lender, and lacks relevant experience in the practical application of guidelines of this sort.[56]

49. In any event, even if JPMorgan's Guidelines should be considered a set of "rules" (and they are not), Tenzer often ignores that JPMorgan generally followed those Guidelines with respect to the Loan at issue here. Most of Tenzer's criticisms amount to little more than nitpicking at the edges of what was otherwise a commercially reasonable underwriting process for the Loan.

50. *Second*, Tenzer asserts that "customary industry practices and procedures" require greater "scrutiny" when "historical financial data is known to be inaccurate or incomplete," and then lays out additional diligence that he suggests could have been performed in this case but purportedly was not.[57] As I explain more fully in the sections below, Tenzer's opinion that underwriting involves different levels of "scrutiny" finds no support in industry practice, but his assertion suffers from an even more fundamental flaw because it is based on a premise for which he provides no support: that JPMorgan somehow knew in 2019 that the "historical financial data" it received were "inaccurate or incomplete."[58] Tenzer does not point to any evidence or analysis of what JPMorgan purportedly knew when the Loan was originated in 2019, and his opinions are the product of hindsight bias based on Tyler Ross's guilty plea to fraudulent manipulation of financial statements many years later. This is another critical error that infects Tenzer's analysis throughout his Report.

51. *Third*, Tenzer does not even attempt to show how JPMorgan's purported deviations from the Guidelines or supposed deficiencies in underwriting connect to the claims identified in the complaint. According to the complaint, Plaintiff's claim against JPMorgan is based on an

---

[56] I also note that Tenzer does not say that there is anything wrong with the Guidelines themselves.

[57] Tenzer Report at 33-49.

[58] Tenzer Report at 3, 33.

allegation that JPMorgan's underwriting team had "***actual knowledge*** . . . after ***due inquiry***" that information JPMorgan received from the borrower was not "true, complete and correct in all material respects."[59] Tenzer does not opine on what "due inquiry" means in this context, nor does he identify any actual knowledge on the part of JPMorgan that the information it received from the borrower was materially untrue, incomplete, or incorrect, let alone fraudulent. In his Report, he states that Plaintiff "is alleging" that "JPMorgan either knew about the misrepresentations ***or failed to conduct adequate due diligence to uncover them*** before securitizing the loan."[60] But I am informed by counsel that Plaintiff's claim is not based on any "fail[ure] to conduct adequate due diligence," nor is it based on any purported breach of the Guidelines. Instead, the claim is based on purported "actual knowledge" after "due inquiry." Tenzer does not make any effort to connect his opinions on underwriting and adherence to Guidelines to that specific claim.

### B. Tenzer's Overview of "Customary Industry Practices and Procedures" (Opinion 1) Is Fatally Flawed Because It Places Undue Importance on Historical Financials Relative to Other Sources of Information.

52. Tenzer's Report includes a section describing what Tenzer considers to be "customary industry practices and procedures" for underwriting commercial mortgage loans.[61] While Tenzer identifies certain types of information an underwriter may wish to collect and certain analyses that may be undertaken during the underwriting process, Tenzer completely ignores how a lender's focus in an underwriting is dependent on the underlying purpose of the loan. This oversight—potentially a result of Tenzer's lack of experience underwriting a loan from a lender's perspective—leads him to focus solely and myopically on the historical information the lender reviews. In reality, in acquisition financing like the ROCO Loan, the borrower's business plan and pro forma budget are far more important to the lender's underwriting than historical financial information. Historical information may help inform an evaluation of the buyer's business plan and pro forma budget, but it is future operations and cash flows that are going to have to support the loan, not historical operations under a different owner.

---

[59] Compl. ¶¶ 44, 68, 107. I have been informed by counsel that the other claims in the complaint against JPMorgan are no longer part of the case.

[60] Tenzer Report at 5-6 (emphasis added).

[61] *See id.* at 15-21.

53. In my experience, the most important documents to review in underwriting a commercial loan for an acquisition are not historical materials provided by the seller, but documents reflecting the buyer's pro forma budget for their operation of the properties post-acquisition. While a focus on historical financial statements may be appropriate in a *refinancing* transaction, where the collateral property is not changing hands, the focus in an *acquisition* is primarily on the buyer's forward-looking business plan and pro forma budget. That is particularly true of a value-add acquisition like the ROCO properties, which the buyer planned to acquire with an expectation that the buyer will make significant operational and capital improvements, substantially changing their anticipated future cash flows.

54. Ignoring this crucial context, Tenzer inexplicably fails to mention the borrower's business plan or pro forma budget in his description of the types of information customarily reviewed in an underwriting. This oversight undermines the credibility of Opinion 1, and shows why Tenzer's assertions have at most limited applicability to a value-add acquisition like the ROCO Loan at issue in this case

55. Tenzer seems to acknowledge that underwriting is primarily a forward-looking exercise, noting that it is important "to understand each line item [in T12s] and determine whether it would change going forward."[62] But the buyer's business plan is more important in determining likely change to, *e.g.*, operating expenses than historical T12s from a different owner who operated the properties in a different manner without professional management. Given that the borrower's operation of the collateral property may directly impact the property's ability to support debt service payments, it is much more important for the underwriter to review and analyze the changes and assumptions made in adjusting historical financial data to reflect the buyer's plans for the future operation and performance of the collateral property, particularly in the context of value-add acquisitions like the one at issue here.

56. Setting aside this fundamental issue with the Report, Tenzer also incorrectly describes how certain categories of information are used in a typical commercial mortgage underwriting. For example, Tenzer opines generally that "[c]ash receipts and bank statements are reconciled with the T12s to verify that the financials accurately reflect actual collections."[63] This general

---

[62] *Id.* at 18.

[63] *Id.*

statement overlooks the actual use of property bank statements in a mortgage loan underwriting. Bank statements are not always obtained by a lender in underwriting a loan, but when they are they are primarily used to confirm collection of rent reflected in property rent rolls; they are generally not used to confirm other aspects of T12s, such as non-rental income or operating expenses. As discussed below in Section C.3, Tenzer's Report consistently places an undue importance on bank statements in the context of the ROCO Loan.

57. Finally, Tenzer lists a number of third-party reports lenders procure in an underwriting, including property appraisals, property condition reports, environmental reports, zoning reports, and seismic reports.[64] While I generally agree that such reports may be procured in commercial mortgage underwriting, Tenzer overlooks the important role played by the lender in the appraisal process. Tenzer opines that the appraisal is "adopted" by the lender's "Appraisal Services Department" and then "provided to the loan origination team as well as the underwriters."[65] While the origination team should not deal directly with the appraiser, the origination team does not simply receive the appraisal report uncritically. The origination team should review the appraisal report to confirm that the appraisal reports do not reflect inaccurate information about the subject properties, as JPMorgan's origination team did here.[66]

### C. Despite Tenzer's Unsupported Criticisms (Opinion 2), JPMorgan's Diligence of the ROCO Loan Was Consistent with Both Industry Practice and JPMorgan's CMBS Underwriting Guidelines.

58. Tenzer asserts that JPMorgan "failed to follow a number of . . . customary industry practices and procedures," and JPMorgan's own Guidelines, in underwriting the Loan.[67] To support this assertion, Tenzer focuses exclusively on purported deviations from JPMorgan's own Guidelines, even though he concedes that "JPMorgan establishes the criteria" in its Guidelines "and can choose when to deviate from" them.[68] Tenzer does not claim that JPMorgan failed to

---

[64] *Id.* at 20-21.

[65] *Id.* at 20.

[66] JPMC-WF-00221588. The Guidelines at states that "Third-party reports should be reviewed as soon as possible after receipt." JPMC-WF-00487307 at 379. I note that JPMorgan clearly reviewed the appraisal reports because they included data from the reports in the June Addendum. *See, e.g.*, JPMC-WF-00149721 at 728, 743, 763-764.

[67] Tenzer Report at 21-32.

[68] *Id.* at 21.

complete any of the practices and procedures he considers to be "customary" in the industry, independent of the Guidelines. As such, to the extent Tenzer attempts to claim that JPMorgan's underwriting was deficient because it deviated from the Guidelines, that claim is refuted by his own Report.

59. Moreover, nowhere in his Report does Tenzer identify any financial information provided to JPMorgan that JPMorgan actually knew was materially untrue, incomplete, or inaccurate. As such, I understand that Tenzer's Report is irrelevant to Plaintiff's claim that JPMorgan allegedly breached a representation in the Mortgage Loan Purchase and Sale Agreement that JPMorgan had no "actual knowledge" after due inquiry that information the borrower provided was not true, complete, and accurate in all material respects. Even if Tenzer could show that JPMorgan failed to adhere to the Guidelines, Tenzer does not explain how that deviation demonstrates that JPMorgan failed to conduct due inquiry in underwriting the loan.

60. In my opinion, JPMorgan conducted extensive analysis of the Loan collateral, as well as of the buyer and the buyer's planned management company. This underwriting analysis was consistent with both industry standards and JPMorgan's Guidelines, and JPMorgan's process was at least as comprehensive as the level of analysis that has been done by commercially reasonable lenders in my experience.

### 1. A Loan's LTV and Debt Yield Do Not Change the Level of "Scrutiny" Applied in Underwriting the Loan.

61. Tenzer argues that, because the Loan exceeded the 80% LTV threshold in the Guidelines for multifamily property loans, "customary industry practice would require even more scrutiny in underwriting . . . so that the lender understood the risk and to take appropriate measures to address them."[69] He similarly claims that "increased stringency in underwriting" was required based on the Loan's 7.1% debt yield ("DY"), below the 8% threshold in the Guidelines.[70] Tenzer's opinion is based on a false premise. A lender should scrutinize the risks associated with *every* loan it writes, regardless of the LTV or DY.

62. In my experience from years in commercial real estate lending, the level of diligence or "scrutiny" applied to a particular loan does not vary depending on the loan's LTV or DY. The

[69] *Id.* at 21-22.

[70] *Id.* at 23 & n.65.

lender should always scrutinize the materials and information received in every underwriting. And exceeding an internal guideline for LTV for a certain type or class of property generally does not trigger some obligation for "increased stringency in underwriting."[71] Tenzer cites no authority for his theory that any loan that exceeds a particular LTV ratio requires "more scrutiny," and I am not aware of any.[72]

63. Even if the Guidelines did require some higher level of stringency in diligence, Tenzer does not assert that JPMorgan failed to apply such "increased stringency" to the Loan at issue here. Tenzer merely opines that a higher LTV and/or lower DY "would cause a reasonable underwriter to be aware of the increased risk and to ensure that its underwriting procedures were strictly followed," while in the same sentence acknowledging that "it is JPMorgan's prerogative to deviate" from its Guidelines.[73]

### 2. Tenzer's Critique of NOI Used in the Preliminary Underwriting Committee Memo Ignores JPMorgan's Extensive Review of Historical and Pro Forma NOI.

64. Tenzer argues that JPMorgan deviated from the Guidelines by purportedly not explaining differences between ROCO's historical NOI and the buyer's pro forma NOI in the March Memo provided to the Committee in connection with the preliminary Committee meeting on March 7, 2019.[74] The Guidelines contain no specific instructions about what NOI must be included in a preliminary Committee memo prepared at the outset of the underwriting process. Moreover, Tenzer's assertion inexplicably ignores the full extent of JPMorgan's evaluation of variances between ROCO's historical NOI and the buyer's projected NOI,[75] not to mention the two additional memos the JPMorgan origination team provided to the Committee before the Committee approved the Loan.[76] Additionally, the purpose of the preliminary credit committee memo is not to approve the loan, but rather in preparation to issue a term sheet. The March Memo was merely preliminary. Accordingly, in providing the preliminary March Memo, the origination team did not, as Tenzer claims, give the Committee "a false picture as to cash flows"

---

[71] *Id.* at 22-23.

[72] *See id.* at 21-24.

[73] Tenzer Report at 23-24.

[74] Tenzer Report at 25.

[75] JPMC-WF-00072008 at 013-020, 035-036.

[76] JPMC-WF-00145609; JPMC-WF-00007541.

or "obscur[e] a legitimate view of the amount and stability of NOI."[77] Tenzer's claim fails to account for the circumstances of the March Memo and the extensive other materials that were provided to the Committee over time.

65. The March Memo included Iron Hound's adjustments to NOI for the ROCO portfolio, and explained that "the Sponsor has committed to investing an estimated $39.5 million across value-add capital projects and deferred maintenance items."[78] In my experience, a preliminary underwriting committee memo does not contain as much detail as memos submitted later in the underwriting process, so it is not surprising that the March Memo contained fewer details and fewer footnotes than the May Memo and June Addendum.[79]

66. Moreover, Tenzer's recitation of facts leaves out critical details regarding JPMorgan's diligence and follow-up questions regarding the financials it received from the buyer's agents.

67. In February 2019, when JPMorgan was first informed via e-mail of Iron Hound's adjustments to "other income" based on charges that Iron Hound did not believe were "being collected" and the "right-sizing" of certain "repairs and maintenance" expenses, JPMorgan immediately asked Iron Hound to explain "what portion of other income was not being collected," and where the "right-sizing" was captured in the T12s.[80] Mr. Perone responded that "[v]arious fees that were running through the accrual based cash flows provided to us by the seller were not real or being collected." As for the right-sizing of operating expenses, Mr. Perone responded that the "right-sizing" was captured in "[r]epairs and maintenance and turnover costs."[81]

68. In my view, nothing about Mr. Perone's February 2019 email communication would suggest to a reasonable underwriter that the historical financial statements were materially inaccurate, let alone fraudulent. In my experience, it is not unusual for certain "other income" (like termination, cleaning, pet or damages fees) to go uncollected, particularly where, as here, the properties were being run by inexperienced or nonprofessional managers. Nor in my experience is it unusual that "accrual based" financial statements reflect charges that have

[77] Tenzer Report at 25-26.

[78] JPMC-WF-00072008 at 013, 035.

[79] *Compare* JPMC-WF-00072008, *with* JPMC-WF-00145609, *and* JPMC-WF-00007541.

[80] JPMC-WF-00209237 at 237.

[81] *Id.* at 238.

accrued but have not been collected. Tenzer does not offer any evidence or analysis to suggest otherwise.

69. In any event, throughout the subsequent underwriting process, JPMorgan continued to probe differences between the buyer's NOI and ROCO's historical NOI. After Iron Hound sent JPMorgan updated T12s as of February 2019,[82] JPMorgan asked Iron Hound to explain why "2019 Budget NOI [was] below TTM February 2019 NOI" for three specific properties.[83] For two of the properties, Iron Hound responded: "This difference is related to Other Income. Essentially, we removed Other Income items that were one-time charges that were shown as recurring revenue items (i.e. one-time pet fees, cleaning fees, damage fees, etc.)."[84] For the third, Iron Hound explained that "[d]ue to the smaller size of this asset, we believed that it would cost more to operate."[85] Nothing in Iron Hound's responses would suggest to a reasonable underwriter that the financial information provided to JPMorgan was false or fraudulent; rather, they suggest differences in anticipated operation and the perspective of a more sophisticated buyer as to what it was relying on in purchasing the properties.

70. At the same time, JPMorgan asked about a change in miscellaneous revenue (i.e., other income) for the Steeplechase property in new T12s received from Iron Hound: "Why did miscellaneous revenue decline from $616k to $510k from 2018 to TTM Feb?"[86] Iron Hound responded that, "The Seller purchased this property from Connor Real Estate, and Connor ran all of their deals in a unique way that is very fat on utility reimbursement and misc. revenue. They have their own utility billing company that charges very high fees. Additionally, they charged very high cable and internet fees (to another one of the property owner's companies), and fees for all sorts of misc. stuff. When the Seller purchased this property, they reduced the expenses to make leasing efforts easier and switched third party billing providers."[87] Much like the response addressed above, nothing in Iron Hound's response would suggest to a reasonable underwriter that any financial information was false or fraudulent. Nevertheless, the record shows that

[82] JPMC-WF-00185016 at 016.

[83] JPMC-WF-00075725 at 726.

[84] *Id.*

[85] *Id.*

[86] JPMC-WF-00001179 at 181.

[87] JPMC-WF-00001179 at 181-182.

JPMorgan continued to probe adjustments to "other income" during the course of its underwriting.

71. In April 2019, JPMorgan noted "pretty big deltas in some of the 'Other Income' line items" between "the 2018 YE financials" and the "2019 Budget."[88] On April 25, JPMorgan asked Iron Hound: "For the overall portfolio, the 2019B shows Other Income of $3.3mm, whereas TTM March 2019 has Other Income of $6.3mm. Based on our review of the individual models, the primary drivers for this significant decline are reduced Termination Fees and reduced Cleaning and Damages Fees. Can you please elaborate what Cleaning and Damage Fees captures and how you intend to reduce that number post acquisition? How was the Termination Fee line item projected for the 2019 Budget?"[89] Iron Hound responded, "We believe those line items are higher than what we have historically experienced so we took more conservative approach."[90] Notably, Iron Hound's response to JPMorgan's specific inquiry regarding "other income" did not in any way suggest that the financial information was false, inaccurate or incomplete, let alone fraudulent. On the contrary, Iron Hound made clear that the historical "other income" amounts merely reflected "higher [amounts] than what we have historically experienced so we took more conservative approach" in formulating the buyer's budget.[91] Again, nothing in Iron Hound's response would suggest to a reasonable underwriter that any financial information was false or fraudulent.

72. Also on April 25, JPMorgan asked why, for the Steeplechase property, "Cable Income-Upfront Payments anticipated to decline from $376,029 as of TTM March 2019 to $0 for 2019B?"[92] Iron Hound responded, "The referenced cable income line item was a one-time payment and is not expected to occur on an on-going basis."[93] Again, based on my experience in the industry, nothing about Iron Hound's response suggested any financial information was inaccurate, let alone fraudulent.

---

[88] JPMC-WF-00186971.

[89] JPMC-WF-00081940 at 940.

[90] JPMC-WF-00136785 at 785.

[91] *Id.*

[92] JPMC-WF-00136785 at 786.

[93] *Id.*.

73. When the Loan was brought before the Committee in May, the May Memo clearly explained the variances between the historical revenue and the revenue projected by the buyer:

> A significant portion of miscellaneous income for TTM February 2019 is derived from what the Sponsor believes are above-market termination fees and late charges, as well as excessive cleaning and damages fees. The Sponsor believes that as they upgrade the Portfolio, they will be able to attract a higher caliber of tenants, thereby reducing termination fees and cleaning and damages fees. While it is anticipated that this revenue line item will decline in the short-term, it will be more than offset by higher tenant retention and increased rental rates and occupancy.[94]

74. As reflected above, it is entirely unreasonable for Tenzer to suggest that the origination team somehow "painted a false picture of cash flows" for the Committee and "obscur[ed] a legitimate view of the amount and stability of NOI amounts."[95] It is also unreasonable to suggest, as Tenzer does, that JPMorgan "failed to 'carefully analyze'" variances between ROCO's historical T12s and the buyer's pro forma budget.[96] The preceding paragraphs clearly disprove this assertion. Further, Meyer Chetrit (on behalf of the buyer) certified to JPMorgan that the financial information provided to JPMorgan was "true, complete and correct in all material respects,"[97] and it was entirely reasonable for JPMorgan to rely on that representation. Tenzer's failure to grapple with these facts—or even attempt to address the buyer's certification to the truth, completeness and correctness of the financial information it provided—demonstrates that his opinions are unsupported and unreliable.

### 3. JPMorgan Did Not "Waive[]" Bank Statement Reconciliation, as Tenzer Asserts, Nor Does Bank Statement Reconciliation Serve the Purpose Tenzer Claims.

75. Tenzer asserts in Opinion 2.3 that JPMorgan "waived" its typical bank statement reconciliation, and that bank statements are "the primary independent verification tool for T12 financials."[98] Tenzer is wrong on both points.

---

[94] JPMC-WF-00003989 at 022; *see also* JPMC-WF-00149721 at 748 (June Addendum).

[95] Tenzer Report at 25-26.

[96] *Id.* at 41-44 (Opinion 4.2).

[97] Loan Agreement § 4.1.11.

[98] Tenzer Report at 26.

76. JPMorgan by no means "waived" its review of bank statements in underwriting the Loan. JPMorgan included a request for property bank statements in the initial diligence checklist it sent to the Iron Hound in March 2019, consistent with the Guidelines, and was informed by Iron Hound that property bank statements were not available.[99]

77. In my experience, the availability of property bank statements varies depending on the type of transaction, as does their importance to the lender's underwriting. In a refinancing, where the borrower already owns the collateral properties, bank statements should be readily available and provided to the lender. In acquisition financing, however, bank statements may not be readily available to the borrower, or to the lender. Tenzer is thus wrong to claim that it is "suspect" that the borrower did not have access to ROCO's property bank statements.[100]

78. Moreover, bank statements do not serve the purpose Tenzer suggests in acquisition financing. Bank statements are typically used to verify rental income. JPMorgan's Guidelines confirm this: the Guidelines recommend that the origination team "[c]omplete a reconciliation of actual cash receipts (bank deposits) to the monthly rents used for underwriting."[101] There are other sources of information that lenders may use to verify other aspects of the T12s, including the appraiser's analysis of income and expense items of comparable properties.

79. In any event, JPMorgan continued to follow up with the buyer's advisors until they procured a sampling of bank statements for certain properties in the ROCO portfolio.[102] On June 6, 2019, Iron Hound provided JPMorgan with a sampling of bank statements for Galloway Apartments, Hickory Ridge, Hilliard Village, Northwood, and Riverside Ranch, dated April 30, 2019.[103] Together, these five properties represented nearly 23% of the underwritten NOI reflected in the Offering Circular.[104]

---

[99] JPMC-WF-00185669 at 669. Tenzer claims without support that the "N/A" notation JPMorgan made in the diligence checklist indicated that bank statements were "not applicable" as opposed to "not available." Tenzer Report at 11; *see* Stromberg Tr. at 206 ("Could be 'not available.'").

[100] Tenzer Report at 27.

[101] *Id.* at 26 (citing JPMC-WF-00487307 at 345).

[102] *See, e.g.*, JPMC-WF-00128898 at 898 (March 2019); JPMC-WF-00131951 at 951 (April 2019); JPMC-WF-00131958 (April 2019); JPMC-WF-00151578 at 580 (May 2019); JPMC-WF-00148265 at 266 (June 2019).

[103] JPMC-WF-00005896 at 896; JPMC-WF-00005898; JPMC-WF-00005901; JPMC-WF-00005905; JPMC-WF-00005909; JPMC-WF-00005915.

[104] JPMC-WF-00063888 at 174 (Offering Circular at A-3).

80. JPMorgan e-mailed Situs the April bank statements for the five properties received to reconcile the bank statements against historical financials for the properties.[105] Situs responded with the result of the reconciliation of the bank statements in an email of June 10, 2019.[106] For the five properties, the total difference was a positive $42,529 (about 3.4%).[107] In my experience, given that the analysis of the available bank statements revealed a positive cash flow, a reasonable underwriter reviewing that information would not conclude that further analysis of bank statements was required to proceed with the loan. Indeed, in my opinion, it would have been commercially reasonable for JPMorgan to underwrite the Loan without receiving any bank statements, given the universe of other information JPMorgan received during the underwriting process.

81. JPMorgan also inquired into whether the Buyer or its agents had reviewed the bank statements and compared them against the Seller's operating statements.[108] In response, Post Road Management, another advisor to the Chetrit Group, stated that it had "sampled a handful of properties [and] compared bank statements to collections on operating statements and found no meaningful discrepancies."[109] This additional information only further supports my view that a reasonable underwriter could conclude that further inquiry into and analysis of bank statements was not required to proceed with the loan.

82. This analysis by multiple parties did not reveal that any financial information provided to JPMorgan was untrue, incomplete or incorrect in any material respect, let alone that any such information was the result of fraud by ROCO. Tenzer asserts that, "[i]f JPMorgan had requested, reviewed, and reconciled the bank statements with the T12s," the "income and expense items could have been tied out and those that were manipulated could have been uncovered."[110] But Tenzer provides no evidence or analysis to support that assertion. Tenzer does not appear to

[105] SITUS_0020164 at 164.

[106] SITUS_0021687 at 687.

[107] *Id.*

[108] JPMC-WF-00007602 at 602.

[109] *Id.*

[110] Tenzer Report at 28-29.

have reviewed any bank statements, and he provides no explanation how a review of bank statements would have "uncovered" ROCO's fraud.[111]

83. Moreover, suggesting that had JPMorgan done something more it would have uncovered a fraud we now know to exist is an example of hindsight bias—backing into a conclusion when one already knows the outcome. It is easy, knowing what happened, to look back and say had JPMorgan done something more it would have uncovered a fraud it did not in fact know about. But this is very different than evaluating whether the inquiry JPMorgan made in the course of underwriting the loan was reasonable in light of the information known at the time. Underwriting a loan is different than conducting a forensic audit. JPMorgan's analysis and diligence in the course of underwriting the loan was extensive and reasonable.

#### 4. Tenzer's View of "Non-Recurring Income" Is Inconsistent with Underwriting Best Practices.

84. In arguing that JPMorgan's underwriting was somehow inconsistent with "customary industry practices and procedures," Tenzer claims that JPMorgan erroneously "included one-time and non-recurring income in the underwriting base," contrary to the Guidelines' direction that unsustainable income be excluded from underwritten NOI.[112] Tenzer also claims without support that removing certain types of income from JPMorgan's underwriting "would have highlighted the anomalous manipulation in ROCO's T12s."[113] These claims are misguided and unreliable for a number of reasons.

85. First, loan underwriting is based on each individual lender's view of NOI for a particular property or portfolio of properties in a specific transaction. As such, there is no one set definition of what constitutes unsustainable, "one-time," or "non-recurring" income, nor a single standard for factoring such income into a lender's underwriting. This is part of the reason JPMorgan's Guidelines explicitly provide that origination teams may deviate from the Guidelines when the circumstances warrant. As such, Tenzer's individual view as to whether,

---

[111] Tenzer half-heartedly re-raises his argument that JPMorgan "waived its typical bank statement reconciliation" in his discussion of additional steps JPMorgan purportedly failed to take after learning that ROCO's financial information was inaccurate. *See id.* at 47. Even if JPMorgan had learned of such inaccuracies—which it did not—JPMorgan did not waive its bank statement reconciliation, and Tenzer does not even attempt to show that bank statement reconciliation could have possibly revealed ROCO's fraud.

[112] *Id.* at 21, 29-30.

[113] *Id.* at 30.

*e.g.*, pet fees should be underwritten has no bearing whatsoever on the reasonableness of JPMorgan's underwriting.

86. Second, in my experience, the types of income Tenzer considers to be one-time or non-recurring—pet fees, cleaning fees, damage fees—are, in fact, recurring revenue. Taking pet fees as an example, there are generally two types of pet fees for residential properties: a one-time fee charged when a pet moves into a unit, and a monthly fee. Monthly pet fees obviously recur. But even one-time pet fees may be considered recurring given the rate of turnover in a multifamily property. If, for instance, a multifamily residential complex experiences tenant turnover in roughly 50% of units annually, there will likely be new pets moving in each year and new charges of "one-time" pet fees. The same analysis can be applied to cleaning and other "one-time" fees associated, which recur upon a change in tenants.

87. Third, Tenzer again places too much importance on historical financial information for the ROCO acquisition financing. He argues that other income should not have been underwritten for the nine properties for which JPMorgan did not receive 2017 T12s.[114] As underwriting is meant to be a forward-looking exercise of NOI a property may generate, the borrower's business plan is often a more reliable basis for underwriting income than two-year-old T12s. Moreover, 2017 T12s were not provided for those nine properties because the seller did not own the properties in 2017. It would be needlessly draconian, not to mention illogical, to exclude income generated by those properties in a forward-looking underwriting for this reason. Underwriting necessary involves an exercise of judgment. Tenzer argues based on hindsight that he would have exercised his judgment differently than JPMorgan did. That is not a reasonable basis on which to assert that JPMorgan's underwriting was in some way deficient or divergent from industry practice. Even if Tenzer would personally have assumed the 17 properties not owned by ROCO in 2017 would have zero other income going forward (a view I frankly find wrong), it was not unreasonable for the JPMorgan professionals underwriting the Loan to presume they would have such other income and consider it in their analysis of future cash flows.

---

[114] *Id.* at 29.

88. Given all these flaws in Tenzer's assessment of one-time or non-recurring income, it makes no sense to claim that removing these income items from JPMorgan's underwriting would somehow have revealed ROCO's fraudulent manipulation of T12s.[115]

### 5. JPMorgan Did Not "Accept[] the Borrower's Expense 'Right-Sizing' at Face Value."

89. Tenzer claims that, because JPMorgan incorporated the borrower's pro forma operating expenses into its underwritten NOI, JPMorgan missed an opportunity to "identif[y] the anomalous manipulation in ROCO's T12s."[116] This is another example of backing into a conclusion in hindsight based on knowing what happened rather than evaluating JPMorgan's underwriting of the Loan based on contemporaneous circumstances. It is entirely reasonable, if not preferable, to underwrite to the borrower's projected operating expenses in a value-add acquisition financing. Even so, JPMorgan did not merely accept the borrower's projected operating expenses at "face value," but instead repeatedly questioned why the borrower had a different view of operating expenses than the seller. And ultimately, JPMorgan's underwritten cash flows were lower than those used by the borrower.

90. First, it makes no sense to fault JPMorgan for using the borrower's operating expenses in its underwritten NOI. JPMorgan knew throughout the underwriting process that the borrower viewed the ROCO portfolio as a value-add proposition. As stated in the March Memo, the borrower told JPMorgan that it intended to "invest[] an estimated $39.5 million across value-add capital projects and deferred maintenance items."[117] By the time of the May Memo, this planned investment had increased to $40 million, and was to be accompanied by an investment "of $14.9 million or $333 per unit per year for ongoing capital needs across the entire Portfolio over the five-year Loan term."[118] In these circumstances, it would be reasonable to—and I would expect to—underwrite operating expenses to the borrower's pro forma budget.

---

[115] In something of a non sequitur, Tenzer claims that the "borrower's pro forma NOI was nearly 50% less than the historical financial information in the T12s." Tenzer Report at 30. This is simply not true. The borrower's Budget NOI was $43.3 million and the T12 NOI was $38.6 million. Additionally, JPMorgan's underwritten NOI was lower than both the Budget NOI and the T12 NOI at $37.1 million.

[116] Tenzer Report at 32.

[117] JPMC-WF-00209845 at 850.

[118] JPMC-WF-00003989 at 994.

91. Second, as already discussed, JPMorgan repeatedly inquired as to the differences based on the borrower's "right-sizing" of operating expenses. As early as February 2019, when Iron Hound first informed JPMorgan that they had "'right-sized' operating expenses by ~$375 per unit," JPMorgan asked for an explanation of the "right-sizing."[119] Iron Hound's response—that the right-sizing was captured in "[r]epairs and maintenance and turnover costs"—was consistent with the borrower's value-add view of the ROCO portfolio.[120]

92. And in May, JPMorgan inquired in a list of diligence questions to Iron Hound: "Repairs and Maintenance expense was $5.05mm as of TTM February 2019 and is projected to increase to $6.9mm for the 2019 Budget. What is driving this budgeted increase in R&M expense? How does this interplay with the planned capital expenditure programs?"[121] Iron Hound responded, "The Seller did not spend much on repairs and maintenance of the Properties. Therefore, we 'right-sized' this figure to conform to what we thought was realistic and what we typically spend across our other 8,000+ units. Capital expenditures will hopefully drive down these anticipated costs, but o[u]r 2019 projection for R&M represents a conservative approach."[122] In my experience, these were the right questions to ask, and the responses Iron Hound provided are reasonable and would give a reasonable underwriter comfort in relying on the buyer's projection.

93. Moreover, with Situs's assistance, JPMorgan reviewed three years' worth of historical capital expenditure information for the properties and summarized this information for the Committee.[123] This information would provide a reasonable underwriter additional comfort in relying on the buyer's projection.

94. Finally, as with Tenzer's assertions about "one-time" or "non-recurring" income, Tenzer provides no evidence or analysis to support his naked assertion that some adjustment to JPMorgan's underwriting somehow would have revealed ROCO's fraudulent inflation of the NOI in historical T12s. Instead, Tenzer's analysis appears to be based on nothing more than hindsight bias.

---

[119] JPMC-WF-00209237 at 237.

[120] *Id.*

[121] JPMC-WF-00190126 at 126.

[122] *Id.*

[123] JPMC-WF-00209845; JPMC-WF-00792561.